**Objection Deadline: May 27, 2016 at 4:00 p.m. (CT)**
**Hearing Date: June 6, 2016 at 9:00 a.m. (CT)**

Stephen A. Youngman (22226600)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777

Gary T. Holtzer (*pro hac vice*)
Kelly DiBlasi (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

------------------------------------------------------------ x
                                                             :
*In re:*                                                     :          **Chapter 11**
                                                             :
**CHC GROUP LTD.** *et al.,*                                 :          **Case No. 16–31854 (BJH)**
                                                             :
                                                             :
            **Debtors.**                                     :          **(Jointly Administered)**
                                                             :
------------------------------------------------------------ x

**APPLICATION PURSUANT TO SECTIONS 363(b) AND 105(a)**
**OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS TO**
**(I) EMPLOY AND RETAIN CDG GROUP, LLC TO PROVIDE**
**THE DEBTORS A CHIEF RESTRUCTURING OFFICER**
**AND ADDITIONAL PERSONNEL AND (II) DESIGNATE**
**ROBERT A. DEL GENIO AS THE CHIEF RESTRUCTURING OFFICER**
**FOR THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON JUNE 6, 2016 AT 9:00 A.M. IN COURTROOM #2, 14TH FLOOR OF THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION, EARLE CABEL FEDERAL BUILDING, 1100 COMMERCE ST., DALLAS, TEXAS 75242.**

TO THE HONORABLE BARBARA J. HOUSER, UNITED STATES BANKRUPTCY

JUDGE:

CHC Group Ltd. and its above-captioned debtor affiliates, as debtors and debtors

in possession (collectively, the "**Debtors**")[1] respectfully represent:

### Relief Requested

1.      The Debtors submit this application (the "**Application**") pursuant to

sections 363(b) and 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), for

authority to employ and retain CDG Group, LLC ("**CDG**") for the purpose of providing a chief

restructuring officer (the "**CRO**") and additional personnel to assist the Debtors with the

restructuring process, and (ii) designate Robert A. Del Genio as CRO to the Debtors, in

accordance with the terms and conditions of that certain engagement letter, dated April 26, 2016,

including any amendments, schedules, and attachments thereto (the "**Engagement Letter**"),

*nunc pro tunc* to the Petition Date (as defined below).[2]

2.      A declaration in support of this Application is annexed hereto as

**Exhibit B** (the "**Del Genio Declaration**").  A copy of the Engagement Letter is annexed hereto

as **Exhibit C**.  A proposed form of order approving the Application is annexed hereto as

**Exhibit D**.

---

[1] A list of the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, where applicable, is attached hereto as **Exhibit A**.

[2] This Application summarizes the terms of the Engagement Letter.  To the extent that there is a conflict between the summary herein and the terms of the Engagement Letter, the terms of the Engagement Letter shall govern. Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Engagement Letter.

## Jurisdiction and Venue

3.      This Court has jurisdiction to consider this matter pursuant to 28

U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

4.      On May 5, 2016 (the "**Petition Date**"), each of the Debtors commenced a

voluntary case under chapter 11 of the Bankruptcy Code in this Court.  The Debtors are

authorized to operate their businesses and manage their properties as debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) and Rule

1015-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern

District of Texas (the "**Local Rules**").

## The Debtors' Businesses

6.      The Debtors, together with their non-debtor affiliates (collectively,

"**CHC**"), comprise a global commercial helicopter service company, primarily engaged in

providing helicopter services to the offshore oil and gas industry.  CHC also provides helicopter

services for search and rescue and emergency medical services to various government agencies.

In addition, CHC maintains the industry's largest independent helicopter maintenance, repair,

and overhaul business, which services CHC's helicopter fleet as well as third-party customers.

CHC manages its domestic and overseas businesses from Irving, Texas and its sales force from

an office in Houston, Texas.  CHC maintains one of its primary engine overhaul facilities in Fort

Collins, Colorado.  Only certain entities within CHC – primarily the issuers or guarantors of the

Debtors' funded debt – are Debtors in these proceedings.  CHC's other entities, including certain

operating entities, are not debtors in these cases and are continuing to conduct their businesses in the ordinary course.

7.      Additional information about the Debtors' businesses, capital structure and the circumstances leading to the commencement of these chapter 11 cases can be found in the *Declaration of Robert A. Del Genio in Support of the Debtors' Chapter 11 Petitions and Request for First Day Relief*, [Docket No. 13], filed on the Petition Date.

## CDG's Retention

### A.    CDG's Qualifications

8.      In consideration of the size and complexity of their businesses, as well as the exigencies of these chapter 11 cases, the Debtors have determined that the services of an experienced CRO will substantially enhance their attempts to maximize the value of their businesses.   After interviewing other financial advisory firms, the Debtors selected Mr. Del Genio to serve as CRO and additional CDG personnel in connection with that role.  This decision was based on Mr. Del Genio's and CDG's longstanding reputations for assisting companies through complex financial restructurings, including bankruptcy reorganizations, and their high degree of success in a wide range of industries.

9.      CDG is a financial advisory firm that provides restructuring, crisis and turnaround management, and merger and acquisition services, with a major focus on crisis management and the restructuring of under-performing companies, including in the context of a chapter 11 filing.  CDG has extensive experience in providing financial advisory services in reorganization proceedings, and has an excellent reputation for the services it has rendered in chapter 11 cases on behalf of debtors and creditors throughout the United States.

10.     Since 1998, when CDG was founded, it has advised on over 300 restructuring and interim management transactions with a total deal value in excess of $40

4

billion. Some of CDG's prior engagements include, among numerous others, Adelphia Communications Corporation, Avondale Mills, Inc., Caraustar, Inc., Dan River, Inc., Encompass Services, Inc., Factory Card Outlet, Finish Line, Inc., Journal Register Company, Linens 'n Things, Mariner Health Group, Inc., Malden Mills Industries, Inc., MicroAge, Inc., Milacron, Inc., Montgomery Ward, LLC, Orius Corp., Ovation Brands, Panavision, Inc., Reichhold Holdings US, Inc., RHI Entertainment LLC, Sharper Image Corporation, The Penn Traffic Company, TransCentra, Inc., USInternetworking, Inc., and Wheeling Pittsburg Steel Group.

11.     Mr. Del Genio is a Managing Member and one of the founders of CDG, a financial advisory firm that provides restructuring, crisis and turnaround management, and merger and acquisition services.

12.     As set forth in the Del Genio Declaration, CDG was engaged prior to the Petition Date to provide financial and restructuring advisory services to the Debtors pursuant to the Engagement Letter. As a result of its prepetition work for the Debtors, CDG's professionals are familiar with the Debtors' corporate and capital structure, management, and various other aspects of the Debtors' businesses. CDG has a well-developed knowledge of the Debtors' financial history and business operations and is well-suited to provide the Debtors with services contemplated by the Engagement Letter.

13.     Accordingly, the Debtors submit that the retention of CDG on the terms and conditions set forth in the Engagement Letter is necessary and appropriate, is in the best interests of the Debtors' creditors and all other parties in interest, and should be granted.

**B.     Scope of Services**

14.     Mr. Del Genio will lead the engagement and will be made available to serve as the CRO of the Debtors, reporting to the Board of Directors of the Debtors. In addition,

among other things, and pursuant to the terms and conditions of the Engagement Letter, CDG

will:

(a) be the principal driver of the restructuring processes and collaborate with the Debtors' professionals and management to coordinate the restructuring process and manage to the agreed upon timeline;

(b) assist the Debtors' management to ensure that all required information and data is provided to advisors on a timely basis;

(c) analyze, prepare and review the new cash forecasting and liquidity management model, assist with future liquidity management, and validate assumptions;

(d) develop and evaluate strategic alternatives for recommendation to the Debtors' management;

(e) work with the Debtors' advisors, on behalf of the Debtors, in the preparation, design, and presentation of a formal restructuring proposal to accompany the business plan;

(f) assist the Debtors in connection with any chapter 11 filing under the Bankruptcy Code or any foreign insolvency regime;

(g) participate in negotiations with the various groups affected by the restructuring proposal and their respective advisors;

(h) provide periodic status reports to the Board of Directors, creditor constituents, senior management and the other advisors with respect to the progress of the restructuring; and

(i) perform such other services and analyses relating to the restructuring effort as are or become consistent with the foregoing items, or as the parties to the Engagement Letter mutually agree (subparagraphs (a) through (i) inclusive are collectively referred to herein as the "**Services**").

