ORRICK HERRINGTON & SUTCLIFFE LLP
Raniero D'Aversa, Jr., Esq. (Admitted pro hac vice)
Laura D. Metzger, Esq. (Admitted pro hac vice)
Jeffery Hermann, Esq. (Admitted pro hac vice)
Steven J. Fink, Esq. (Pro hac vice admission pending)
51 West 52nd Street
New York, New York 10019
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Email: rdaversa@orrick.com
        lmetzger@orrick.com
        jhermann@orrick.com
        sfink@orrick.com

-and-

KANE RUSSELL COLEMAN & LOGAN PC
George H. Barber, Esq. (TX Bar No. 01705650)
1601 Elm Street
Suite 3700
Dallas, Texas 75201
Telephone: (214) 777-4200
Facsimile: (214) 777-4299
Email: gbarber@krcl.com

*Counsel for ECN Capital (Aviation) Corp.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| CHC GROUP LTD., *et al.*, | ) | Case No. 16-31854-bjh-11 |
| Debtors. | ) | (Jointly Administered) |

**ECN CAPITAL (AVIATION) CORP.'S OBJECTION TO THE SECOND AMENDED
JOINT CHAPTER 11 PLAN OF CHC GROUP LTD. AND ITS AFFILIATED DEBTORS**

TO THE HONORABLE BARBARA J. HOUSER, UNITED STATES BANKRUPTCY JUDGE:

ECN Capital (Aviation) Corp. (f/k/a Element Capital Corp.) ("ECN Capital"), a creditor in

the above-captioned bankruptcy cases, through its undersigned counsel, files this objection (the "Objection") to the *Second Amended Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors* [Dkt. No. 1371] (the "Plan").[1]  In support of its Objection, ECN Capital respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The above-captioned debtors (collectively, the "Debtors") have filed a Plan that runs afoul of their fiduciary responsibility to maximize the bankruptcy estate for the benefit of their creditors by transferring potentially valuable unencumbered prepetition claims against Airbus to the Reorganized Debtors.  In April 2016, an accident occurred with one of the Debtors' helicopters causing a series of harms to the Debtors.  Yet the Plan is silent as to these claims, their potential value, and a path to pursue them.  It also seeks to transfer the claims and all other "Causes of Action" to the Reorganized Debtors, rather than preserving them for the unsecured creditors and the estate as required by the Bankruptcy Code.

2.      With the Plan paying general unsecured creditors 1.8% on the face amount of their claims, the Debtors should be (and are) obligated to turn over every rock looking for unencumbered assets to distribute to unsecured creditors.  Instead, the Debtors are disregarding a potentially meaningful source of recovery (and their fiduciary duties) by removing these (and other) Causes of Action from the estate and effectively reducing the recovery to unsecured creditors.  The Debtors have an obligation to propose the Plan in good faith, disclose potential Airbus litigation claims, project a value of these claims, pursue them, and make this estate asset available to satisfy unsecured creditor claims.  The Plan should be revised to either create a litigation trust or another mechanism to hold and pursue the Airbus claims and other Causes of Action for the benefit of the unsecured creditors.

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings assigned to such terms in the Plan.

766363846

## BACKGROUND

3.    On May 5, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code.

### ECN Capital's Relationship with the Debtors

4.    Pursuant to the Master Lease Facility Agreement dated as of June 5, 2013 (as amended, supplemented or otherwise modified prior to the date hereof, the "Master Lease"), by and between ECN Capital and CHC Helicopters (Barbados) SRL ("CHC Barbados"), together with all documents delivered pursuant thereto or in connection therewith (the "Transaction Documents"), CHC Barbados leased seven helicopters and various related equipment (collectively, the "Aircraft") to the Debtors for operations in their business.  Five of the Aircraft were designed and manufactured by Airbus Helicopters (SAS) ("Airbus"), consisting of one Eurocopter EC 225 ("EC 225") and four Eurocopter AS 332 L2s ("AS 332 L2").