**C.     Professional Compensation**

15.     Subject to the Court's authorization, the Debtors request that CDG be

compensated pursuant to the terms and conditions of the Engagement Letter (the "**Fee**

**Structure**").  The principle terms of the Fee Structure are as follows:

(a)     Monthly Fee:  A monthly fee of $300,000.

(b) <u>Restructuring Fee</u>: If a restructuring is consummated, CDG shall be entitled to receive a transaction fee (the "**Restructuring Fee**"), equal to $1,000,000. For the avoidance of doubt, CDG shall, in no event, be entitled to more than one Restructuring Fee. The Restructuring Fee shall be payable in full on the date of the closing of a restructuring.

(c) <u>Expenses</u>: CDG will bill monthly in arrears for the reimbursement of all of its reasonable and documented out-of-pocket expenses (including, but not limited to, travel costs, lodging, meals, research, telephone and facsimile, courier, overnight mail, and copy expenses), incurred in connection with CDG's obligations under the Engagement Letter.

16. The Fee Structure summarized above and described more fully in the Engagement Letter is consistent with, and typical of, arrangements entered into by CDG and other financial advisory and consulting firms with the rendering of comparable services to clients such as the Debtors. CDG and the Debtors believe that the Fee Structure is both reasonable and market-based and should be approved.

**D.   <u>Record Keeping</u>**

17. It is not the general practice of financial advisory and consulting firms, including CDG, to keep detailed time records similar to those customarily kept by attorneys. CDG does not ordinarily charge for its services or maintain contemporaneous time records on an hourly or daily basis. Nonetheless, CDG will maintain time records, in a summary format, containing a description of the services rendered by each professional and the amount of time spent on a daily basis by each such individual in rendering services on behalf of the Debtors. CDG will also maintain detailed records of any actual and necessary costs and expenses incurred in connection with the aforementioned services.

**E.   <u>Indemnity</u>**

18. As part of the overall compensation payable to CDG under the terms of the Engagement Letter, the Debtors have agreed to the indemnification provisions described in the Engagement Letter (the "**Indemnification Provisions**"). The Indemnification Provisions

provide, among other things, that the Debtors will indemnify and hold harmless CDG and its affiliates, consultants, and independent contractors and each of their respective members, officers, directors, employees, agents, controlling parties, and representatives with respect to certain Losses. The Debtors are not liable under the Indemnification Provisions to the extent that any Loss is found in a final judgment, by a court of competent jurisdiction, on the merits, to have primarily resulted from such indemnified party's bad faith, self-dealing, gross negligence, or willful misconduct.

19.     The terms of the Engagement Letter, including the Indemnification Provisions, were fully negotiated between the Debtors and CDG at arm's length, and the Debtors respectfully submit that the Indemnification Provisions are customary, reasonable and in the best interests of the Debtors and their estates. Accordingly, as part of this Application, the Debtors request that this Court approve the Indemnification Provisions.

## F.     Prepetition Payments to CDG

20.     In the 90 days prior to the Petition Date, CDG received retainers and payments totaling $ 1, 321,552.15 in the aggregate for services performed for the Debtors and reimbursable expenses incurred in connection with the performance of those services. CDG has applied these funds to amounts due for services rendered and expenses incurred prior to the Petition Date. Of these amounts, $550,000 remained as a credit balance as of the Petition Date in favor of the Debtors for future professional services to be performed and expenses to be incurred.

## G.     Efforts to Avoid Duplication of Services

21.     CDG's services are intended to complement, and not duplicate, the services to be rendered by any other professional retained by the Debtors in these chapter 11 cases. CDG has informed the Debtors that it understands that the Debtors have retained and may retain additional professionals during the term of the engagement and will use its reasonable

efforts to work cooperatively with such professionals to integrate any respective work conducted by the professionals on behalf of the Debtors.

**H.**      **CDG's Disinterestedness**

22.      CDG has reviewed the list of interested parties provided by the Debtors. To the best of CDG's knowledge as of the date hereof, and except to the extent disclosed herein and in the Del Genio Declaration, CDG: (i) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code; (ii) does not hold or represent an interest adverse to the Debtors' estates; and (iii) has no connection to the Debtors, their creditors or related parties.

23.      Given the large number of parties-in-interest in these chapter 11 cases, and despite the efforts to identify and disclose CDG's relationships with parties-in-interest in these chapter 11 cases, CDG is unable to state with certainty that every client relationship or other connection has been disclosed in the Del Genio Declaration. CDG will make continued inquiries following the filing of the Application, on a periodic basis, with additional disclosures to this Court if necessary or otherwise appropriate.

24.      The Debtors are informed that CDG will not share any compensation to be paid by the Debtors, in connection with services to be performed after the Petition Date, with any other person, other than other principals and employees of CDG, to the extent required by section 504 of the Bankruptcy Code.

**Basis for Relief**

25.      The Debtors seek approval of the employment of CDG pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, *nunc pro tunc* to the Petition Date. Section 363(b)(1) of the Bankruptcy Code, provides, in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Further, pursuant to section 105(a) of the Bankruptcy Code, the

"court may issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a).

26.     Under applicable case law, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved. *See*, *e.g., Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring an "articulated business justification"); *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, the court defers to the trustee's judgment so long as there is a "legitimate business justification"); *In re Del. & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)).

27.     Courts have applied the section 363(b) standard when a debtor employs one or more individuals to serve as restructuring officers or managers. *See In re Tokheim Corp.*, Case No. 02-13437 (RJN) (Bankr. D. Del. Feb. 25, 2003).  The retention of interim corporate officers and other temporary employees, therefore, is proper under section 363 of the Bankruptcy Code.  This Court and other courts have authorized retention of officers utilizing this provision of the Bankruptcy Code on numerous occasions.  *See*, *e.g. In re Mirant Corporation*, *et al.*, Case No. 03-46590 (DML) (Bankr. N.D.Tex. Sept. 29, 2003) (Docket. No. 999), *In re Pilgrim's Pride Corporation*, Case No. 08-45664 (Bankr. N.D. Texas. Feb. 9, 2009) (Docket. No. 825); *In re PRC, LLC*, Case No. 08-10239 (MG) (Bankr. S.D.N.Y. Feb. 27, 2008) (Docket. No. 182); *In re Bally Total Fitness of Greater N.Y., Inc.*, Case No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 1, 2007) (Docket. No. 72); *In re Dana Corp.*, Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. Mar. 6, 2006) (Docket. No. 84); *In re Penn Traffic Company*, Case No. 03-22945 (ASH) (Bankr.

S.D.N.Y. June 3, 2003) (Docket. No. 31); *In re Acterna Corp.*, Case No. 03-12837 (BRL) (Bankr. S.D.N.Y. May 6, 2003) (Docket. No. 44).

28.     The resources, capabilities, and experience of Mr. Del Genio and CDG in advising the Debtors are crucial during these chapter 11 cases.  Mr. Del Genio and CDG have extensive experience and excellent reputations for providing high quality financial advisory services to debtors and creditors in large and complex chapter 11 cases and other debt restructurings.  They already possesses a well-developed knowledge of the Debtors' financial history and business operations and are well-suited to provide the Debtors with the financial and restructuring management services contemplated in the Engagement Letter.

29.     Accordingly, the Debtors submit that the relief requested in the Application is in the best interests of the Debtors' estates and all parties-in-interest to these chapter 11 cases.