5.    ECN Capital entered into a sale leaseback transaction with CHC Barbados, whereby ECN Capital purchased the helicopters from CHC Barbados and leased them back to CHC Barbados for sublease and operation.  The Debtors rejected these leases and all related subleases.  *See Order Granting Debtors' First Omnibus Motion to Reject Certain Equipment Leases and Subleases Pursuant to Section 365 of the Bankruptcy Code* [Dkt. No. 428] and *Order Granting Debtors' Second Omnibus Motion to Reject Certain Equipment Leases and Subleases Pursuant to Section 365 of the Bankruptcy Code* [Dkt. No. 427].

6.    On August 26, 2016, ECN Capital filed a general unsecured claim for at least $80,877,435 against CHC Barbados due to the rejection of ECN Capital's Aircraft manufactured by Airbus.  ECN Capital has also asserted general, unsecured, non-priority, claims in the same amount against co-debtors 6922767 Holding SARL, CHC Helicopter Holding S.à.r.l., CHC

766363846

Helicopter S.A. and Heli-One Leasing ULC (f/k/a Heli-One Leasing Inc.), who guaranteed the obligations of CHC Barbados under the Master Lease and the other Transaction Documents.[2]

**Debtors' Plan**

7.    On December 19, 2016, the Debtors filed the Plan.  Under the Plan, general unsecured creditors, such as ECN Capital, are scheduled to receive a recovery of approximately 1.8% plus, as applicable, 0.1%-1.2% on account of Allowed Secondary General Unsecured Claims.  *See Revised Disclosure Statement for the Second Amended Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors* [Dkt. No. 1379] (the "Disclosure Statement") at 11.  This recovery is comprised of the creditor's pro rata share of New Membership Interests (prior to dilution on account of the New Second Lien Convertible Notes and the Management Incentive Plan) and New Unsecured Notes.  *See id.*; Plan § 4.7.

8.    Neither the Plan nor the Disclosure Statement specifically references any potential claims that the Debtors and their estates may hold against third parties.  Rather, the Plan vaguely provides for any "Causes of Action," among other estate assets, to vest with the Reorganized Debtors free and clear on the Plan's Effective Date.  *See* Plan § 10.2.  Unlike litigation trusts established alongside many plans of reorganization, the Plan does not contain any mechanism for unsecured creditors to benefit from proceeds obtained from Causes of Action.  Rather, any proceeds of claims against Airbus (and others) will become property of the Reorganized Debtors.

**The Accident**

9.    Prior to the Petition Date, on April 29, 2016, an EC 225 manufactured by Airbus (which was not owned by ECN Capital) crashed near Turøy, Norway (the "Accident") while operated by CHC Helikopter Service AS, a Norway subsidiary of debtor CHC Group Ltd.  All 13 individuals on board were killed.  As a result of the Accident and the subsequent investigation by the Accident Investigation Board of Norway, civil aviation authorities in the United States, Europe, Norway and the United Kingdom prohibited the flight and/or commercial use of any EC 225s or

---

[2] Nothing herein shall be construed as a waiver of ECN Capital's rights to assert administrative expense priority claims against the Debtors.  ECN Capital expressly reserves any and all rights to assert such claims.

AS 332 L2s due to an unsafe condition caused by a design defect in the helicopters' main gear box. The Accident Investigation Board of Norway, the United Kingdom Civil Aviation Authority, and the United States Federal Aviation Authority specifically concluded that the EC 225s and the AS 332 L2s were not safe to fly in their current condition. Consequently, five of ECN Capital's Aircraft and all of the Debtors' other leased or owned EC 225s and AS 332 L2s were mandatorily grounded. *See* Disclosure Statement at 30 n. 9. Eventually the Debtors rejected all of their leased EC 225s and abandoned four owned EC 225s. *Id.*

10.     As an owner of one EC 225 and four AS 332 L2s, on November 17, 2016, ECN Capital filed a complaint against Airbus in the Bankruptcy Court asserting claims against Airbus relating to the defects with the EC 225s and AS 332 L2s.[3] *See Complaint by ECN Capital (Aviation) Corp. against Airbus Helicopters (SAS)* [Dkt. No. 1211] (the "Complaint"). ECN Capital is not the only party that sees potential value in pursuing claims against Airbus stemming from the Accident and subsequent grounding. Based on these events, on July 28, 2016, Wells Fargo Bank Northwest, N.A. filed a lawsuit against Airbus Helicopters, Inc. (an Airbus subsidiary that sells, delivers and operates EC 225s and AS 332 L2s) for breach of contract and breach of warranty. *See Complaint by Wells Fargo Bank Northwest N.A. against Airbus Helicopters, Inc.*, DC-16-09090 (Tex. Dist. Ct., Jul. 28, 2016) [Dkt. No. 2]. Similarly, on November 21, 2016, Era Group Inc. filed a complaint against Airbus and Airbus Helicopters, Inc. for breach of express and implied warranty. *See Complaint by Era Group Inc. against Airbus Helicopters, Inc., et al.*, DC-16-15017 (Tex. Dist. Ct., Nov. 21, 2016) [Dkt. No. 2]. These complaints further suggest that the Debtors have actionable claims against Airbus that should be pursued through the Plan.