## Notice

30.     No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases.  Notice of this Application shall be given to:  (i) the Office of the United States Trustee for the Northern District of Texas; (ii) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (iii) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, Bank of America Tower, New York, NY 10036 (Attn: Michael S. Stamer, Esq.), counsel to an informal group of certain unaffiliated holders of the 9.250% Senior Secured Notes Due 2020; (iv) Norton Rose Fulbright, 2200 Ross Avenue, Suite 3600, Dallas, TX 75201 (Attn: Louis R. Strubeck, Jr., Esq. and Richard P. Borden, Esq.), counsel to certain secured lenders under the Revolving Credit Agreement; (v) Paul Hastings LLP, 75 East 55th Street, New York, NY 10022 (Attn: Leslie A. Plaskon, Esq. and Andrew V. Tenzer, Esq.), counsel to certain secured lenders under the ABL Credit Agreement; (vi) The Bank of New York Mellon, 101

Barclay Street, Floor 4 East, New York, NY 10286 (Attn: International Corporate Trust), in its capacity as indenture trustee under the 9.250% Senior Secured Notes due 2020 and under the 9.375% Senior Notes due 2021; (vii) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10178 (Attn: Glenn E. Siegel, Esq. and Rachel Jaffe Mauceri, Esq.), counsel to the indenture trustee under the 9.250% Senior Secured Notes due 2020; (viii) the Board of Equalization, PO Box 942879, Sacramento, Ca. 94279; (ix) the Securities and Exchange Commission; (x) the Office of the United States Attorney, 1100 Commerce Street, 3rd Floor, Dallas, TX 75242; (xi) the Internal Revenue Service; (xii) all parties who have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002; and (xiii) CDG Group, LLC, 650 Fifth Avenue, New York, NY 10019 (Attn: Kenneth E. Adelsberg). The Debtors respectfully submit that no further notice of this Application is required.

**<u>No Previous Request</u>**

31.     No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated:   May 13, 2016
         Dallas, Texas

Respectfully Submitted,


*/s/ Hooman Yazhari*
By:     Hooman Yazhari
Title:   General Counsel and CAO
CHC Group Ltd.

## EXHIBIT A

### Debtors

| Debtor | Last Four Digits of Federal Tax I.D. No. | Debtor | Last Four Digits of Federal Tax I.D. No. |
|---|---|---|---|
| CHC Group Ltd. | 7405 | CHC Hoofddorp B.V. | 2413 |
| 6922767 Holding SARL | 8004 | CHC Leasing (Ireland) Limited | 8230 |
| Capital Aviation Services B.V. | 2415 | CHC Netherlands B.V. | 2409 |
| CHC Cayman ABL Borrower Ltd. | 5051 | CHC Norway Acquisition Co AS | 6777 |
| CHC Cayman ABL Holdings Ltd. | 4835 | Heli-One (Netherlands) B.V. | 2414 |
| CHC Cayman Investments I Ltd. | 8558 | Heli-One (Norway) AS | 2437 |
| CHC Den Helder B.V. | 2455 | Heli-One (U.S.) Inc. | 9617 |
| CHC Global Operations (2008) ULC | 7214 | Heli-One (UK) Limited | 2451 |
| CHC Global Operations Canada (2008) ULC | 6979 | Heli-One Canada ULC | 8735 |
| CHC Global Operations International ULC | 8751 | Heli-One Holdings (UK) Limited | 6780 |
| CHC Helicopter (1) S.à r.l. | 8914 | Heli-One Leasing (Norway) AS | 2441 |
| CHC Helicopter (2) S.à r.l. | 9088 | Heli-One Leasing ULC | N/A |
| CHC Helicopter (3) S.à r.l. | 9297 | Heli-One USA Inc. | 3691 |
| CHC Helicopter (4) S.à r.l. | 9655 | Heliworld Leasing Limited | 2464 |
| CHC Helicopter (5) S.à r.l. | 9897 | Integra Leasing AS | 2439 |
| CHC Helicopter Australia Pty Ltd | 2402 | Lloyd Bass Strait Helicopters Pty. Ltd. | 2398 |
| CHC Helicopter Holding S.à r.l. | 0907 | Lloyd Helicopter Services Limited | 6781 |
| CHC Helicopter S.A. | 6821 | Lloyd Helicopter Services Pty. Ltd. | 2394 |
| CHC Helicopters (Barbados) Limited | 7985 | Lloyd Helicopters International Pty. Ltd. | 2400 |
| CHC Helicopters (Barbados) SRL | N/A | Lloyd Helicopters Pty. Ltd. | 2393 |
| CHC Holding (UK) Limited | 2198 | Management Aviation Limited | 2135 |
| CHC Holding NL B.V. | 6801 | | |

# EXHIBIT B

**Del Genio Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

--------------------------------------------------------- x

                                                          :

*In re:*                                                  :          **Chapter 11**

                                                          :

**CHC GROUP LTD.** *et al.,*                              :          **Case No. 16–31854 (BJH)**

                                                          :

                                                          :

**Debtors.**                                              :          **(Jointly Administered)**

                                                          :

--------------------------------------------------------- x

**DECLARATION OF ROBERT A. DEL GENIO IN SUPPORT OF DEBTORS'
APPLICATION FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS
363(b) AND 105(a) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO
(I) EMPLOY AND RETAIN CDG GROUP, LLC TO PROVIDE THE DEBTORS A
CHIEF RESTRUCTURING OFFICER AND ADDITIONAL PERSONNEL AND (II) TO
DESIGNATE ROBERT A. DEL GENIO AS THE CHIEF RESTRUCTURING OFFICER
FOR THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE**

I, Robert A. Del Genio, hereby declare under penalty of perjury:

1.      I am a Managing Member and founder of CDG Group, LLC ("**CDG**"), a financial

advisory firm that provides restructuring, crisis and turnaround management, and merger and

acquisition services.  CDG maintains its principal office at 650 Fifth Avenue, New York, New

York 10019.  I am duly authorized to make this declaration on behalf of CDG (the

"**Declaration**") in support of the Debtors' application to (i) employ and retain CDG to provide

the Debtors a chief restructuring officer and additional personnel, and (ii) designate me as Chief

Restructuring Officer ("**CRO**") under the terms and conditions set forth in the Application (the

"**Application**") and that certain engagement letter, dated April 26, 2016, including any

amendments, schedules, and attachments thereto (the "**Engagement Letter**").[1]

---

[1] Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the
Application.

2.      Although neither CDG nor myself are being employed as estate professionals pursuant to section 327 of the Bankruptcy Code, I still submit this Declaration out of an abundance of caution and for the Court's benefit.

3.      Except as otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein and, if called as a witness, I would testify thereto.  Certain of the disclosures set forth herein relate to matters within the knowledge of other employees of CDG and are based on information provided by them.

4.      To the extent any information disclosed herein requires amendment or modification upon CDG's completion of further review or as additional information becomes available to it, a supplemental affidavit will be submitted to the Court reflecting such amended or modified information.

### CDG's Qualifications

5.      CDG is a financial advisory firm that provides restructuring, crisis and turnaround management, and merger and acquisition services, with a major focus on crisis management and the restructuring of under-performing companies, including in the context of a chapter 11 filing.  CDG has extensive experience in providing financial advisory services in reorganization proceedings, and has an excellent reputation for the services it has rendered in chapter 11 cases on behalf of debtors and creditors throughout the United States.  I am one of the founders of CDG.

6.      Since 1998, when CDG was founded, it has advised on over 300 restructuring and interim management transactions with a total deal value in excess of $40 billion.  Some of CDG's prior engagements include, among numerous others, Adelphia Communications Corporation, Avondale Mills, Inc., Caraustar, Inc., Dan River, Inc., Encompass Services, Inc., Factory Card Outlet, Finish Line, Inc., Journal Register Company, Linens 'n

Things, Mariner Health Group, Inc., Malden Mills Industries, Inc., MicroAge, Inc., Milacron, Inc., Montgomery Ward, LLC, Orius Corp., Ovation Brands, Panavision, Inc., Reichhold Holdings US, Inc., RHI Entertainment LLC, Sharper Image Corporation, The Penn Traffic Company, TransCentra, Inc., USInternetworking, Inc., and Wheeling Pittsburg Steel Group.