11.     Despite owning and leasing many EC 225s and AS 332 L2s, the Debtors have not publicly disclosed their intentions with respect to their claims against Airbus relating to the

---

[3] In the Complaint, ECN Capital alleges that it suffered damages as a result of Airbus's negligence, defective design, defective manufacturing, failure to warn, violation of the implied warranty of merchantability, negligent misrepresentation, and/or fraud regarding the unsafe helicopters. If ECN Capital's claims against Airbus are successful, other plaintiffs—such as a litigation trust or similar structure established for unsecured creditors' benefit (or, if the Court declines to establish a litigation trust, the Reorganized Debtors)—could rely on collateral estoppel to recover from Airbus for similar claims.

Accident and the subsequent grounding of the EC 225s and AS 332 L2s. The only specific mention of the Debtors' potential claims against Airbus relating to the Accident does not even appear in the Plan, but in their restructuring agreement with Airbus where the Debtors expressly reserve the right to pursue such claims. *See 2017 Omnibus Restructure Agreement*, dated January 24, 2017 between Airbus Helicopters (SAS) and its affiliates and CHC Group, Ltd. and its affiliates *[Dkt. No. 1536, Ex. C]*. [Dkt No. 1536, Ex. C] (the "Airbus Restructuring Agreement") ¶ 8(g).[4] It is odd that the Debtors negotiated a full scale restructuring of their purchase orders, maintenance agreements, spare parts agreements and other interactions with Airbus, and will pay Airbus more than $2.6 million in cash, but did not resolve the claims relating to the Accident or the subsequent grounding. Moreover, the $2.6 million provided for in the Airbus Restructuring Agreement constitutes more than a 56% recovery on Airbus's $4,603,409 asserted unsecured claim amount, or, at worst, an approximately 22% recovery if the $2.6 million payment includes payment in full of Airbus's asserted $1,601,168 administrative priority claim. In any event, Airbus, a member of the Creditors' Committee, will receive a significantly higher recovery than other unsecured creditors. Additionally, the Debtors have failed to explain why they have expressly reserved claims against Airbus arising from the Accident while failing to address such claims with any specificity in the Plan.[5] Instead, the Plan tosses them, along with all other Causes of Action, away

---

[4] In the Disclosure Statement, the Debtors note generally that all claims arising from the Accident against any original equipment manufacturer are preserved. But the Debtors do not expressly mention such claims against Airbus, the manufacturer of the helicopter that crashed in the Accident. Specifically, the Disclosure Statement provides:

> For the avoidance of doubt, neither the proposed Plan nor this Disclosure Statement attempts to alter any rights or claims (whatever such rights or claims may be) that any debtor, creditor, lessor, or third party may have against any OEM (original equipment manufacturer) of any helicopter or helicopter component arising out of accidents involving the "EC 225" and "AS 332 L2" helicopter types and resulting regulatory actions, including, without limitation, the April 29, 2016 EC 225 helicopter type accident near the Flesland Airport in Bergen, Norway and resulting regulatory suspension of flight operations.

Disclosure Statement at 32.

[5] Although Sections 10.7(a) and 10.7(b) of the Plan release and discharge Airbus from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, and liabilities whatsoever brought by the Debtors and Releasing Parties, respectively, Airbus is a "Released Party" *solely in its capacity* as a member of the Creditors' Committee. *See* Plan § 10.7(a), (b). Accordingly, both the Debtors and ECN Capital may pursue causes of action against Airbus resulting from the Accident.

from the unsecured creditors and gifts them to the Reorganized Debtors. With the Debtors' confirmation hearing scheduled for February 13, 2017, this disconnect needs to be resolved.