### Scope of Services

7.      I will lead the engagement and will be made available to serve as the CRO of the Debtors, reporting to the Board of Directors of the Debtors.  In addition, among other things, and pursuant to the terms and conditions of the Engagement Letter, CDG will:

(a)     be the principal driver of the restructuring processes and collaborate with the Debtors' professionals and management to coordinate the restructuring process and manage to the agreed upon timeline;

(b)     assist the Debtors' management to ensure that all required information and data is provided to advisors on a timely basis;

(c)     analyze, prepare and review the new cash forecasting and liquidity management model, assist with future liquidity management, and validate assumptions;

(d)     develop and evaluate strategic alternatives for recommendation to the Debtors' management;

(e)     work with the Debtors' advisors, on behalf of the Debtors, in the preparation, design, and presentation of a formal restructuring proposal to accompany the business plan;

(f)     assist the Debtors in connection with any chapter 11 filing under the Bankruptcy Code or any foreign insolvency regime;

(g)     participate in negotiations with the various groups affected by the restructuring proposal and their respective advisors;

(h)     provide periodic status reports to the Board of Directors, creditor constituents, senior management and the other advisors with respect to the progress of the restructuring; and

(i)     perform such other services and analyses relating to the restructuring effort as are or become consistent with the foregoing items, or as the parties to the

Engagement Letter mutually agree (subparagraphs (a) through (i) inclusive are collectively referred to herein as the "**Services**").

### Professional Compensation

8.      Subject to the Court's authorization, the Debtors request that CDG be compensated pursuant to the terms and conditions of the Engagement Letter (the "**Fee Structure**").  The principle terms of the Fee Structure are as follows:

(a)      <u>Monthly Fee</u>:  A monthly fee of $300,000.

(b)      <u>Restructuring Fee</u>:  If a restructuring is consummated, CDG shall be entitled to receive a transaction fee (the "**Restructuring Fee**"), equal to $1,000,000.  For the avoidance of doubt, CDG shall, in no event, be entitled to more than one Restructuring Fee.  The Restructuring Fee shall be payable in full on the date of the closing of a restructuring.

(c)      <u>Expenses</u>:  CDG will bill monthly in arrears for the reimbursement of all of its reasonable and documented out-of-pocket expenses (including, but not limited to, travel costs, lodging, meals, research, telephone and facsimile, courier, overnight mail, and copy expenses), incurred in connection with CDG's obligations under the Engagement Letter.

9.      In the 90 days prior to the Petition Date, CDG received retainers and payments totaling $ 1, 321,552.15 in the aggregate for services performed for the Debtors and reimbursable expenses incurred in connection with the performance of those services.  CDG has applied these funds to amounts due for services rendered and expenses incurred prior to the Petition Date.  Of these amounts, $550,000 remained as a credit balance as of the Petition Date in favor of the Debtors for future professional services to be performed and expenses to be incurred.

10.      The Fee Structure summarized above and described more fully in the Engagement Letter is consistent with CDG's normal and customary billing practices for comparably-sized and complex cases and transactions, both in and out of court, involving the services to be provided in connection with these chapter 11 cases.  Moreover, the Fee Structure is

consistent with and typical of arrangements entered into by CDG and other financial advisory and consulting firms in rendering comparable services to the clients.

## Record Keeping

11.     It is not the general practice of financial advisory and consulting firms, including CDG, to keep detailed time records similar to those customarily kept by attorneys. CDG does not ordinarily charge for its services or maintain contemporaneous time records on an hourly or daily basis.  Nonetheless, CDG will maintain time records, in a summary format, containing a description of the services rendered by each professional and the amount of time spent on a daily basis by each such individual in rendering services on behalf of the Debtors. CDG will also maintain detailed records of any actual and necessary costs and expenses incurred in connection with the aforementioned services.

## Indemnity

12.     As part of the overall compensation payable to CDG under the terms of the Engagement Letter, the Debtors have agreed to the indemnification provisions described in the Engagement Letter (the "**Indemnification Provisions**").  The Indemnification Provisions provide, among other things, that the Debtors will indemnify and hold harmless CDG and its affiliates, consultants, and independent contractors and each of their respective members, officers, directors, employees, agents, controlling parties, and representatives with respect to certain Losses.  The Debtors are not liable under the Indemnification Provisions to the extent that any Loss is found in a final judgment by a court of competent jurisdiction on the merits to have primarily resulted from such indemnified party's bad faith, self-dealing, gross negligence, or willful misconduct.

13.    The terms of the Engagement Letter, including the Indemnification Provisions, were fully negotiated between the Debtors and CDG at arm's length and are customary and reasonable for financial advisory and consulting engagements.

### Efforts to Avoid Duplication of Services

14.    CDG's services are intended to complement, and not duplicate, the services to be rendered by any other professional retained by the Debtors in the chapter 11 cases. CDG has informed the Debtors that it understands the Debtors have retained and may retain additional professionals during the term of the engagement and will use its reasonable efforts to work cooperatively with such professionals to integrate any respective work conducted by the professionals on behalf of the Debtors.

### CDG's Disinterestedness

15.    To determine whether it holds or represents any interests adverse to the Debtors, CDG conducted a review of the individuals and entities that may be parties in interest in these cases, the categories of which are listed on **Schedule 1** to this Declaration (collectively, the "**Potential Parties-in-Interest**").  To the extent that CDG's search of its relationships indicated that CDG currently represents, previously represented during the last two years, or has a connection with any of the Potential Parties-in-Interest, the identities of such Potential Parties-in-Interest as well as the relationship to the Debtors and connection to CDG, are set forth in **Schedule 2** to this Declaration.

16.    Except as set forth in **Schedule 2** to this Declaration, to the best of my knowledge, information, and belief after reasonable inquiry, neither I, nor CDG, nor any member or employee thereof, has any connections with the Debtors, their creditors, the Office of the United States Trustee for the Northern District of Texas, or any other party with an actual or potential interest in the Debtors' cases or their respective attorneys or accountants.

17.     As part of CDG's diverse practice, I personally have appeared in numerous cases, proceedings, and transactions that involve many different professionals, including attorneys, accountants, and financial consultants, who may represent claimants and parties-in-interest in the Debtors' chapter 11 cases.  Also, I personally have performed in the past, and may perform in the future, financial advisory services for various attorneys and law firms, lenders, and creditors, some of whom may be involved in these proceedings.  In addition, I personally have in the past, and will likely in the future be working with or against other professionals involved in these cases in matters unrelated to the Debtors and these cases.  Based on my current knowledge of the professionals involved, and to the best of my knowledge, none of these relationships create interests materially adverse to the Debtors in matters upon which CDG is to be employed, and none are in connection with these cases.

18.     Accordingly, I believe that CDG is a "disinterested person," as defined in Section 101(14) of the Bankruptcy Code.

19.     Even with the substantial efforts described above to identify and disclose potential conflicts and connections with parties-in-interest in this case, in light of the extensive number of creditors and other parties in interest, neither I nor CDG are able to conclusively identify all potential relationships or state with absolute certainty that every client representation or other connection of CDG has been disclosed.  To the extent CDG discovers any facts or additional information during the period of CDG's retention that require disclosure, CDG will supplement the Declaration to disclose such information.

I declare pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on May 13, 2016

_/s/ Robert A. Del Genio_
By:     Robert A. Del Genio
Title:   Managing Member

## **Schedule 1**

### **Interested Parties**

- 5% or More Equity Holders;
- Contract counterparties;
- Bank Lenders - UCC;
- Counsel and Professionals to the Debtor;
- Customers;
- Directors and Officers;
- Institutional Investors – Bond Holders;
- Affiliates – JV Alliances;
- Ordinary Course Professionals
- Ordinary Course Professionals – Foreign Counsel;
- Significant Competitors;
- Unions;
- Governmental Offices and Regulatory Agencies;
- Proposed Debtors' Professionals;
- Insurance Providers and Brokers;
- Litigation Parties;
- Taxing Authorities;
- Vendors;
- Landlords;
- United States Bankruptcy Judges for the Northern District of Texas; and
- United States Trustees for the Northern District of Texas.