## OBJECTION

12. The Plan is flawed because it does not maximize unsecured creditor recoveries. It fails to make potential proceeds of the claims against Airbus and other Causes of Action a source of additional distributable value to unsecured creditors and instead vests the claims and their proceeds in the Reorganized Debtors. Such proceeds should be subject to a litigation trust or other similar structure in order to benefit unsecured creditors.

## The Plan Does Not Maximize Estate Value Because it Fails to Make Potential Proceeds from the Airbus Claims and other Causes of Action Available to Unsecured Creditors

13. This Plan does not maximize value for unsecured creditors as the Bankruptcy Code requires. *See Toibb v. Radloff*, 501 U.S. 157, 163 (1991) (stating that "Chapter 11 . . . embodies the general Code policy of maximizing the value of the bankruptcy estate") (citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 351–54 (1985)). A debtor-in-possession serves as a fiduciary for creditors and is charged with the duty to maximize value of the estate for the benefit of creditors. *See, e.g., Love v. Tyson Foods, Inc.*, 677 F.3d 258, 273 n. 11 (5th Cir. 2012) ("The debtor in possession performing the duties of the trustee is the representative of the estate and is saddled with the same fiduciary duty as a trustee to maximize the value of the estate available to pay creditors.") (citation omitted); *In re Renaissance Hosp.-Grand Prairie, Inc.*, No. 08-43775, 2008 WL 5746904, at *2 (Bankr. N.D. Tex. Dec. 31, 2008) ("A trustee or debtor in possession and its professionals have the duty of preserving, protecting and maximizing the estate."). To carry out fundamental objectives of the Bankruptcy Code, estate assets should be placed under the control of the court for distribution among creditors. *See MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 91 (2d Cir. 1988), *cert. denied*, 488 U.S. 868 (1988) (observing that a fundamental purpose of bankruptcy law is "to place the property

7

of the bankrupt, wherever found, under the control of the court, for equal distribution among the creditors") (citation omitted).  A debtor's obligation to maximize value for unsecured creditors is also relevant to the confirmation requirement that a plan be proposed in good faith.  *See* 11 U.S.C. § 1129(a)(3) (requiring a plan to be "proposed in good faith and not by any means forbidden by law"); *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 469 (Bankr. S.D. Ohio 2011) (the good faith requirement for plan confirmation requires a court to assess, in part, whether the plan maximizes assets recoverable to satisfy unsecured claims); *see also In re Mangia Pizza Invs., LP*, 480 B.R. 669, 693 (Bankr. W.D. Tex. 2012) (finding that debtor did not propose plan in good faith because it did not maximize the value of the estate through a definitive marketing and sales process).

14.    This Plan disregards valuable prepetition unencumbered estate assets available for distribution to unsecured creditors because it does not include a strategy for pursing the Debtors' claims against Airbus (or other Causes of Action) and distributing the proceeds to unsecured creditors.  It is well established that estate assets include causes of action that may be asserted by a debtor-in-possession.  *See, e.g.*, *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 9 (1983) (citing legislative history for the proposition that section 541(a)(1) of the Bankruptcy Code includes causes of action); *Wischan v. Adler (In re Wischan)*, 77 F.3d 875, 877 (5th Cir. 1996) (stating that prepetition causes of action are property of the estate); *Am. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1277 (5th Cir. 1983) (stating that a state cause of action is property of the estate "within the meaning of section 541(a)(1) of the [Bankruptcy] Code").  In keeping with a debtor-in-possession's fiduciary obligation to maximize the value of property of the estate, the Fifth Circuit has observed that a debtor-in-possession is charged with collecting property of the estate and is "duty bound" to assert causes of action if doing so would maximize the value of the estate.  *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 246 (5th Cir. 1988) (stating that debtor must assert causes of action against its officers and directors if such action would maximize estate value); *see also Weintraub*, 471

8

U.S. at 353 (a trustee must investigate potential causes of action and assert them in order to maximize the value of the estate).