**Schedule 2**

**Parties-in-Interest Disclosure**

- Weil, Gotshal & Manges LLP was and is counsel to entities unrelated to the Debtors or this case in situations where CDG has been an advisor.
- Each of the entities on **Attachment A** hereto, and certain of its affiliated, or apparently affiliated, entities, have provided debt or equity financing to, or were otherwise a creditor of, a number of entities unrelated to the Debtors or this case in situations where CDG has been an advisor to or officer of such entities or an advisor to (i) the lender group in which any of such lenders was a member and/or agent or (ii) lender groups in which one or more of such lenders was not a member.
- Each of ExxonMobil Explor & Prod Romania Ltd and ExxonMobil Exploration & Production, or certain of its affiliated, or apparently affiliated, entities, was a counterparty to an executory contract to a company unrelated to this case as to which CDG served as an advisor.
- Each of the entities on **Attachment B** hereto, and certain of its affiliated, or apparently affiliated, entities was an insurance and benefits provider to an entity unrelated to this case in situations where CDG served as an advisor to such entity or its lenders.
- Each of American Express Australia Ltd and Amex Bank of Canada, or certain of its affiliated, or apparently affiliated, entities, was an unsecured creditor to an entity unrelated to this case as to which CDG served as the chief executive officer.
- Ernst & Young, a professional in interest in this bankruptcy matter, was an advisor to an entity unrelated to this case in a situation where CDG an advisor to lenders of such entity.
- Further, as part of its diverse practice, CDG appears in numerous cases, proceedings, and transactions that involve many different professionals, including attorneys, accountants, and financial consultants, who represent claimants and parties-in-interest in chapter 11 cases. Further, CDG has performed in the past, and may perform in the future, advisory consulting services for various attorneys and law firms, and has been represented by several attorneys and law firms, some of whom may be involved in these proceedings. Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these relationships create interests materially adverse to the Debtors and none are in connection with this case.
- CDG does not believe it is a "creditor" of any of the Debtors within the meaning of section 101(10) of the Bankruptcy Code.
- From time to time, CDG has provided services, and likely will continue to provide services, to certain creditors of the Debtors and various other parties adverse to the Debtors in matters unrelated to the Debtors' chapter 11 cases.
- CDG personnel and their family members may have business associations with certain creditors of the Debtors unrelated to the Debtors' chapter 11 cases.
- The Debtors have numerous shareholders, lenders, creditors, and other parties with whom they maintain business relationships. CDG may have advisory or other commercial or professional relationships with such entities or persons unrelated to the Debtors or their business affairs. No such relationships are in any way related to these chapter 11 cases.

- If any new material, relevant facts or relationships are discovered or arise, CDG will promptly file a supplemental declaration pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure.

**Attachment A**

GE Capital Europe
Barclays Bank PLC
JP Morgan Chase
RBC
Standard Bank
UBS
Wells Fargo
Citibank
Deutsche Bank AG New York
Nordea Bank Danmark
Bank of America, National Association
ING Luxembourg SA
Credit Suisse
Bank of Nova Scotia
Liberty Mutual
Liberty Mutual Fire Insurance thru AeroCompTM
AllianceBernstein, L.P. (U.S.)
Royal Bank of Canada
Tennenbaum Capital Partners, LLC
Manulife Asset Management (U.S.), LLC
BlackRock Fund Advisors
Nordea Invesatment Management (Denmark)
Guardian Capital, L.P.
BlackRock Advisors (U.K.), LTD
Oppenheimer Funds, Inc.
AllianceBernstein Japan, LTD
Avenue Capital Management II, L.P.
Invesco PowerShares Capital Management

**<u>Attachment B</u>**

Fidelity Bank
Allianz Insurance Australia Limited
AIG lead
Catlin
Allianz Canada
AIG
AIG Seguros Brasil SA
AIG Resseguros
AIG Seguros
Allianz Brasil
FM Global Brasil
AIG Europe Limited
Mitsui/Allianz Global Corporate & Specialty
Chubb Insurance Company
AIG Insurance Company of Canada
FM Global
Granite State Insurance Company
AIG Europe Ltd Oddzial w Polsce
Allianz Insurance Plc
State Street Global Advisors (SSgA)
General Re-New England Asset Management, Inc.

## **EXHIBIT C**

**Engagement Letter**



CDG Group, LLC
650 Fifth Avenue
New York, New York 10019
Tel: 212 813 1300
www.cdggroup.com

April 26, 2016


Hooman Yazhari
General Counsel
CHC Group Ltd.
190 Elgin Avenue
George Town
Grand Cayman, KY1-9005

Dear Mr. Yazhari:

This letter agreement confirms the engagement of CDG Group, LLC ("CDG") by CHC Group Ltd. (together with its subsidiaries, the "Company") with respect to those items identified in the Scope of Services set forth below and with respect to other services as to which the Company and CDG may agree in writing during the Term (as determined pursuant to Section C below) of this engagement ("Agreement"). All references in this letter to this Agreement shall include Schedule I hereto and Attachment A thereto.


A.      Scope of Services

Commencing on the Effective Date (as defined below), CDG, working collaboratively with the senior management team of the Company, the Board of Directors of the Company and other Company professionals, CDG will assist the Company in evaluating and implementing strategic and tactical options through the restructuring process and perform the services described below. As used herein, the term "Effective Date" shall mean the date that the Company shall have made any chapter 11 filing under the U.S. Bankruptcy Code or any foreign insolvency regime.

   i.      Robert A. Del Genio will lead the engagement and will be made available to serve as the Chief Restructuring Officer of the Company, reporting to the Board of Directors of the Company;

   ii.     CDG will be the principal driver of the Restructuring processes and will collaborate with Company professionals and management to coordinate the Restructuring process and manage to the agreed upon timeline;

       1.   Get up to speed quickly and thoroughly by reviewing all work done to date and vet the Company's views against the views of other professionals (e.g. does the business plan reflect the findings and

views of, and the legal analysis performed by, Seabury Corporate Advisors LLC or other advisors of the Company);

2. Maintain a dedicated team of professionals on the ground and in constant communication with the relevant parties and coordinate the efforts of the management of the Company and the advisors;

iii. Assist the Company management and its team to ensure that all required information and data is provided to advisors on a timely basis;

iv. Analyze, prepare and review new cash forecasting and liquidity management model and assist with future liquidity management as well as validating assumptions and determining runway;

v. Develop and evaluate strategic alternatives for recommendation to the Company's management;

1. Work with the financial advisors of the Company to understand the liquidity and financial performance of the Company, its joint ventures and its divisions (including the Heli-One division); and

2. Determine what the Heli-One division would look like on a stand-alone basis and what transitional services would need to be provided to this business following a potential sale of such division;

vi. Work with Company's advisors, on behalf of the Company, in the preparation, design, and presentation of a formal Restructuring proposal (the "Proposal") to accompany the business plan;

vii. Assist the Company, in connection with the preparation of documents with respect to, and assisting the Company in connection with, any chapter 11 filing under the U.S. Bankruptcy Code or any foreign insolvency regime;

1. Work with senior management to determine what areas of the business will be assisting in providing critical information and which employees will be "brought under the tent";

2. Work closely and discretely with the designated parties to ensure that accurate and timely data is used in the filing documents; and

3. Develop timelines and milestones for the designated parties to keep them on track to achieve the target dates;

viii. Participate in negotiations with the various groups affected by the Proposal and their respective advisors;

      1.    Manage leaseholder and vendor negotiations on behalf of the Company for unfavorable leases, supply agreements, outsourcing arrangements and other unfavorable contracts;

ix.    Provide periodic status reports to the Board of Directors, creditor constituents, senior management and the other advisors with respect to the progress of the Restructuring;

      1.    Drive the Restructuring process on a daily and weekly basis including leading the weekly restructuring calls and manage other related milestones; and

      2.    Ensure management is focused on their day jobs but also are kept up-to-date and involved in the restructuring process as needed; and

x.    Perform such other services and analyses relating to the Restructuring effort as are or become consistent with the foregoing items, or as the parties hereto mutually agree.

In rendering its services to the Company hereunder, CDG is not assuming any responsibility for the Company's underlying business decision to pursue (or not to pursue) any business strategy or to effect (or not to effect) any transaction. CDG shall have no decision-making or policy-making power, and shall only make recommendations to the Company's management and Board of Directors for their decision. The Company agrees that CDG shall not have any obligation or responsibility to provide accounting or audit services for the Company or to otherwise advise with respect to the tax consequences of any proposed transaction directly or indirectly related to our services hereunder. The Company agrees that CDG shall not have any obligation or responsibility to provide any fairness opinions or any advice or opinions with respect to solvency in connection with any transaction (except to the extent specifically provided for in this Agreement). CDG will not perform, directly or indirectly, solicitation services in connection with any transaction providing for the exchange of any security between the Company and its existing security holders. The Company and CDG confirm that each will rely on its own counsel, accountants and other similar expert advisors for legal, accounting, tax and other similar advice.