15. The Debtors have not even meet the Bankruptcy Code's disclosure obligations with respect to the Airbus Causes of Action. A debtor has an ongoing "express, affirmative duty to disclose all assets," including potential causes of action or any other "claim with potential." *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 207–08 (5th Cir. 1999). This duty applies regardless of whether the debtor knows all of the facts or even the legal basis for the cause of action. *See id.* All that is necessary to trigger a debtor's disclosure obligations is for the debtor to have "enough information" prior to confirmation to suggest that it may have a possible cause of action. *See id.* at 208. The rationale for this requirement makes sense because "the integrity of the bankruptcy system depends on full and honest disclosure by debtors of all of their assets. . . . The interests of both creditors, who vote their actions in the bankruptcy proceeding on the basis of information supplied in the disclosure statements, and the bankruptcy court, which must decide whether to approve the plan of reorganization on the same basis, are impaired when the disclosure provided by the debtor is incomplete." *Id.* at 208 (citation omitted).

16. Contrary to their fiduciary obligations, the Debtors have not sufficiently disclosed or assessed—in the Disclosure Statement, the Plan or elsewhere—potential claims against Airbus related to the Accident and subsequent grounding of the aircraft, and the potential value of pursuing such claims. Nor have they preserved the value of such claims for the unsecured creditors. Aside from a one sentence reservation of rights in the Disclosure Statement with respect to claims against original equipment manufacturers arising out of accidents involving the EC 225 and AS 332 L2 helicopters, the Plan and Disclosure Statement are silent as to specific claims against Airbus. It is not clear whether the Debtors even considered the potential value of claims against Airbus when calculating projected unsecured creditor recoveries. As unencumbered assets that are a potential source of distributable value, these assets should be directly available to unsecured creditors under the Plan, rather than simply being transferred to the Reorganized Debtors on the Effective Date. *See Johns-Manville*, 837 F.2d at 91 (stating that property of the bankrupt, wherever found, should

be placed under the control of the court, for distribution among creditors). Moreover, that the Debtors have expressly preserved claims against Airbus relating to the Accident suggests that they believe such claims may have substantial value. By seeking confirmation of a Plan that removes Causes of Action from the estates and vests them solely with the Reorganized Debtors, the Debtors have robbed unsecured creditors of their right to directly benefit from any value attributable to such claims. As such, the Debtors have failed to maximize the value of estate property for the benefit of creditors in clear violation of their fiduciary duties and the good faith requirement for plan confirmation under section 1129(a)(3).

### The Airbus Claims and other Causes of Action Should be Subject to a Litigation Trust or Similar Independent Structure for the Benefit of Unsecured Creditors

17.     The Debtors should amend the Plan to provide for a specific mechanism by which claims against Airbus and others are to be pursued and proceeds of such claims, if any, are to be distributed to unsecured creditors in an effort to maximize their recoveries. The simple and most common solution, as used in many other cases, will be to establish a litigation trust managed by *an independent fiduciary* (and not by the Creditors' Committee, which includes Airbus and approved this Plan that essentially disregards claims against Airbus). *Moglia v. Keith (In re Manchester, Inc.)*, No. 08-30703, 2009 WL 2243592, at *1 (Bankr. N.D. Tex. July 16, 2009) (various claims and causes of action belonging to the debtors were transferred to a litigation trust that was managed by a litigation trustee and established pursuant to a plan so that such claims and causes of action could be pursued for the benefit of creditors.); *Kaye v. Dupree (In re Avado Brands, Inc.)*, 358 B.R. 868, 883 (Bankr. N.D. Tex. 2006) (same); *Eastchase, L.P v. Farris (In re e2 Commc'ns, Inc.)*, No. 02-30574, 2005 WL 7144839, at *4 (Bankr. N.D. Tex. Mar. 24, 2005) (same). To this end, the Plan must also be "specific and unequivocal" as to its retention of claims against Airbus and others.[6] *See Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating,*

---

[6] The Joint Plan of Reorganization Term Sheet annexed to Plan Support Agreement notes that the proposed plan shall contain provisions regarding the retention of causes of action, including any claims against Airbus. *See Plan Support Agreement* [Dkt. No. 956, Ex. C] at Ex. A. As described in note 4 above, the Disclosure Statement provides that the Plan does not alter any claims "that any debtor, creditor, lessor, or third party" may have against original equipment manufacturers such as Airbus. However, the Plan is silent as to any such claims or potential claims.