Notwithstanding anything contained in this Agreement to the contrary, CDG makes no representations or warranties about the Company's ability to (i) successfully complete any transaction or (ii) satisfy its obligations in full or (iii) maintain sufficient liquidity to operate its business.

B.    <u>Fees & Expenses</u>

For CDG's services provided pursuant to this Agreement, it is agreed that the Company shall pay the following cash fees:

i.    Monthly Fee:  A monthly fee of $300,000 (the "Monthly Fee"), which shall be due and paid by the Company, beginning on the date hereof and thereafter in advance on each monthly anniversary thereof during the Term (as determined pursuant to Section C hereof) of this Agreement. Notwithstanding the foregoing, if there shall be for any monthly period a material reduction in the scope of services to be performed by CDG, the Fee for such period shall then be in an amount agreed to by the parties hereto based on the reduced level of services, it being understood that if CDG shall temporarily cease to provide services for a monthly period, then the fees for such period will cease to accrue.

ii.   Restructuring Fee:  If a Restructuring is consummated, CDG shall be entitled to receive a transaction fee (the "Restructuring Fee"), equal to $1,000,000.  For the avoidance of doubt, CDG shall, in no event, be entitled to more than one Restructuring Fee. The Restructuring Fee shall be payable in full on the date of the closing of a Restructuring.

iii.  Expenses:  In addition to the foregoing, CDG will bill monthly in arrears for the reimbursement of all of its reasonable and documented out-of-pocket expenses (including but not limited to travel costs (which shall be by means of economy class transportation (or its equivalent) for itineraries less than 5 hours), lodging, meals, research, telephone and facsimile, courier, overnight mail and copy expenses), incurred in connection with CDG's obligations under this Agreement, including the fees and disbursements of CDG's attorneys, plus any sales, use or similar taxes (including additions to such taxes, if any) arising in connection with any matter referred to in this Agreement.  CDG will submit to the Company monthly invoices for all services rendered and expenses incurred hereunder.  The Company shall reimburse CDG for such expenses upon receipt of such invoices therefor whether or not any transaction contemplated by this Agreement shall be proposed or consummated.

For purposes of this Agreement, the term "Restructuring" shall mean any of the following:  (x) recapitalization, refinancing or restructuring with respect to the Company's obligations (including, without limitation, through any exchange, conversion, cancellation, forgiveness, retirement and/or a material modification or amendment to the terms, conditions or covenants of any of the Company's obligations (including, without limitation, joint ventures or partnership interests, capital or operating lease obligations, bond obligations, trade credits, environmental obligations, pension and other employee benefit obligations, and other contract obligations)), including pursuant to an exchange transaction, a solicitation of consents, waivers, acceptances or authorizations, a bankruptcy proceeding or reorganization, a refinancing or repurchase, or (y) a Sale (as defined below).  More than one of the foregoing events described in this paragraph shall nevertheless constitute one and only one Restructuring.  For purposes of this agreement, the term "Sale" shall mean the disposition to one or more third parties in one or a series of related transactions (whether or not pursuant to 11 U.S.C. § 363) of (x) a significant portion of the equity securities of the Company by the security holders of the Company

4

or the Company or (y) a significant portion of the assets (including the assignment of any executory contracts) or businesses of the Company or its subsidiaries, in either case, including through a sale or exchange of capital stock, options or assets, a lease of assets with or without a purchase option, a merger, consolidation or other business combination, an exchange or tender offer, a recapitalization, the formation of a joint venture, partnership or similar entity, or any similar transaction.

In the event CDG is requested or authorized by the Company or is required by government regulation, subpoena, or other legal process to produce CDG's documents or CDG's members, employees, agents or representatives as witnesses with respect to CDG's services for the Company, the Company will reimburse CDG for its professional time and expenses, as well as the fees and expenses of CDG's counsel, incurred in responding to such requests. The provisions of this paragraph shall not be applicable to any chapter 11 proceedings of the Company.

C.   Term

The term of CDG's engagement hereunder (the "Term") shall commence on the date hereof and continue until terminated by either party in accordance with the provisions of Section E hereof.

D.   Staffing

CDG's services will be led by Robert A. Del Genio, a Managing Member, who shall serve as the Company's Chief Restructuring Officer. Michael Healy, a Senior Managing Director will also be staffed on this engagement along with Chris Goff, an Associate, and Tom Ackerman, an Associate, providing support for Mr. Del Genio and Mr. Healy.

E.   Termination

Either party may terminate this Agreement on ten (10) days' written notice; provided, however, that (a) termination in accordance with this Section E or expiration of the Term shall not affect the Company's continuing obligation to indemnify and to otherwise limit the liability of the Indemnified Parties (as defined herein) as provided for in this Agreement; and (b) CDG shall be entitled to (i) the fees earned and expenses incurred, as calculated in accordance with Section B, through the date of such termination or expiration of the Term and (ii) be paid the Restructuring Fee if a Restructuring is consummated on or before the date that is 12 months after the date of termination hereof or the date of expiration of the Term, as the case may be; provided, further that the Company shall have no liability or obligation whatsoever under subclause (ii) of this paragraph if this Agreement is terminated by the Company for Cause (as defined herein) or is terminated by CDG without Cause. For purposes of this paragraph, termination for "Cause" means the termination is primarily based upon the bad faith, self-dealing, gross negligence or willful misconduct of the other party. Upon any termination for Cause, the Company shall pay CDG any other fees earned and expenses incurred, as calculated in accordance with Section B, through the date of such termination.

5

F.    Certain Tax Disclosures

Notwithstanding anything herein to the contrary and except as reasonably necessary to comply with any applicable federal and state securities laws, the Company (and each employee, representative, or other agent of the Company) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of any transaction directly or indirectly related to our services hereunder and all materials of any kind (including opinions or other tax analyses) that are provided to any party relating to such tax treatment and tax structure. For this purpose, "tax structure" is any fact that may be relevant to understanding the tax treatment of any transaction directly or indirectly related to our services hereunder.

G.    Miscellaneous

The Company's Directors and Officers insurance policies include any past, present or future officer (including the Chief Restructuring Officer) or director of the Company as an "Insured Person" under the policy and the Company's employment practices policy includes any individuals who are or were owners, partners, employees, directors or officers (including the Chief Restructuring Officer) of the Company as an "Insured" under the policy (collectively, the "Policies"). A true, correct, and complete copy of the Company's current Directors and Officers liability insurance shall be promptly furnished to CDG. The Company represents that the premiums associated with the Policies have been paid in full and that no notice of termination or conversion has been received with respect to the Policies. The Company shall use commercially reasonable efforts to maintain directors and officers liability insurance coverage of not less than the Company's current coverage and otherwise comparable as to premiums, terms and amounts as that provided under the Policies during the term of this Agreement, with any replacement coverage being obtained from an insurer with a rating from a nationally recognized rating agency not lower than the present insurer.

The Company recognizes and confirms that CDG in acting pursuant to this engagement will be using information in reports and other information provided by others, including, without limitation, information provided by or on behalf of the Company and any potential acquirers, and that CDG does not assume responsibility for and may rely, without independent verification, on the accuracy and completeness of any such reports and information. The foregoing shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any Indemnified Party (as defined elsewhere in this Agreement).

Except as contemplated by the terms hereof or as required by applicable law, regulation or legal process, CDG shall keep confidential all non-public information provided to it by or at the request of the Company, and shall not disclose such information to any third party or to any of its employees or advisors except to those persons who have a need to know such information in connection with CDG's performance of its responsibilities hereunder and who are advised of the confidential nature of the information and who agree to keep such information confidential. CDG shall not disclose the existence of this Agreement or the fact that CDG has been engaged by the Company until such time as the Company publicly discloses such information or the Company consummates a

6

Restructuring. For the avoidance of doubt, CDG may provide non-public information to prospective transaction parties as contemplated by this Agreement, at the request of the Company and subject to such parties executing appropriate confidentiality agreements.