*LLC)*, 540 F.3d 351, 355 (5th Cir. 2008) ("'After confirmation of a plan, the ability of the [debtor] to enforce a claim once held by the estate is limited to that which has been retained in the plan.' … For a debtor to preserve a claim, 'the plan must expressly retain the right to pursue such actions.' The reservation must be 'specific and unequivocal.'") (internal citations omitted). *See also Floyd v. CIBC World Markets, Inc.*, 426 B.R. 622, 637–38 (S.D. Tex. 2009) (in assessing debtors' ability to pursue prepetition claims after confirmation of the plan, "[c]ourts are to consider the disclosure statement as well as the terms of a plan of reorganization").

18.     If the Plan does not require that the Debtors establish a litigation trust or similar structure to pursue Causes of Action (including those against Airbus) on behalf of unsecured creditors, then any litigation recoveries will indirectly benefit the Reorganized Debtors' future stakeholders by virtue of their New Membership Interests.  Such future stakeholders will largely consist of the Debtors' secured creditors, who are to receive the substantial majority of the Reorganized Debtors' New Membership Interests under the Plan.  Thus, the Reorganized Debtors' pursuit of Causes of Action like those against Airbus will disproportionately benefit the Debtors' secured creditors vis-à-vis ECN Capital and other general unsecured creditors—who are the rightful beneficiaries of such Causes of Action but will receive only a small portion of the New Membership Interests.[7]  As such, without a litigation trust or similar structure, the Plan does not maximize the value of the Debtors' estates.[8]

---

[7] Under the Plan, general unsecured creditors hold only a minimal amount of the New Membership Interests, as holders of Primary General Unsecured Claims will receive, in the aggregate, only 5.7% of the New Membership Interests prior to dilution.  When factoring in dilution from the New Second Lien Convertible Notes, this amount significantly decreases to only 0.8%, exclusive of further dilution (in an unknown amount) on account of the Management Incentive Plan.  *See* Plan at 15.  Separately, all holders of Secondary General Unsecured Claims will receive, in total, 5.9% of the New Membership Interest prior to dilution.  When factoring in dilution from the New Second Lien Convertible Notes, this amount decreases to 0.9%, exclusive of further dilution (in an unknown amount) on account of the Management Incentive Plan.  *See* Plan at 19.  The amounts that general unsecured creditors could receive, by virtue of their New Membership Interests, as a result of possible recoveries by the Debtors in litigation against Airbus could be further jeopardized by a potential lack of incentive on the part of the Debtors to pursue aggressively all Causes of Action they may have against Airbus, making it all the more necessary for the Plan to include a mechanism by which the Debtors will preserve and pursue such Causes of Action.

[8] Additionally, as of the date hereof, the Debtors have not filed security documents related to the Exit Revolving Credit Facility, the Amended and Restated ABL Credit Facility, the PK Financing Facility or the New Second Lien Convertible Notes.  Any liens granted by the Debtors under the new financings implemented on the Effective Date should expressly exclude the claims and proceeds of claims against Airbus.

## RESERVATION OF RIGHTS

19.     ECN Capital reserves the right to supplement this Objection and to adopt or join in any other or further objections raised by other parties.


## CONCLUSION

20.     WHEREFORE, ECN Capital respectfully requests that the Court require the Debtors to modify the Plan consistent with this Objection, including the implementation of a litigation trust or other similar mechanism in which claims against Airbus and other Causes of

766363846

Action are pursued for the benefit of unsecured creditors, and grant such other relief as the Court deems just and proper.

Dated: February 1, 2017

ORRICK, HERRINGTON & SUTCLIFFE LLP

s/Jeffery Hermann_____

Raniero D'Aversa, Jr., Esq.
Laura D. Metzger, Esq.
Steven J. Fink, Esq.
Jeffery Hermann, Esq.
51 West 52nd Street
New York, New York 10019
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
rdaversa@orrick.com
lmetzger@orrick.com

-and-

KANE RUSSELL COLEMAN & LOGAN PC

George H. Barber, Esq.
1601 Elm Street
Suite 3700
Dallas, Texas 75201
Telephone: (214) 777-4200
Facsimile: (214) 777-4299
gbarber@krcl.com

*Counsel for ECN Capital (Aviation) Corp.*

766363846