The Company agrees that any information or advice (written or oral) rendered by CDG, its affiliates or any of its representatives in connection with this engagement is for the confidential use of the Company only and the Company will not and will not permit any third party to disclose or otherwise refer to such advice or information in any manner without CDG's prior written consent, not to be unreasonably withheld.

The Company agrees to provide indemnification to and to limit liability of CDG and certain other persons in connection with CDG's engagement hereunder in accordance with Schedule I, which is attached hereto and made a part hereof.

Any controversy or claim arising out of or relating to this Agreement or the services provided by CDG pursuant hereto (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of the Company or of CDG) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in Schedule I to this Agreement.

IN THE EVENT MEDIATION AND/OR ARBITRATION ARE UNAVAILABLE TO RESOLVE A DISPUTE BETWEEN THE PARTIES HERETO, THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING IN CONNECTION WITH OR AS A RESULT OF THE ENGAGEMENT PROVIDED FOR IN THIS AGREEMENT.

The Company expressly acknowledges that CDG has been retained solely as an advisor to the Company, and not as an advisor to or an agent of any other person, and that the Company's engagement of CDG is not intended to confer rights upon any persons not a party hereto (including shareholders, employees or creditors of the Company) as against CDG, CDG's affiliates or their respective directors, members, officers, agents and employees. It is further understood and agreed that CDG will act under this Agreement as an independent contractor (and, except as provided herein, not as an officer or employee) with duties solely to the Company as and to the extent set forth herein and nothing in this Agreement or the nature of CDG's services shall be deemed to create a fiduciary or agency relationship between CDG and the Company or its shareholders, employees or creditors. The obligations of CDG are solely entity obligations, and no officer, director, member, employee, agent, member, or controlling person shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of any other party to this Agreement.

If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction to be void, invalid, or otherwise unenforceable, in whole or part, the remaining terms, provisions, covenants and restrictions contained in this Agreement shall remain in effect.

7

This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, excluding New York's choice of law principles, and all claims relating to or arising out of this Agreement, or the breach thereof, whether sounding in contract, tort or otherwise, shall likewise be governed by the laws of the State of New York, excluding New York's choice of law principles.

This Agreement shall constitute the entire understanding among the parties hereto with respect to the subject matter hereof, and supersedes and cancels all prior agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter. For the avoidance of doubt, this Agreement shall constitute a termination of the Agreement dated February 10, 2016 between CDG and Weil, Gotshal & Manges LLP as counsel to the Company as contemplated by section E of said Agreement.

Upon termination of this Agreement, CDG may publicly disclose its role pursuant to this Agreement; provided that if CDG's engagement becomes public prior to termination of this Agreement by any reason other than disclosure by CDG, CDG may publicly disclose its role at such earlier time.

This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

This Agreement is important to us and we appreciate the opportunity to serve you. If you are in agreement with the terms set forth herein, please confirm that the foregoing is in accordance with your understanding of our agreement by signing and returning this letter and remitting to us $300,000 by wire or check.

Very truly yours,

CDG Group, LLC

By: _____

Consented and Agreed to:

CHC Group Ltd.

By: _____

8

**Schedule I**

## INDEMNIFICATION, CONTRIBUTION, LIMITATION OF LIABILITY AND MEDIATION

This Schedule I and Attachment A hereto are a part of and incorporated into that certain letter agreement (together, the "Agreement"), dated April 26, 2016 between CDG Group, LLC ("CDG") and CHC Group Ltd. (the "Company"). All capitalized terms used but not defined herein shall have the same meaning as set forth in the Agreement.

The Company agrees to indemnify and hold harmless each of CDG and its affiliates, consultants, and independent contractors and each of their respective members, officers, directors, employees, agents, controlling parties and representatives (each, an "Indemnified Party" and collectively, the "Indemnified Parties") against any and all Losses caused by, relating to, based upon or arising out of (directly or indirectly):

   i.  this Agreement;

   ii.  the Indemnified Parties' acceptance of or the performance or non-performance of the services that are the subject of this Agreement and related activities prior to the date of this Agreement;

   iii.  any document or information, whether oral or written, provided to CDG by the Company or any of its representatives;

   iv.  the breach of any representations, warranties or covenants by the Company given pursuant hereto or in connection herewith;

   v.  CDG's involvement in the Restructuring or any part thereof;

   vi.  any filings made by or on behalf of any party with any governmental agency in connection with the Restructuring; or

   vii.  the Restructuring (items (i) through (vii) are collectively referred to herein as the "Indemnified Events").

As used herein, the term "Losses" shall mean any and all losses, claims, damages, liabilities, penalties, obligations and expenses, including, but not limited to, reasonable and documented attorney's fees, disbursements and court costs, and costs of investigation and preparation as and when incurred in investigating, preparing, pursuing or defending any action or claim (whether or not in connection with (x) pending or threatened litigation in which any Indemnified Party is a party, or may reasonably be expected to be made a party, or (y) enforcing this Agreement) and whether or not joint or several.

The Company agrees that it will not, without the prior written consent of an Indemnified Party, settle, compromise, discharge or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding based upon or in any way related

9

to or arising out of any Indemnified Event and to which an Indemnified Party is or may reasonably be expected to be made a party unless (i) the Company has obtained a written agreement, approved by the relevant Indemnified Party (which approval shall not be unreasonably withheld, delayed or conditioned) and executed by each party to such proposed settlement, compromise or discharge, or (ii) such settlement includes a provision unconditionally releasing such Indemnified Party and holding such Indemnified Party harmless against all liability in respect of claims by any releasing party relating to or arising out of the Indemnified Event.  The Company will be liable for any settlement entered into by an Indemnified Party of any claim against such Indemnified Party made with the Company's prior written consent, which consent shall not be unreasonably withheld, delayed or conditioned.

If any action, proceeding or investigation is commenced to which any Indemnified Party proposes to demand indemnification hereunder, such Indemnified Party will notify the Company as promptly as practicable; provided, however, that any failure by such Indemnified Party to notify the Company will not relieve the Company from its obligations hereunder, except to the extent that such failure shall have actually prejudiced the defense of such action or increased the indemnifiable Losses hereunder.  The Company will on demand, advance or pay promptly, on behalf of each Indemnified Party, all Losses that are asserted in good faith by the Indemnified Party to be subject to indemnification hereunder.  Each Indemnified Party hereby undertakes, and the Company hereby accepts its undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified therefor.  If any such action, proceeding or investigation in which an Indemnified Party is a party or is threatened to be made a party is also against the Company, the Company may, in lieu of advancing the expenses of separate counsel for any such Indemnified Party provide such Indemnified Party with legal representation by the same counsel who represents the Company, provided such counsel is reasonably satisfactory to such Indemnified Party, at no cost to such Indemnified Party; provided, however, that if such counsel or counsel to the Indemnified Party shall determine that due to the existence of actual or potential conflicts of interest between such Indemnified Party and the Company such counsel is unable to represent both the Indemnified Party and the Company, then the Indemnified Party shall be entitled to use one separate counsel of its own choice and the Company shall promptly advance its reasonable expenses of such separate counsel upon submission of invoices therefor.  Nothing herein shall prevent an Indemnified Party from using separate counsel of its own choice at its own expense, and the Company agrees to cause its counsel to cooperate with such counsel to the Indemnified Party.

In the event the foregoing indemnity is unavailable to an Indemnified Party for any reason, the Company agrees to contribute to any Losses related to or arising out of any Indemnified Event.  Each of the Company, on the one hand, and the Indemnified Parties, on the other, shall contribute in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) from any actual or proposed transaction giving rise to this Agreement; provided, however, in no event regardless of the legal theory advanced or the allegations made in connection therewith shall the Indemnified Parties' aggregate contribution to the amount paid or payable to all parties exceed the aggregate fees actually received by such Indemnified Party under this Agreement.  For

any other Losses, or for Losses referred to in the preceding sentence, if the allocation provided for therein is unavailable for any reason, the Company and CDG shall contribute in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of each of the Company and the Indemnified Parties in connection with the statements, omissions or other conduct which resulted in such Losses, as well as any other relevant equitable considerations. Benefits received (or anticipated to be received) by the Company shall be deemed to be equal to the aggregate cash consideration and value of securities or any other property payable, exchangeable or transferable in any such transaction or proposed transaction, and benefits received by the Indemnified Parties shall be deemed to be equal to the compensation payable by the Company to the Indemnified Parties in connection with such engagement. Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any other alleged conduct relates to information provided by the Company or other conduct by the Company (or its employees or other agents) on the one hand or by the Indemnified Parties on the other hand. The Company and CDG agree that it would not be just and equitable if contribution were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to above.

The Company will not be liable under the foregoing indemnification provision to any Indemnified Party to the extent that any Loss is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) on the merits to have primarily resulted from such Indemnified Party's bad faith, self-dealing, gross negligence or willful misconduct.

The Company agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its owners, parents, creditors or security holders for or in connection with the engagement of CDG, except to the extent of any such liability for Losses that are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) on the merits to have primarily resulted from such Indemnified Party's bad faith, self-dealing, gross negligence or willful misconduct. Notwithstanding anything contained herein to the contrary, in no event regardless of the legal theory advanced or the allegations made in connection therewith shall payments made by an Indemnified Party exceed the aggregate fees actually received by such Indemnified Party under this Agreement.

The rights provided herein shall not be deemed exclusive of any other rights to which the Indemnified Parties may be entitled under the certificate of incorporation or by-laws of the Company, any other agreements, any vote of stockholders or directors of the Company, any applicable law or otherwise.

11

## Attachment A

## Dispute Resolution Procedures

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in the letter agreement, dated April 26, 2016, by and between CDG Group, LLC ("CDG") and CHC Group Ltd. (the "Company") (the "Agreement").

### Mediation

A dispute shall be submitted to mediation by written notice to the other party. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot otherwise agree on a mediator, one will be appointed by the American Arbitration Association ("AAA").

The mediation will be conducted as specified by the mediator. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

The mediation shall take place in the Borough of Manhattan, New York, New York.

### Arbitration

If a dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation period), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Commercial Arbitration Rules of the AAA. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as follows: CDG and the Company will each select one arbitrator and the third arbitrator will be chosen by the two previously selected arbitrators. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No

12

potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

Unless provided otherwise in the Agreement, the arbitrators shall have no power to award (i) damages inconsistent with the Agreement or (ii) punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or in any other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a federal court deciding the matter in the same jurisdiction.

No discovery will be permitted in connection with the arbitration unless it is expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery. All aspects of the arbitration shall be treated as confidential. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.

The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

The arbitration shall take place in the Borough of Manhattan, New York, New York.

13

## **EXHIBIT D**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

```
------------------------------------------------------------- x
                                              :
In re:                                        :        Chapter 11
                                              :
CHC GROUP LTD. et al.,                        :        Case No. 16–31854 (BJH)
                                              :
                                              :
            Debtors.                          :        (Jointly Administered)
                                              :
------------------------------------------------------------- x
```

**ORDER PURSUANT TO SECTIONS 363(b) AND 105(a) OF
THE BANKRUPTCY AUTHORIZING THE DEBTORS TO (I) EMPLOY AND RETAIN
CDG GROUP, LLC TO PROVIDE THE DEBTORS A CHIEF OF RESTRUCTURING
OFFICER AND ADDITIONAL PERSONNEL, AND (II) DESIGNATE
ROBERT A. DEL GENIO AS THE CHIEF RESTRUCTURING OFFICER FOR
THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE**

Upon the Application, dated May 13, 2016 (the "**Application**"),[1] of CHC Group

Ltd. and its above-captioned debtor affiliates, as debtors and debtors in possession (collectively,

the "**Debtors**"), for an order pursuant to sections 363(b) and 105(a) of title 11 of the United

---

[1] Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Application.

States Code (the "**Bankruptcy Code**"), authorizing the Debtors to (i) employ and retain CDG Group, LLC ("**CDG**") to provide the Debtors a chief restructuring officer ("**CRO**") and additional personnel and (ii) designate Robert A. Del Genio as the CRO for the Debtors in connection with their chapter 11 cases, *nunc pro tunc* to the Petition Date, all as more fully described in the Application; and the Court having jurisdiction to consider the Application and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Application and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided to (i) the Office of the United States Trustee for the Northern District of Texas (the "**U.S. Trustee**"), (ii) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis), (iii) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, Bank of America Tower, New York, NY 10036 (Attn: Michael S. Stamer, Esq.), counsel to an informal group of certain unaffiliated holders of the 9.250% Senior Secured Notes Due 2020, (iv) Norton Rose Fulbright, 2200 Ross Avenue, Suite 3600, Dallas, TX 75201 (Attn: Louis R. Strubeck, Jr., Esq. and Richard P. Borden, Esq.), counsel to certain secured lenders under the Revolving Credit Agreement, (v) Paul Hastings LLP, 75 East 55th Street, New York, NY 10022 (Attn: Leslie A. Plaskon, Esq. and Andrew V. Tenzer, Esq.), counsel to certain secured lenders under the ABL Credit Agreement, (vi) The Bank of New York Mellon, 101 Barclay Street, Floor 4 East, New York, NY 10286 (Attn: International Corporate Trust), in its capacity as indenture trustee under the 9.250% Senior Secured Notes due 2020 and under the 9.375% Senior Notes due 2021, (vii) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10178 (Attn: Glenn E. Siegel, Esq. and Rachel Jaffe Mauceri, Esq.), counsel to the indenture trustee under the 9.250%

Senior Secured Notes due 2020, (viii) the Board of Equalization, PO Box 942879, Sacramento, Ca. 94279, (ix) the Securities and Exchange Commission, (x) the Office of the United States Attorney, 1100 Commerce Street, 3rd Floor, Dallas, TX 75242, (xi) the Internal Revenue Service, (xii) all parties who have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002 and (xiii) CDG Group, LLC, 650 Fifth Avenue, New York, NY 10019 (Attn: Kenneth Adelsberg) (collectively, the "**Notice Parties**"); and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Application (the "**Hearing**"); and upon the appearances of all interested parties having been noted in the record of the Hearing; and upon the record of the Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Application is in the best interests of the Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED that:

1. The Application is granted as set forth herein.

2. The terms and conditions of the Engagement Letter, including without limitation, the Indemnification Provisions and the Fee Structure set forth therein, are reasonable terms and conditions and are approved.

3. The Debtors are authorized, pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, to employ and retain CDG to provide the Debtors a chief restructuring officer and additional personnel, in accordance with the terms and conditions of the Engagement Letter, *nunc pro tunc* to the Petition Date.

4.      The Debtors are authorized, pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, to designate Robert A. Del Genio as the CRO, *nunc pro tunc* to the Petition Date.

5.      CDG shall be permitted to maintain, in a summary format, a description of the services rendered by each professional and the amount of time spent on a daily basis by each such individual in rendering services on behalf of the Debtors.

6.      All requests by Indemnified Persons for the payment of indemnification, contribution, or otherwise as set forth in the Engagement Letter during the pendency of these chapter 11 cases shall be made by means of an application to the Court and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the Engagement Letter and is reasonable under the circumstances of the litigation or settlement in respect of which indemnity is sought.

7.      Notwithstanding anything to the contrary in the Application, the declarations or the Engagement Letter, CDG shall be required to maintain receipts for all expenses in any amount for which it seeks reimbursement.

8.      Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

9.      Notice of the Application as provided herein shall be deemed good and sufficient notice of such Application and the requirements of Bankruptcy Rules 4001(d) and 6004(a) are waived.

10.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Application.

11. To the extent there is any inconsistency between this Order and the Engagement Letter and/or the Application, the provisions of this Order shall govern.

12. This Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

###END OF ORDER###

Respectfully Submitted,

**WEIL, GOTSHAL & MANGES LLP**

*/s/ Stephen A. Youngman*
Stephen A. Youngman (22226600)
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile:  (214) 746-7777
Email:        stephen.youngman@weil.com

-and-

Gary T. Holtzer (*pro hac vice*)
Kelly DiBlasi (*pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:     (212) 310-8000
Facsimile:     (212) 310-8007
Email:          gary.holtzer@weil.com
Email:          kelly.diblasi@weil.com

*Proposed Attorneys for Debtors and Debtors in Possession*