Hearing Date: **February 13, 2017 at 9:00 a.m. (CT)**

Stephen A. Youngman (22226600)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-7700
Facsimile: (214) 746-7777

Gary T. Holtzer (*pro hac vice*)
Kelly DiBlasi (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

-------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| *In re:* | : | **Chapter 11** |
|  | : |  |
| **CHC GROUP LTD.** *et al.,* | : | **Case No. 16–31854 (BJH)** |
|  | : |  |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |

-------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF CHC GROUP LTD. AND ITS AFFILIATED DEBTORS AND RESPONSE TO OBJECTIONS TO CONFIRMATION

## Table of Contents

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ........................................................................................................2

FACTS ......................................................................................................................9

JURISDICTION AND VENUE ...............................................................................10

ARGUMENT ..........................................................................................................10

I.      STANDARD OF PROOF ...............................................................................10

II.     THE GLOBAL SETTLEMENT UNDERLYING THE PLAN SHOULD BE APPROVED .............11

     A.     INTRODUCTION ...................................................................................11

     B.     NEGOTIATIONS LEADING TO THE PLAN ......................................................12

          (1)    AIRCRAFT NEGOTIATIONS ..............................................................13

          (2)    INVESTMENT AND PLAN NEGOTIATIONS .........................................13

     C.     SETTLEMENT SUMMARY .....................................................................15

     D.     LEGAL STANDARD FOR APPROVAL OF SETTLEMENTS.................................16

     E.     THE GLOBAL SETTLEMENT IS FAIR AND REASONABLE, SUPPORTED BY SOUND BUSINESS JUSTIFICATIONS, AND IN THE DEBTORS' BEST INTERESTS ..........................................................................................19

          (1)    PROBABILITY OF SUCCESS IN LITIGATION ........................................20

          (2)    COMPLEXITY AND LIKELY DURATION OF LITIGATION ..........................20

          (3)    OTHER FACTORS BEARING ON THE WISDOM OF THE COMPROMISE......21

III.    SECTION 1129(a)(1): THE PLAN COMPLIES WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE ...........................................................................23

     A.     SECTION 1122: THE PLAN'S CLASSIFICATION STRUCTURE IS PROPER .............23

          (1)    CLASSIFICATION OF SECURED CLAIMS ............................................26

          (2)    CLASSIFICATION OF UNSECURED CLAIMS .........................................26

          (3)    CLASSIFICATION OF INTERESTS .......................................................27

     B.     SECTION 1123(a): THE PLAN'S CONTENT IS APPROPRIATE .............................28

          (1)    SECTION 1123(a)(1): DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS ...........................................................................28

          (2)    SECTION 1123(a)(2): CLASSES NOT IMPAIRED BY THE PLAN ...............28

          (3)    SECTION 1123(a)(3): TREATMENT OF CLASSES IMPAIRED BY THE PLAN .............................................................................................29

          (4)    SECTION 1123(a)(4): EQUAL TREATMENT WITHIN EACH CLASS .........29

          (5)    SECTION 1123(a)(5): ADEQUATE MEANS FOR IMPLEMENTATION........31

i

(6) SECTION 1123(a)(6): PROHIBITION ON ISSUANCE OF NONVOTING SECURITIES ...........................................................................32

(7) SECTION 1123(a)(7): PROVISIONS REGARDING DIRECTORS AND OFFICERS ........................................................................................33

(8) SECTION 1123(a)(8): INAPPLICABLE PROVISION ....................34

C. SECTION 1123(b): THE PLAN'S CONTENT IS PERMITTED ................34

(1) SECTION 1123(b)(1): IMPAIRMENT/UNIMPAIRMENT OF CLAIMS AND INTERESTS ..........................................................34

(2) SECTION 1123(b)(2): ASSUMPTION/REJECTION OF EXECUTORY CONTRACTS AND LEASES ...............................34

(3) SECTION 1123(b)(3): SETTLEMENT/RETENTION OF CLAIMS AND CAUSES OF ACTION ...................................35

(4) SECTION 1123(b)(4): SALE OF ASSETS ...............................36

(5) SECTION 1123(b)(5): MODIFICATION OF RIGHTS ................36

(6) SECTION 1123(b)(6): OTHER PERMISSIBLE PROVISIONS ......36

D. SECTION 1123(c): INAPPLICABLE PROVISION ...............................40

E. SECTION 1123(d): CURE OF DEFAULTS ........................................40

IV. SECTION 1129(a)(2): THE DEBTORS HAVE COMPLIED WITH THE BANKRUPTCY CODE .................................................................................40

A. SECTION 1125: POSTPETITION DISCLOSURE STATEMENT AND SOLICITATION ..............................................................................41

B. SECTION 1126: ACCEPTANCE OF THE PLAN ...............................41

V. SECTION 1129(a)(3): THE PLAN HAS BEEN PROPOSED IN GOOD FAITH AND NOT BY ANY MEANS FORBIDDEN BY LAW ..............................................43

VI. SECTION 1129(a)(4): THE PLAN PROVIDES THAT PROFESSIONAL FEES AND EXPENSES ARE SUBJECT TO COURT APPROVAL ......................................45

VII. SECTION 1129(a)(5): THE DEBTORS HAVE DISCLOSED ALL NECESSARY INFORMATION REGARDING DIRECTORS, OFFICERS, AND INSIDERS ..............46

VIII. SECTION 1129(a)(6): REGULATORY APPROVAL IS NOT APPLICABLE ............47

IX. SECTION 1129(a)(7): THE PLAN SATISFIES THE BEST INTERESTS TEST .........48

X. SECTION 1129(a)(8): THE PLAN HAS BEEN ACCEPTED BY MOST IMPAIRED CLASSES ENTITLED TO VOTE AND, AS TO SUCH CLASSES, THE REQUIREMENTS OF SECTION 1129(a)(8) HAVE BEEN SATISFIED ........................................50

XI. SECTION 1129(a)(9): THE PLAN PROVIDES FOR PAYMENT IN FULL OF ALL ALLOWED PRIORITY CLAIMS .................................................................52

A. SECTION 1129(a)(9)(A): ADMINISTRATIVE EXPENSE CLAIMS .........52

B. SECTION 1129(a)(9)(B): OTHER PRIORITY CLAIMS ......................52

C. SECTION 1129(a)(9)(C): PRIORITY TAX CLAIMS ..........................53

XII.    SECTION 1129(a)(10):  AT LEAST ONE CLASS OF IMPAIRED CLAIMS HAS
        ACCEPTED THE PLAN ...........................................................................................54
XIII.   SECTION 1129(a)(11):  THE PLAN IS FEASIBLE .....................................................54
XIV.    SECTION 1129(a)(12):  ALL STATUTORY FEES HAVE OR WILL BE PAID ......................57
XV.     SECTION 1129(a)(13):  CONTINUATION OF RETIREE BENEFITS ...................................57
XVI.    SECTIONS 1129(a)(14), 1129(a)(15), AND 1129(a)(16):  INAPPLICABLE
        PROVISIONS .........................................................................................................58
XVII.   SECTION 1129(b): THE PLAN SATISFIES THE "CRAM DOWN" REQUIREMENTS
        WITH RESPECT TO CLASS 8 AND CLASS 10 ............................................................58
        A.      THE PLAN DOES NOT DISCRIMINATE UNFAIRLY ..............................................59
        B.      THE PLAN IS FAIR AND EQUITABLE..............................................................62
XVIII.  SECTION 1129(c):  THE PLAN IS THE ONLY PLAN ...................................................64
XIX.    SECTION 1129(d):  THE PRINCIPAL PURPOSE OF THE PLAN IS NOT THE
        AVOIDANCE OF TAXES ...........................................................................................64
XX.     SECTION 1129(e):  INAPPLICABLE PROVISION..........................................................64
XXI.    SECTION 1127:  MODIFICATION OF THE PLAN ........................................................64
XXII.   CAUSE EXISTS TO WAIVE STAY OF CONFIRMATION ORDER .....................................66
XXIII.  THE OBJECTIONS TO THE PLAN SHOULD BE OVERRULED ..........................................66
        A.      THE UST OBJECTION ...............................................................................66
                (1)     INCLUSION OF THE MANAGEMENT INCENTIVE PLAN IN THE CHAPTER 11
                        PLAN WAS INTENDED ONLY TO PROVIDE NECESSARY DISCLOSURES; IT
                        IS NOT A PRE-EMERGENCE RETENTION PLAN REQUIRING APPROVAL
                        UNDER SECTION 503 ...................................................................67
                (2)     THE RELEASE AND EXCULPATION PROVISIONS ARE PERMISSIBLE ........70
                (3)     THE DEBTORS HAVE INCLUDED A GOVERNMENT CARVE-OUT IN THE
                        CONFIRMATION ORDER ................................................................72
        B.      THE ECN OBJECTION ...............................................................................73
                (1)     THE PLAN IS VALUE-MAXIMIZING..................................................73
                (2)     THE PLAN HAS BEEN PROPOSED IN GOOD FAITH ...................................75
                (3)     INFORMATION REGARDING DEBTORS' AIRBUS MODEL EC225 AND
                        AS332 L2 HELICOPTERS...............................................................76
        C.      THE KLS OBJECTION ...............................................................................77
                (1)     THE PLAN DOES NOT VIOLATE SECTION 1123(a)(4) OF THE
                        BANKRUPTCY CODE ......................................................................77
                (2)     THE RELEASE AND EXCULPATION PROVISIONS ARE PERMISSIBLE ........80
XXIV.   CONCLUSION .......................................................................................................81
EXHIBIT A (LIST OF DEBTORS) ......................................................................................... A-1

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Ad Hoc Comm. of Pers. Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.)*,
   412 B.R. 53 (S.D.N.Y. 2008).............................................................................29, 68, 69

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007), *appeal dismissed*, 371 B.R. 660 (S.D.N.Y. 2007),
   *aff'd*, 544 F.3d 420 (2d Cir. 2008) .................................................................................48, 79

*In re Affiliated Foods, Inc.*,
   249 B.R. 770 (Bankr. W.D. Mo. 2000).................................................................................49

*In re Am. Solar King Corp.*,
   90 B.R. 808 (Bankr. W.D. Tex. 1988)...................................................................................65

*In re AMR Corp.*,
   490 B.R. 158 (Bankr. S.D.N.Y. 2013) ..................................................................................69

*In re Armstrong World Indus., Inc.*,
   348 B.R. 111 (D. Del. 2006).................................................................................................11

*Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*,
   584 F.3d 229 (5th Cir. 2009) ...............................................................................................67

*In re Barnes*,
   309 B.R. 888 (Bankr. N.D. Tex. 2004)..................................................................................75

*Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc)*,
   622 F.2d 872 (5th Cir. 1980) ..........................................................................................27, 60

*Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*,
   764 F.2d 406 (5th Cir. 1985) ..........................................................................................44, 75

*In re Buttonwood Partners, Ltd.*,
   111 B.R. 57 (Bankr. S.D.N.Y. 1990).....................................................................................60

*In re Cano Petroleum, Inc.*,
   No. 12-31549 (BJH), 2012 WL 2931107 (Bankr. N.D. Tex. Jul. 18, 2012) .........................23

*CFB-5, Inc. v. Cunningham*,
   371 B.R. 175 (N.D. Tex. 2007)..............................................................................................16

*Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*,
   68 F.3d 914 (5th Cir. 1995) ............................................................................................17, 18

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004) .....................................................................................18

*In re Drexel Burnham Lambert Grp., Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...................................................................................49

*In re Eagle Bus Mfg. Inc.*,
134 B.R. 584 (Bankr. S.D. Tex. 1991), *aff'd*, 158 B.R. 421 (S.D. Tex. 1993).......................24

*Fin. Sec. Assur. Inc. v. T-H New Orleans Ltd. P'Ship (In re T-H New Orleans Ltd. P'Ship)*,
116 F.3d 790 (5th Cir. 1997) ........................................................................................44, 55

*In re Furlow*,
70 B.R. 973 (Bankr. E.D. Pa. 1987) ..................................................................................60

*In re Gen. Homes Corp. FGMC*,
134 B.R. 853 (Bankr. S.D. Tex. 1991) ...............................................................................60

*In re Great Bay Hotel & Casino, Inc.*,
251 B.R. 213 (Bankr. D.N.J. 2000) ...............................................................................23, 26

*In re Hardeman Cnty. Hosp. Dist.*,
540 B.R. 229 (Bankr. N.D. Tex. 2015).................................................................................60

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. Ltd., II (In re Briscoe Enters., Ltd., II)*,
994 F.2d 1160 (5th Cir. 1993) .............................................................................10, 55, 75

*In re Heritage Org., LLC*,
375 B.R. 230 (Bankr. N.D. Tex. 2007)............................................................................17, 18

*In re Idearc Inc.*,
423 B.R. 138 (Bankr. N.D. Tex. 2009), *subsequently aff'd*,
662 F.3d 315 (5th Cir. 2011) ....................................................................................... *passim*

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assoc. (In re Route 37 Bus. Park Assoc.)*,
987 F.2d 154 (3rd Cir. 1993) ........................................................................................26, 27

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *as modified*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir.1988) ....................................23, 41

*Kane v. Johns-Manville Corp.*,
843 F.2d 636 (2d Cir.1988).................................................................................................55

*Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*,
329 B.R. 491 (D.N.J. 2005), *aff'd*, 241 F. App'x 1 (3d Cir. 2007) .........................................46

*Local Loan Co. v. Hunt*,
292 U.S. 234 (1934)............................................................................................................19

*In re Meadow Glen, Ltd.*,
  87 B.R. 421 (Bankr. W.D. Tex. 1988) .................................................................................24

*In re Mirant Corp.*,
  334 B.R. 800 (Bankr. N.D. Tex. 2005) ...............................................................................16

*In re Mirant Corp.*,
  348 B.R. 725 (Bankr. N.D. Tex. 2006), *aff'd sub nom Objecting Class 3 Claimholders v.*
  *New Mirant Entities*, Case No. 4:06-CV-744-A, 2006 WL 3780884 (N.D. Tex. Dec. 26,
  2006) .............................................................................................................................17, 18

*In re NII Holdings, Inc.*,
  536 B.R. 61 (Bankr. S.D.N.Y. 2015) ..................................................................................74

*In re Nw. Timberline Enters., Inc.*,
  348 B.R. 412 (Bankr. N.D. Tex. 2006) ...............................................................................11

*Official Comm. Of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec.*
  *Power Coop., Inc.)*,
  119 F.3d 349 (5th Cir.1997) ...........................................................................................17, 18

*Official Comm. of Unsecured Creditors v. Moeller (In re Age Refining, Inc.)*,
  801 F.3d 530 (5th Cir. 2015) ......................................................................................17, 18, 74

*Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*,
  995 F.2d 1274 (5th Cir. 1991) .............................................................................................24

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
  761 F.2d 1374 (9th Cir. 1985) .............................................................................................55

*Protective Committee for Independent Stockholders of TMT Trailer Ferry Inc. v. Anderson*,
  390 U.S. 414 (1968) .......................................................................................................16, 18

*Republic Supply Co. v. Shoaf*,
  815 F.2d 1046 (5th Cir. 1987) .............................................................................................71

*Rivercity v. Herpel (In re Jackson Brewing Co.)*,
  624 F.2d 599 (5th Cir. 1980) ..........................................................................................16, 17

*Ronit, Inc. v. Stemson Corp. (In re Block Shim Dev. Co.—Irving)*,
  939 F.2d 289 (5th Cir.1991) ...............................................................................................75

*In re Sentry Operating Co. of Tex., Inc.*,
  264 B.R. 850 (Bankr. S.D. Tex. 2001) ...............................................................................60

*Stucki v. Orwig*,
  Case No. 3:12–CV–1064–L, 2013 WL 1499377 (N.D. Tex. Apr. 12, 2013) ..........................59

*United Sav. Ass'n v. Timbers of Inwood Forest Assocs. (In re Timbers of Inwood Forest Assocs.)*,
793 F.2d 1380 (5th Cir. 1986), *aff'd en banc*, 808 F.2d 363 (5th Cir. 1987), *aff'd*, 484 U.S.
365 (1988) ..........................................................................................................................63

*United States v. Energy Res. Co.*,
495 U.S. 545 (1990) ...................................................................................................19, 55

*In re W.R. Grace & Co.*,
729 F.3d 311 (3rd Cir. 2013) ...............................................................................................29

*W. Real Estate Equities, LLC v. Vill. At Camp Bowie I, LP (In re Vill. at Camp Bowie I, L.P.)*,
710 F.3d 239 (5th Cir. 2013) ...............................................................................................44

*In re Wool Growers Cent. Storage Co.*,
371 B.R. 768 (Bankr. N.D. Tex. 2007)................................................................................70

**Statutes**

11 U.S.C. § 105 ................................................................................................... *passim*

11 U.S.C. § 109 ............................................................................................................10

11 U.S.C. § 330 ............................................................................................................46

11 U.S.C. § 331 ............................................................................................................46

11 U.S.C. § 363 .................................................................................................9, 69, 78

11 U.S.C. § 365 ...............................................................................................34, 35, 40

11 U.S.C. § 503 ...............................................................................66, 67, 68, 69, 70

11 U.S.C. § 506 ...............................................................................................12, 15, 21

11 U.S.C. § 507 ....................................................................................................52, 57

11 U.S.C. § 1107 ...........................................................................................................2

11 U.S.C. § 1108 ...........................................................................................................2

11 U.S.C. § 1114 ....................................................................................................57, 58

11 U.S.C. § 1122 ................................................................................................. *passim*

11 U.S.C. § 1123 ................................................................................................. *passim*

11 U.S.C. § 1124 ....................................................................................................28, 51

11 U.S.C. § 1125 ...........................................................................................4, 5, 41, 64, 65

11 U.S.C. § 1126 ....................................................................................................... *passim*

11 U.S.C. § 1127 ................................................................................................64, 65, 66

11 U.S.C. § 1128 ...............................................................................................................4, 5

11 U.S.C. § 1129 ....................................................................................................... *passim*

11 U.S.C. § 1145 ........................................................................................................4, 5, 39

28 U.S.C. § 157 ..................................................................................................................10

28 U.S.C. § 1334 ................................................................................................................10

28 U.S.C. § 1408 ................................................................................................................10

28 U.S.C. § 1409 ................................................................................................................10

FED. R. BANKR. P. 1015 ......................................................................................................2

FED. R. BANKR. P. 2002 ..................................................................................................4, 5

FED. R. BANKR. P. 2016 ....................................................................................................46

FED. R. BANKR. P. 3001 ..................................................................................................4, 5

FED. R. BANKR. P. 3003 ..................................................................................................4, 5

FED. R. BANKR. P. 3012 ....................................................................................................20

FED. R. BANKR. P. 3016 ..................................................................................................4, 5

FED. R. BANKR. P. 3017 ..................................................................................................4, 5

FED. R. BANKR. P. 3018 ..................................................................................................4, 5

FED. R. BANKR. P. 3019 ....................................................................................................65

FED. R. BANKR. P. 3020 ..............................................................................................4, 5, 66

FED. R. BANKR. P. 6004 ..............................................................................................9, 69, 78

FED. R. BANKR. P. 9006 ..................................................................................................4, 5

FED. R. BANKR. P. 9019 ....................................................................................................*passim*

BANKR. N.D. TEX. R. 1015-1 ...........................................................................................2

BANKR. N.D. TEX. R. 2002-1 .........................................................................................4, 5

BANKR. N.D. TEX. R. 2016-1 ...............................................................................................46

BANKR. N.D. TEX. R. 3017-1 ...........................................................................................4, 5

BANKR. N.D. TEX. R. 3018-1 ...........................................................................................4, 5

BANKR. N.D. TEX. R. 3020-1 ...........................................................................................4, 5

**Other Authorities**

H.R. REP. NO. 95-595 (1977)..........................................................................................23, 41

S. REP. NO. 95-989 (1978) .................................................................................................23

5 COLLIER ON BANKRUPTCY ¶ 1129.02 (15TH ED. 1984) ....................................................55

**Docketed Cases**

*In re Energy & Expl. Partners, Inc.*,
No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 26, 2016) ......................................69, 70, 71, 80

*In re Goodrich Petroleum Corp.*,
No. 15-31975 (MI) (Bankr. S.D. Tex. Sept. 28, 2016).........................................69, 70, 71, 80

*In re Life Partners Holdings, Inc.*,
No. 15-40289-rfn11 (RFN) (Bankr. N.D. Tex. May 27, 2016) ...............................................19

*In re Linn Energy, LLC*,
No. 16-60040 (DRJ) (Bankr. S.D. Tex. Jan. 27, 2017) ...........................................................69

*In re Reddy Ice Holdings, Inc.*,
No. 12-32349 (SGJ) (Bankr. N.D. Tex. May 18, 2012) ..........................................................19

*In re SandRidge Energy, Inc.*,
No. 16-32488 (DRJ) (Bankr. S.D. Tex. Sept. 20, 2016).......................................69, 70, 71, 81

TO THE HONORABLE BARBARA J. HOUSER,
UNITED STATES BANKRUPTCY JUDGE:

        CHC Group Ltd. and its above-captioned debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"),[1] submit this Memorandum of Law (the "**Memorandum**") in support of confirmation of the Plan[2] pursuant to section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**"), and respectfully represent as follows:

## PRELIMINARY STATEMENT

        The Debtors are pleased to present the Court with a request for confirmation of a largely consensual Plan—one that is supported by the Consenting Creditor Parties, was voted on by creditors with overwhelming support, and satisfies the requirements of the Bankruptcy Code. This Plan is the culmination of significant efforts and negotiations among the Debtors and multiple creditor constituencies, and is a huge success for the company. It will permit the Debtors to substantially reduce their financial obligations, receive a significant investment of new capital, restructure their fleet, and reorganize their businesses, which will save jobs as well as preserve and maximize the value of their assets.

        Of the Debtors' many stakeholders, only two creditors and the U.S. Trustee objected. These objections can be easily overruled. The objecting creditors do not take issue with the Plan as a whole, but rather largely focus on particular provisions that they believe should be changed to enhance their own recovery profile. The U.S. Trustee's objection raises concerns about post-emergence executive compensation and the release and exculpation provisions, all of which comply with applicable law.

---

[1] A list of the Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, where applicable, is attached hereto as **Exhibit A**.

[2] Capitalized terms are defined below.

The Debtors have reached the final juncture in these Chapter 11 Cases, and have managed to do so approximately nine (9) months after filing these cases. Given the complexities of the Debtors' businesses and organizational and capital structure, coupled with the challenges inherent in restructuring a global enterprise, this is a tremendous accomplishment. It is a testament to the hard work by, and cooperation among, the Debtors' management, the Debtors' advisors, and the Debtors' key creditors and their advisors. The Debtors look forward to confirmation of their Plan so that they can quickly emerge from these Chapter 11 Cases and begin their new start.

## **BACKGROUND**

On May 5, 2016 (the "**Petition Date**"), each of the Debtors commenced a voluntary case in this Court under chapter 11 of the Bankruptcy Code. As of the present date, the Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On May 6, 2016, the Court entered an order pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "**Local Rules**") authorizing the joint administration and procedural consolidation of these Chapter 11 Cases. *See* Docket No. 52. On May 13, 2016, the United States Trustee for the Northern District of Texas (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (the "**Creditors' Committee**").[3]

By order entered on September 20, 2016 [Docket No. 884], the Court authorized the Debtors to commence certain ancillary proceedings and, among other things, (i) seek

---

[3] Membership on the Creditors' Committee has been modified from time to time.

recognition of these Chapter 11 Cases in Canada, (ii) request that the Supreme Court of British Columbia (the "**Canadian Court**") lend assistance to this Court in protecting the property of the Debtors' estates, and (iii) seek any other appropriate relief from the Canadian Court that is just and proper in furtherance of the protection of the Debtors' estates. On September 30, 2016, the Debtors commenced an ancillary proceeding in Canada. On October 13, 2016, the Canadian Court entered an order recognizing these Chapter 11 Cases as a "foreign main proceeding" under the applicable provisions of the Companies' Creditors Arrangement Act (Canada), R.S.C. 1985, c. C-36 as amended, and enforcing certain of this Court's orders in Canada to protect the Debtors' assets and operations in Canada.[4]

By Order entered on December 20, 2016 [Docket No. 1381] (the "**Support Agreements Approval Order**"), the Court authorized the Debtors to enter into and perform under (i) that certain Plan Support Agreement among the Debtors and the Consenting Creditor Parties,[5] dated as of October 11, 2016 (as amended from time to time, the "**Plan Support Agreement**"), (ii) that certain Backstop Agreement among the Debtors and the Backstop Parties, dated as of October 11, 2016 (as amended from time to time, the "**Backstop Agreement**"), and (iii) that a term sheet with the Milestone Parties, dated as of October 11, 2016 (as amended from time to time, the "**Milestone Term Sheet**" and, together with the Plan Support Agreement, the Backstop Agreement, all exhibits, schedules, and annexes, the "**Support Agreements**").

Pursuant to the Support Agreements, on November 11, 2016, the Debtors filed the *Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors* [Docket No. 1171] (as

---

[4] Following entry of the Confirmation Order, the Debtors will file a motion requesting that the Canadian Court enter an order recognizing the Confirmation Order.

[5] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, the Plan Supplement, the Disclosure Statement, or the Disclosure Statement Motion, as may be applicable.

amended, supplemented, restated or modified from time to time, the "**Plan**") and the *Proposed Disclosure Statement for the Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors* [Docket No. 1172] (as amended, the "**Disclosure Statement**"), as well as the *Motion of Debtors for Entry of an Order (I) Approving Proposed Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Establishing Rights Offering Procedures, (IV) Scheduling Confirmation Hearing and (V) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan Pursuant to Sections 105, 1125, 1126, 1128, and 1145 of the Bankruptcy Code and Bankruptcy Rules 2002, 3001, 3003, 3016, 3017, 3018, 3020, and 9006 and Local Rules 2002-1, 3017-1, 3018-1, and 3020-1* [Docket No. 1173] (the "**Disclosure Statement Motion**"). Amended versions of the Plan and Disclosure Statement were filed on December 5, 2016 [Docket Nos. 1285 and 1286, respectively], December 19, 2016 [Docket Nos. 1371 and 1372, respectively], December 20, 2016 [Docket No. 1379, with respect to the Disclosure Statement], and on February 8, 2017 [Docket No. 1633, with respect to the Plan].

On December 20, 2016, this Court entered an order approving the Disclosure Statement Motion [Docket No. 1382] (the "**Disclosure Statement Order**"). Pursuant to the Disclosure Statement Order, the Court (i) established certain solicitation and voting procedures with respect to the Plan (the "**Solicitation and Voting Procedures**"); (ii) established procedures governing the Rights Offering (the "**Rights Offering Procedures**"); (iii) established notice and objection procedures with respect to the Plan (the "**Notice and Objection Procedures**"); (iv) set February 2, 2017 as the Voting Deadline, the Rights Expiration Time, and the Plan Objection Deadline; and (v) scheduled the Confirmation Hearing to commence on February 13, 2017.

On or before December 28, 2016, in accordance with the Disclosure Statement Order, the Debtors commenced solicitation of votes on the Plan and launched the Rights Offering. *Certificate of Service of Andres A. Estrada re: 1) Second Amended Joint Chapter 11 Plan of Reorganization of CHC Group Ltd. and its Affiliated Debtors; 2) Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Establishing Rights Offering Procedures, (IV) Scheduling Confirmation Hearing and (V) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan Pursuant to Sections 105, 1125, 1126, 1128, and 1145 of the Bankruptcy Code and Bankruptcy Rules 2002, 3001, 3003, 3016, 3017, 3018, 3020, and 9006 and Local Rules 2002-1, 3017-1, 3018-1, and 3020-1; and 3) Revised Disclosure Statement for the Second Amended Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors* [Docket No. 1454] (the "**Solicitation Affidavit**"). The Debtors, through their administrative agent, Kurtzman Carson Consultants LLC ("**KCC**"), caused the relevant Solicitation Packages (as defined in and approved by the Disclosure Statement Order) to be transmitted to and served on Claim holders and other interested parties pursuant to the terms of the Court-approved Solicitation and Voting Procedures.[6] *See generally* Solicitation Affidavit. Specifically, as set forth in the Solicitation Affidavit, Solicitation Packages were transmitted to and served on holders of Revolving Credit Agreement Claims (Class 3), ABL Credit Agreement Claims (Class 4), Senior Secured Notes Claims (Class 5), Unsecured Notes Claims (Class 6),

---

[6] On January 24, 2017, the Debtors, through KCC, caused certain notices, revised instructions, and revised Subscription Forms related to the Rights Offering to be transmitted to holders of allowed Senior Secured Notes Claims and Unsecured Notes Claims. *See Certificate of Service of Ashley Kuarsingh re: Documents Served on January 13, 2017* [Docket No. 1535].

General Unsecured Claims (Class 7), and Convenience Claims (Class 8). Solicitation Affidavit at ¶¶5–12; Ballot Certification at ¶ 7.

Pursuant to the Disclosure Statement Order, the Debtors were not required to solicit votes from the holders of Claims or Interests, as applicable, in (i) Class 1, Other Priority Claims; (ii) Class 2, Other Secured Claims; (iii) Class 9, Intercompany Claims; and (iv) Class 11, Intercompany Interests, as each such Class is Unimpaired under the Plan. Disclosure Statement Order at ¶ 10. Additionally, the Debtors were not required to solicit votes from the holders of Interests in Class 10, Existing CHC Interests, as such Class will not receive any recovery under the Plan and is deemed to reject the Plan. *Id.* at ¶ 9. The Debtors did, however, distribute notices of non-voting status to the members of Class 1, Class 2, and Class 10 pursuant to the Disclosure Statement Order. *Id.* at ¶¶ 25–26; Solicitation Affidavit at ¶¶ 13–14; Ballot Certification at ¶ 7.

In addition, the Debtors published notice of the Confirmation Hearing in (i) *The Globe and Mail*, a Toronto based newspaper, on December 23, 2016; (ii) *The Wall Street Journal*, a daily national newspaper of general circulation throughout the United States, Asia, and Europe, on December 27, 2016; and (iii) the *Cayman Islands Gazette*, the official newspaper of the Government of the Cayman Islands, on January 3, 2017. *See Affidavit of Publication of Notice of Approval of Disclosure Statement, (II) Establishment of Voting Record Date, (III) Hearing on Confirmation of the Plan, (IV) Procedures and Deadline for Objecting to the Confirmation of the Plan, and Procedures and Deadline for Voting on the Plan in the Globe & Mail* [Docket No. 1561]; the *Affidavit of Publication of Notice of Approval of Disclosure Statement, (II) Establishment of Voting Record Date, (III) Hearing on Confirmation of the Plan, (IV) Procedures and Deadline for Objecting to the Confirmation of the Plan, and Procedures*

6

*and Deadline for Voting on the Plan in the Wall Street Journal Global* [Docket No. 1562]; and the *Amended Affidavit of Publication of Notice of Approval of Disclosure Statement, (II) Establishment of Voting Record Date, (III) Hearing on Confirmation of the Plan, (IV) Procedures and Deadline for Objecting to the Confirmation of the Plan, and Procedures and Deadline for Voting on the Plan in the Cayman Islands Gazette* [Docket No. 1600].

By Order entered on January 5, 2017 [Docket No. 1446], the Court authorized Cayman Investments I, 6922767 Holding S.à.r.l., CHC Helicopter S.A., Heli-One Canada ULC, and/or CHC Leasing (Ireland) Limited to commence an ancillary proceeding in the Cayman Islands with respect to CHC Parent (the "**Cayman Proceedings**") requesting that the Grand Court of the Cayman Islands Financial Services Division (the "**Cayman Court**") recognize any approved plan in these Chapter 11 Cases and help effectuate its provisions in the Cayman Islands. On January 9, 2017, CHC Helicopter S.A. commenced the Cayman Proceedings by filing a winding up petition with respect to CHC Parent. Immediately thereafter, CHC Parent filed an application to appoint provisional liquidators for its liquidation in the Cayman Islands. After notice and a hearing, on January 10, 2017, the Cayman Court signed an order appointing Stuart Sybersma of Deloitte & Touche and Neville Kahn of Deloitte LLP as joint provisional liquidators of CHC Parent. On February 3, 2017, CHC Parent filed a summons asking the Cayman Court to enter an order validating certain asset transfers, claims assumptions, and other transactions necessary to implement and effectuate the terms of the Plan, contingent upon this Court entering the Confirmation Order. The hearing on this matter is proceeding today.

The Debtors filed a supplement to the Plan [Docket No. 1519] on January 22, 2017 (as amended, supplemented, restated or modified from time to time, the "**Plan Supplement**"), which included the following documents: (i) List of Initial Directors and

7

Officers of CHC Helicopter I LLC (Reorganized CHC); (ii) Management Incentive Plan Term Sheet; (iii) Reorganized CHC Operating Agreement; (iv) Exit Revolving Credit Agreement; (v) Amended and Restated ABL Credit Agreement; (vi) New Second Lien Convertible Notes Indenture; (vii) New Unsecured Notes Indenture; (viii) Schedule of Assumed Contracts and Leases; (ix) Schedule of Rejected Contracts and Leases; (x) Schedule of Assumed Aircraft Leases; (xi) Schedule of Rejected Aircraft Leases; (xii) Schedule of Postpetition Aircraft Agreements; (xiii) Schedule of Assumed Compensation and Benefit Plans; (xiv) Registration Rights Agreement; (xv) New Intercreditor Agreement; and (xvi) Restructuring Transactions.

With respect to the results of the Rights Offering, the deadline for those eligible, other than the Backstop Parties, to participate in the Rights Offering and exercise their Subscription Rights was February 2, 2017. Ballot Certification at ¶15. KCC received valid subscriptions totaling one-hundred-forty-two-million-one-hundred-thirteen-thousand-three-hundred-eighty dollars ($142,113,380) in face amount of New Second Lien Convertible Notes, which represents thirty-eight-point-zero-three percent (38.03%) of the New Second Lien Convertible Notes offered. Pursuant to the Backstop Agreement and in accordance with the Rights Offering Procedures, Backstop Parties were not required to subscribe during the offer period. However, certain Backstop Parties did subscribe and KCC is currently working with the Backstop Parties to determine the correct subscription rate for those Backstop Parties that did not initially participate in the offer. All remaining notes available in the rights offering will be purchased by the Backstop Parties consistent with their obligations under the Backstop Agreement. *Id*. at ¶16.

Pursuant to the Disclosure Statement Order, the deadline to file objections to the Plan was February 2, 2017. Prior to this deadline, three (3) objections to the Plan were filed:

(i) the *United States Trustee's (1) Objection to Second Amended Joint Chapter 11 Plan of CHC Group, Ltd. and its Affiliated Debtors and (2) Brief in Support of United States Trustee's Objection (Docket Entry No. 1371)* [Docket No. 1592] (the "**UST Objection**"); (ii) *ECN Capital (Aviation) Corp.'s Objection to the Second Amended Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors* [Docket No. 1605] (the "**ECN Objection**"); and (iii) the *Objection to Confirmation of Debtors' Second Amended Joint Chapter 11 Plan and Brief in Support Thereof* [Docket No. 1608] (the "**KLS Objection**" and, collectively with the UST Objection and the ECN Objection, the "**Objections**"). These Objections, and the Debtors' responses to them, are set forth in more detail in Section XXIII below.

## FACTS

Except as set forth herein, the pertinent and salient facts relating to these Chapter 11 Cases and the Plan are set forth in the Disclosure Statement and the Plan. In addition, prior to or contemporaneously with the filing of this Memorandum, the following documents were filed in support of confirmation of the Plan:

(a) *Declaration of Michael B. Cox in Support of Debtors' Motion for an Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019 Authorizing the Debtors to Enter into and Approving Plan Support Agreement, Backstop Agreement and Milestone Term Sheet* [Docket No. 1050], (the "**Cox PSA Declaration**");

(b) *Declaration of Michael J. Genereux in Support of Debtors' Motion for an Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019 Authorizing the Debtors to Enter into and Approving Plan Support Agreement, Backstop Agreement and Milestone Term Sheet* [Docket No. 1055], (the "**Genereux PSA Declaration**");

(c) *Declaration of Robert A. Del Genio in Support of Debtors' Memorandum of Law in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors*, (the "**Del Genio Declaration**");

(d)     *Declaration of Michael J. Genereux in Support of Debtors' Memorandum of Law in Support of Confirmation of the Third Amended Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors*, (the "**Genereux Declaration**");

(e)     *Declaration of David W. Fowkes in Support of the Third Amended Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors*, (the "**Fowkes Declaration**" and, collectively with the Cox PSA Declaration, the Genereux PSA Declaration, the Del Genio Declaration, and the Genereux Declaration, the "**Declarations**"); and

(f)     *Certification of Andres A. Estrada With Respect to the Tabulation of Votes on the Second Amended Joint Chapter 11 Plan of CHC Group Ltd. and its Affiliated Debtors* [Docket No. 1630], (the "**Ballot Certification**").

All facts referenced in the Declarations and Ballot Certification are incorporated herein as though set forth fully at length. Certain additional facts may be provided by live testimony at the Confirmation Hearing. As necessary, specific, salient facts will be referred to in connection with the discussion of applicable legal principles.

## JURISDICTION AND VENUE

This Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court has jurisdiction to enter a final order with respect thereto. The Debtors are eligible debtors under section 109 of the Bankruptcy Code. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## ARGUMENT

### I.     STANDARD OF PROOF

To obtain confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies the applicable provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence. *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. Ltd., II (In re Briscoe*

*Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown."); *see also In re Nw. Timberline Enters., Inc.*, 348 B.R. 412, 435 (Bankr. N.D. Tex. 2006); *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006).

As mentioned above, the foundation of the Plan is a global settlement of all Claims and controversies relating to the rights that holders of Claims or Interests may have with respect to such Claims, Interests, or Plan Distributions on account thereof, pursuant to section 1123(b)(3) of the Bankruptcy Code, which permits a plan to provide for the settlement or adjustment of any claim or interest belonging to a debtor. 11 U.S.C. § 1123(b)(3). Because the Plan and global settlement are a single, integrated agreement, the Debtors also seek approval of the settlements contained therein pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 in addition to seeking confirmation of the Plan.

Through filings with the Court, the Declarations and Ballot Certification, the record of these Chapter 11 Cases (including the Support Agreements Approval Order), and additional testimonial evidence that may be adduced at the Confirmation Hearing, the Debtors will demonstrate, by a preponderance of the evidence, that the Plan satisfies all applicable subsections of section 1129 of the Bankruptcy Code and is well within the settlement standards established pursuant to Bankruptcy Rule 9019, section 105(a) of the Bankruptcy Code, and applicable case law.

## II.    THE GLOBAL SETTLEMENT UNDERLYING THE PLAN SHOULD BE APPROVED

### A.    INTRODUCTION

As described in the Disclosure Statement and elsewhere in the record of these Chapter 11 Cases, the complexity of these Chapter 11 Cases necessitated a consensual exit

strategy. With global operations, a multi-layered capital structure, and the need for a significant fleet reconfiguration, the Debtors faced significant challenges at the outset of these Chapter 11 Cases, and had to contend with a number of complex disputes, including the amount, value, and treatment of funded debt claims; the validity, extent, and priority of the Liens securing the Debtors' secured obligations; the value of the Debtors' assets and equity; potential adequate protection or diminution in value Claims; potential Claims to surcharge Collateral under Bankruptcy Code section 506(c); and the allocation of distributable value among the creditor classes, among others. The Debtors' key creditor constituencies each took opposing positions with respect to many of these disputes, and it quickly became clear to the Debtors and their advisors that these Chapter 11 Cases could be bogged down in litigation on any one or more of these points. The Debtors became concerned that such litigation would be costly and time consuming, thereby reducing liquidity and significantly diminishing value otherwise available for distribution to creditors and potentially threatening any possibility of the company reorganizing. Del Genio Decl. at ¶ 26.

B. **NEGOTIATIONS LEADING TO THE PLAN**

The Debtors commenced these Chapter 11 Cases to reorganize their business, overhaul and reconfigure their aircraft arrangements, and significantly reduce an unsustainable balance sheet. *Id.* at ¶ 27. To accomplish these goals, the Debtors required a significant cash infusion to fund the reorganized company's future operations. With these objectives squarely in focus, the Debtors quickly engaged in discussions with lessors and other key stakeholders to reach a global resolution. Through a series of negotiations with multiple parties spanning several months, the Debtors were able to resolve the potential disputes that threatened to stall any restructuring and reach agreements on multiple fronts for restructured lease and financial terms that achieve the Debtors' goals. *Id.*; Genereux PSA Decl. at ¶ 8; Cox PSA Decl. at ¶¶ 6–11.

12

### (1)     AIRCRAFT NEGOTIATIONS

As a key component of the Debtors' revised business plan, the Debtors designed a comprehensive fleet reconfiguration strategy. The Debtors identified cost savings to be achieved through a significant reduction in the company's prepetition fleet by eliminating non-revenue generating helicopters and other related equipment. The Debtors also determined that they needed a significant reduction in lease and financing related expenses for their remaining helicopters. Additionally, the Debtors concluded that reducing the complexity of their fleet would decrease costs associated with crew training, inventory, and maintenance. Del Genio Decl. at ¶ 28; Cox PSA Decl. at ¶ 6.

In furtherance of these goals, the Debtors negotiated, and sought Court approval of, the rejection of numerous aircraft leases, the abandonment of several aircraft, the terms of new aircraft financing and leasing arrangements, as well as other related agreements, including agreements as to the allowance of certain Claims. Del Genio Decl. at ¶ 29; Cox PSA Decl. at ¶¶ 11, 13. Many of these agreements have already been approved by this Court by separate order, and others have been submitted for approval (by separate motion) concurrently with confirmation of the Plan.

### (2)     INVESTMENT AND PLAN NEGOTIATIONS

In addition to optimizing their fleet, the Debtors entered into chapter 11 to restructure their balance sheet and obtain a new capital infusion to fund a chapter 11 plan and successful emergence as a viable entity. At the outset of these cases, the Debtors' financial advisor, PJT Partners LP, commenced a marketing process to identify parties interested in providing new capital, and the Debtors and their advisors engaged with members of the Debtors' existing capital structure regarding a potential new money investment. Del Genio Decl. at ¶ 30; Genereux PSA Decl. at ¶ 6. As described in more detail in the Support Agreements Motion and

the evidence in support thereof, this process evolved into a months-long series of intense, competitive negotiations among the Debtors, the parties that ultimately became the Plan Sponsors, the Creditors' Committee, the ABL Lender Parties, the Revolving Credit Facility Lenders, and the Milestone Parties (in parallel with a separate competing bid offered by another stakeholder that the Debtors ultimately rejected in favor of the existing deal). Del Genio Decl. at ¶ 30; Genereux PSA Decl. at ¶ 8.

The ultimate goal of these discussions was to build broad consensus around the terms of a chapter 11 plan that would provide for a global settlement among the Debtors and their key creditor groups and an exit strategy that would enable the Debtors to quickly emerge from chapter 11 as reorganized entities with substantially reduced fleet and financial obligations. Del Genio Decl. at ¶ 31; Genereux PSA Decl. at ¶ 8.

These efforts were successful, resulting in the execution of the Support Agreements and agreement on the terms of a chapter 11 plan that provides for (i) a significant deleveraging of the Debtors' balance sheet, (ii) a large capital infusion, and (iii) a key lease arrangement on substantially improved terms, all of which has the support of holders representing or holding approximately sixty-seven-point-fifty-six percent (67.56%) in outstanding principal amount of the Senior Secured Notes Claims (the Debtors' largest creditors), holders representing or holding approximately seventy-three-point-fifty-six percent (73.56%) in outstanding principal amount of the Unsecured Notes Claims, the Milestone Parties (the Debtors' largest lessor), and the Creditors' Committee. Del Genio Decl. at ¶ 32; Genereux PSA Decl. at ¶ 10 ; Cox PSA Decl. at ¶ 11. In addition, the agreed upon plan terms (as incorporated in the Plan) include the resolution of the disputes that carried significant litigation risk and could have delayed prosecution of these Chapter 11 Cases. With these numerous

14

benefits, the Debtors and their advisors easily determined that the Plan deal and the settlements embodied therein represent the best path toward an efficient and highly-consensual emergence from chapter 11 and are in the best interests of the Debtors' estates. Del Genio Decl. at ¶ 32.

C.     SETTLEMENT SUMMARY

The specific terms of the global settlement are integrated in and serve as the foundation of the Plan. At a high level, they include concessions among creditor groups as to (i) the amount, value, and treatment of ABL Credit Agreement Claims, Senior Secured Notes Claims, and Unsecured Notes Claims against the Debtors; (ii) the validity, extent and priority of the Liens securing the Senior Secured Notes; (iii) the value of the Debtors' encumbered and unencumbered Assets; (iv) potential adequate protection or diminution in value Claims that could be asserted by the holders of Senior Secured Notes; (v) potential Claims to surcharge Collateral under section 506(c) of the Bankruptcy Code; (vi) the allocation of distributable value among the various creditor classes; (vii) the Debtors' retention of Causes of Action; (viii) the release and exculpation of the Consenting Creditor Parties; and (ix) the Equity Value and the total enterprise value of the reorganized company premised upon the Debtors remaining as a going concern, which is conditioned upon the $300 million new money investment. *Id.* at ¶ 33; Genereux Decl. at ¶¶ 8–11. As a necessary component of this deal, the Plan includes certain Debtor and third-party releases, an exculpation provision, and an injunction provision. Del Genio Decl. at ¶ 33; Plan, Art. X.

Further, pursuant to the settlement, the Debtors and creditors agreed on the value to be allocated to holders of Allowed General Unsecured Claims, and then agreed on the allocation of such consideration among holders of Allowed Primary General Unsecured Claims and holders of Allowed Secondary General Unsecured Claims. To resolve complex issues regarding the distributable unencumbered value at each Debtor, and to establish a minimum level

15

of recovery for holders of Allowed Primary General Unsecured Claims, the Plan provides for the limited consolidation of the Debtors for distribution on account of Allowed Primary General Unsecured Claims. Del Genio Decl. at ¶ 35. The allocation of the Secondary General Unsecured Claims Distribution among the Secondary Recovery Debtors was negotiated using a recovery waterfall based upon all of the Claims, secured and unsecured, at each entity, as more fully disclosed in Exhibit C to the Disclosure Statement. Disclosure Statement, Ex. C (Estimated Recovery for Allowed Secondary General Unsecured Claims at Secondary Recovery Debtors).

### D.    LEGAL STANDARD FOR APPROVAL OF SETTLEMENTS

Pursuant to Bankruptcy Rule 9019, a court is permitted to approve a compromise or settlement on motion by a debtor, after notice and a hearing. FED. R. BANKR. P. 9019(a). As the Supreme Court noted in *Protective Committee for Independent Stockholders of TMT Trailer Ferry Inc. v. Anderson*, "[c]ompromises are 'a normal part of the process of reorganization'" and are favored in bankruptcy because they minimize litigation costs and further the parties' interest in expediting the administration of the case. 390 U.S. 414, 424 (1968); *see also Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) ("We must remember that compromises are 'a normal part of the process of reorganization,' oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly.") (citations omitted); *In re Mirant Corp.*, 334 B.R. 800, 811 (Bankr. N.D. Tex. 2005) ("One of the goals of Congress in fashioning the Bankruptcy Code was to encourage parties in a distress situation to work out a deal among themselves.").

The decision to approve a particular compromise or settlement lies within the sound discretion of the bankruptcy court. *In re Jackson Brewing Co.*, 624 F.2d at 602–03; *CFB-5, Inc. v. Cunningham*, 371 B.R. 175, 181 (N.D. Tex. 2007) ("Under Rule 9019 of the Federal Rules of Bankruptcy Procedure, approval of compromise settlements is at the discretion of the

16

bankruptcy court."). The bankruptcy court's approval of a settlement is appropriate "when the settlement is fair and equitable and in the best interest of the estate." *Official Comm. of Unsecured Creditors v. Moeller (In re Age Refining, Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015) (quoting *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995)); *In re Heritage Org., LLC*, 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007) (citing *Official Comm. Of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 355 (5th Cir.1997)).

In determining whether to approve a settlement, courts in the Fifth Circuit have applied a three factor test with a focus on comparing "the terms of the compromise with the likely rewards of litigation." *In re Age Refining, Inc*., 801 F.3d at 540 (quoting *In re Jackson Brewing Co*., 624 F.2d at 602). Pursuant to this test, "[a] bankruptcy court must evaluate: (1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise." *Id.* at 540 (citing *In re Jackson Brewing Co*., 624 F.2d at 602); *see also In re Cajun Elec. Power Coop*., 119 F.3d at 356 (citing *same*); *In re Heritage Org., LLC*, 375 B.R. at 259; *In re Mirant Corp*., 348 B.R. 725, 739–40 (Bankr. N.D. Tex. 2006), *aff'd sub nom Objecting Class 3 Claimholders v. New Mirant Entities*, Case No. 4:06-CV-744-A, 2006 WL 3780884 (N.D. Tex. Dec. 26, 2006). Furthermore, "[u]nder the rubric of the third, catch-all provision, [the Fifth Circuit has] specified two additional factors that bear on the decision to approve a proposed settlement." *In re Cajun Elec. Power Coop*., 119 F.3d at 356. These "other factors" include consideration of "(i) the best interests of the creditors, with proper deference to their reasonable views and (ii) the extent to which the settlement is truly the product of arms-

length bargaining, and not of fraud or collusion." *In re Age Refining, Inc.*, 801 F.3d at 540 (citing *In re Cajun Elec. Power Coop.*, 119 F.3d at 356 (*quoting In re Foster Mortg. Corp.*, 68 F.3d at 917–18)); (internal quotation marks omitted); *see also In re Foster Mortg. Corp.*, 68 F.3d at 918 ("We believe a bankruptcy court should consider the amount of creditor support for a compromise settlement as a 'factor bearing on the wisdom of the compromise,' as a way to show deference to the reasonable views of the creditors.").

"In evaluating a Rule 9019 settlement, a bankruptcy court need not 'conduct a mini-trial to determine the probable outcome of any claims waived in the settlement.'" *In re Age Refining*, 801 F.3d at 541. "Rather, the bankruptcy court must 'apprise [itself] of the relevant facts and law so that [it] can make an informed and intelligent decision.'" *Id.*; *see also TMT Trailer Ferry*, 390 U.S. at 424–25 (noting that a court should "compare the terms of the compromise with the likely rewards of litigation"); *In re Cajun Elec. Power Coop.*, 119 F.3d at 356; *In re Heritage Organization, LLC*, 375 B.R. at 260; *In re Mirant*, 348 B.R. at 741, n.36 ("For a settlement to meet the best interests test, the amount being paid or received by the estate . . . need only be within the extremes of the range."); *In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004) ("In approving a settlement, the court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must only conclude that the compromise or settlement falls within the reasonable range of litigation possibilities. That is, the settlement need only be above "the lowest point in the range of reasonableness.") (citations omitted).

In addition, the bankruptcy court's power pursuant to section 105(a) provides additional support for approval of settlements. Section 105(a) of the Bankruptcy Code states that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry

out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process. *See United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) (stating in reference to Bankruptcy Code sections 105(a), 1123(b)(5), and 1129 that "[t]hese statutory directives are consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships"); *Local Loan Co. v. Hunt*, 292 U.S. 234, 240 (1934) ("[C]ourts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity."). Courts in this jurisdiction have relied on section 105(a), in addition to Bankruptcy Rule 9019, in approving settlement agreements. *See, e.g.*, *In re Life Partners Holdings, Inc.*, No. 15-40289-rfn11 (RFN) (Bankr. N.D. Tex. May 27, 2016) [Docket No. 2295]; *In re Reddy Ice Holdings, Inc.*, No. 12-32349 (SGJ) (Bankr. N.D. Tex. May 18, 2012) [Docket No. 424].

E. **THE GLOBAL SETTLEMENT IS FAIR AND REASONABLE, SUPPORTED BY SOUND BUSINESS JUSTIFICATIONS, AND IN THE DEBTORS' BEST INTERESTS**

In the Debtors' business judgment, the resolutions embodied in the Plan are fair, equitable, and in the best interest of the Debtors, their estates and their creditors—who overwhelmingly voted in support of the Plan.

The settlements underlying the Plan are the culmination of months of rigorous arms-length and good faith negotiations between the Debtors, the Creditors' Committee, the Plan Sponsors, and certain of the Debtors' other key stakeholders. The settlements not only avoid costly litigation and time delays, but provide the means to effectively reorganize the Debtors' businesses. Given the significant risks attendant to these disputes, the resolutions set forth in the Plan are well within the range of reasonableness and substantially benefit the Debtors and their stakeholders.

### (1)    PROBABILITY OF SUCCESS IN LITIGATION

The disputes at issue in these Chapter 11 Cases are not typical plaintiff versus defendant, zero-sum, winner-loser disputes.  Rather, they are disputes as to degrees and lines— where does one creditor's interest end and another's begin?  Moreover, the contested issues are interwoven, such that success at one level could impair one's position on another issue.  These integrated issues are complex and subject to alternative interpretation and legal standards, with no clear "winner" on any side.  With these risks, the real probability at issue for the Debtors in settling these disputes was not whether they or another constituent would win or lose any given dispute, if litigated, but rather, what was the probability that the Debtors would become administratively insolvent or unable to reorganize in the process.

### (2)    COMPLEXITY AND LIKELY DURATION OF LITIGATION

Moreover, the disputes involve complex questions of law and fact, with many involving questions of foreign law.  For example, a key issue relates to the extent of the Collateral securing the Revolving Credit Facility and the Senior Secured Notes, including whether and to what extent the Liens on such Collateral were properly perfected as of the Petition Date.  In most instances, this involved questions regarding the perfection of Collateral in various non-U.S. jurisdictions.  Similarly, there is a dispute as to whether the Collateral includes certain non-tangible assets of the Debtors, such as goodwill.  While the Debtors were prepared to litigate these issues (and even contemplated filing a motion under Bankruptcy Rule 3012), they ultimately decided against that path due to concerns about cost and delay.  Hearing Tr. Aug. 30, 2016, 16:20–19:25; Hearing Tr. Sept. 22, 2016, 13:13–14:1.

Likewise, the disputes regarding the Debtors' ability to surcharge Collateral under Bankruptcy Code section 506(c) presented complex questions about what kinds of expenses and what Collateral could be surcharged, and the adequate protection dispute involved complicated

questions about asset value diminution, including the impact of the grounding of the Debtors' EC 225 helicopters. Further, these and other disputes regarding the Debtors' consensual use of cash collateral (which ultimately required the Debtors to obtain ten (10) interim orders) could only have been resolved through a global agreement. Similarly, the dispute regarding how to allocate value among the holders of General Unsecured Claims necessitated a consensual and equitable solution, as the precise recoverable unencumbered value at each Debtor would have involved complex and interdependent determinations of value.

Resolution of these creditor and intercompany issues would require significant discovery, expert testimony, valuation analyses, extensive briefing, evidentiary hearings, and potentially appeals, which would result in substantial administrative expense. Litigation of these issues also would likely result in significant delay, eating away at the Debtors' limited liquidity, undermining their relationships with customers, and potentially prohibiting them from reorganizing. (By way of example, it took the Debtors seventy (70) days to obtain approval of the Support Agreements Motion, and that litigation only involved a very limited number of issues.) Settlement streamlined these cases, enabled the Debtors to propose and bring a plan to confirmation in relatively short order (taking into account the magnitude and complexity of these cases), and permitted the Debtors to preserve liquidity, thus providing greater certainty that the Debtors would be able to emerge as a reorganized enterprise and maximize recoveries to stakeholders.

### (3)    OTHER FACTORS BEARING ON THE WISDOM OF THE COMPROMISE

Furthermore, the settlement underlying the Plan is a good faith compromise that is overwhelmingly supported by the creditor body. It is a global settlement in every sense of the word. It involves compromises from every creditor group and is a testament to cooperation and teamwork. The Plan is the product of several months of analysis and multi-faceted negotiations

among the Debtors and multiple creditor groups. Due to these efforts, the Plan has widespread creditor support, including that of the Creditors' Committee and the holders of ABL Credit Agreement Claims, Revolving Credit Agreement Claims, Senior Secured Notes Claims, Unsecured Notes Claims, General Unsecured Claims, and Convenience Claims. Other than ECN Capital (Aviation) Corp. ("**ECN**"), KLS Diversified Asset Management LP ("**KLS**"), and the U.S. Trustee (each as discussed in more detail in Section XXIII below), no other creditors or parties in interest objected to approval of the Plan settlement terms.

The creditors' substantial knowledge of the Debtors' businesses allowed the parties to work together to develop a Plan that is reasonable and well thought out. As a result, the settlement provisions represent not only a resolution of disputes but an effective path toward reorganization. Pursuant to the terms of the settlement, the Debtors will receive a significant amount of new capital, continue as a going concern, provide an equitable recovery to unsecured creditors, and emerge from chapter 11 before running out of liquidity or losing customer contracts due to uncertainty or skepticism regarding the chapter 11 process—a risk that was particularly acute for the Debtors given their global operations.

Based on the foregoing, the Debtors respectfully request that the Court approve the compromises and settlements contained in the Plan as a reasonable exercise of the Debtors' business judgment that is supported by valid business reasons and in compliance with the requirements of Bankruptcy Rule 9019 and Bankruptcy Code section 105(a).

To confirm the Plan, the Court must determine that the Plan and the Debtors satisfy all of the requirements of section 1129(a) of the Bankruptcy Code. 11 U.S.C. § 1129(a). As set forth below, the Debtors submit that all of these requirements are met.

### III. SECTION 1129(a)(1): THE PLAN COMPLIES WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE

As a prerequisite to plan confirmation, section 1129(a)(1) of the Bankruptcy Code requires that a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) indicates that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which, respectively, govern the classification of claims and the contents of a plan. H.R. REP. NO. 95-595, at 412 (1977); S. REP. NO. 95-989, at 126 (1978); *see also In re Cano Petroleum, Inc.*, No. 12-31549 (BJH), 2012 WL 2931107, at *5 (Bankr. N.D. Tex. Jul. 18, 2012) (citing *In re Johns-Manville Corp.*, 68 B.R. 618, 629-30 (Bankr. S.D.N.Y. 1986), *as modified*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom Kane v. Johns-Manville Corp.*, 843 F.2d 636, 648–49 (2d Cir.1988)); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 223 (Bankr. D.N.J. 2000).

As demonstrated below, the Plan fully complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code.

#### A. SECTION 1122: THE PLAN'S CLASSIFICATION STRUCTURE IS PROPER

Bankruptcy Code section 1122 provides that:

(a)     Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b)     A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122. In other words, section 1122 permits "a plan [to] provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to

other claims or interests in that class." *In re Idearc Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009), *subsequently aff'd*, 662 F.3d 315 (5th Cir. 2011).

As a default rule, substantially similar claims or interests should be classified together. *See Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278 (5th Cir. 1991) ("A fair reading of both subsections suggests that ordinarily 'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class."). Notwithstanding the default rule, "[s]ection 1122 of the Bankruptcy Code does not require that all substantially similar claims be placed in the same class." *Idearc Inc.*, 423 B.R. at 160 (citing *In re Meadow Glen, Ltd.*, 87 B.R. 421, 424 (Bankr. W.D. Tex. 1988)). Rather, "[d]ecisions interpreting section 1122(a) generally uphold separate classification of different groups of unsecured claims when a reasonable basis exists for the classification." *Id.* (citations omitted); *see also In re Eagle Bus Mfg. Inc.*, 134 B.R. 584, 596 (Bankr. S.D. Tex. 1991), *aff'd*, 158 B.R. 421 (S.D. Tex. 1993) ("A classification scheme satisfies section 1122(a) of the Bankruptcy Code when a reasonable basis exists for the choices made and all claims within a particular class are substantially similar."). Accordingly, courts generally grant a debtor broad discretion in classifying claims and equity interest under a chapter 11 plan, subject to the requirements of section 1122(a). *See Idearc Inc.*, 423 B.R. at 160 ("Significantly, a plan proponent is afforded significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar.").

With the exception of Administrative Expense Claims, Professional Fee Claims, and Priority Tax Claims (all of which need not be classified), Article III of the Plan provides for the separate classification of Claims against, and Interests in, each of the Debtors based upon

differences in the legal nature and/or priority of such Claims and Interests.[7] The Plan designates

the following eleven (11) Classes of Claims and Interests for each of the Debtors:

> Class 1:  Other Priority Claims
>
> Class 2:  Other Secured Claims
>
> Class 3:  Revolving Credit Agreement Claims
>
> Class 4:  ABL Credit Agreement Claims
>
> Class 5:  Senior Secured Notes Claims
>
> Class 6:  Unsecured Notes Claims
>
> Class 7:  General Unsecured Claims
>
> Class 8:  Convenience Claims
>
> Class 9:  Intercompany Claims
>
> Class 10:  Existing CHC Interests
>
> Class 11:  Intercompany Interests

The Claims or Interests in each particular Class are substantially similar to the other Claims or

Interests, as the case may be, in such Class. Del Genio Decl. at ¶ 50.

Specifically, the classification of Claims and Interests set forth in the Plan mirrors

the priorities set forth in the Bankruptcy Code and, in large part, groups together Claims based

on the particular debt facilities or instruments that created the obligations underlying such

Claims (*e.g.*, all Claims related to the ABL Credit Agreement are classified together and all

Claims related to the Senior Secured Notes are classified together). *Id*. at ¶ 51. To the extent

that Claims or Interests of equal priority are placed in different Classes, a valid business, factual,

and/or legal reason exists for such separate classification. *Id*.

---

[7] As set forth in Section 3.2 of the Plan, the Plan constitutes forty-three (43) distinct chapter 11 plans, one for each Debtor. For voting and distribution purposes, each Class of Claims or Interests is deemed to contain sub-classes for each of the Debtors, to the extent applicable, with the exception of the limited consolidation provided for in Section 5.21 of the Plan.

### (1)  CLASSIFICATION OF SECURED CLAIMS

The secured Claims in Class 2 (Other Secured Claims), Class 3 (Revolving Credit Agreement Claims), Class 4 (ABL Credit Agreement Claims), and Class 5 (Senior Secured Notes Claims), while of equal priority, are not substantially similar to each other and merit separate classification.  In the first instance, the Collateral securing the Claims in Class 2 and the Collateral securing the Claims in Class 4 is different than the pooled Collateral securing the Claims in Classes 3 and 5.  Likewise, each of these Classes contain Claims arising from different debt instruments, containing different rights and obligations.  Moreover, even where the Collateral is the same, as with the Revolving Credit Agreement Claims in Class 3 and the Senior Secured Notes Claims in Class 5, separate classification is nevertheless warranted since, pursuant to an intercreditor agreement, Revolving Credit Agreement Claims are first in payment vis-à-vis the Senior Secured Notes Claims.  As a result, each of the Classes of secured Claims involves holders with different legal, economic, and voting interests.  Accordingly, the separate classification of the Other Secured Claims, the ABL Credit Agreement Claims, the Revolving Credit Agreement Claims, and the Senior Secured Notes Claims is permissible and appropriate under section 1122(a) of the Bankruptcy Code.  *Id*. at ¶ 53.

### (2)  CLASSIFICATION OF UNSECURED CLAIMS

The unsecured Claims in Class 6 (Unsecured Notes Claims) and Class 7 (General Unsecured Claims) each "represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision [of] whether the proposed reorganization should proceed." *Greate Bay Hotel & Casino*, 251 B.R. at 224–25 (citing *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assoc. (In re Route 37 Bus. Park Assoc.)*, 987 F.2d 154, 159 (3rd Cir. 1993)). On the one hand, the Claims in Class 6 represent the voting interests of financial investors, whereas the Claims in Class 7 represent the voting interests of many operational counterparties,

distinctions which courts have recognized as meriting separate classification. *See id*. at 225 ("There should be no question that the voting interest of the Old Noteholders as a whole, versus the voting interest of the trade creditors, are 'sufficiently distinct and weighty to merit a separate voice' in these proceedings."). Accordingly, the separate classification of the Unsecured Notes Claims and the General Unsecured Claims is permissible and appropriate under section 1122(a) of the Bankruptcy Code. Del Genio Decl. at ¶ 54.

With regard to the unsecured Claims in Class 8 (Convenience Claims), the definition and classification of Convenience Claims is reasonable and necessary for administrative convenience and, therefore, in compliance with section 1122(b) of the Bankruptcy Code. *Id*. at ¶ 55.

Lastly, the unsecured Claims in Class 9 (Intercompany Claims) are not substantially similar to any of the Claims in the unsecured Classes described above because they represent the interests of affiliates, and not third parties. *Id*. at ¶ 56; *Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc)*, 622 F.2d 872, 875 (5th Cir. 1980) (upholding confirmation of a plan over an objection to a classification where there were three unsecured classes: one for small trade creditors, one for other trade creditors, and one for insider creditors). Accordingly, the separate classification of Intercompany Claims is appropriate under section 1122(a) of the Bankruptcy Code.

(3)     CLASSIFICATION OF INTERESTS

As noted above, each Class of Claims or Interests under the Plan is deemed to contain sub-classes for each of the Debtors, as applicable—meaning that not every Class exists at every Debtor. The Interests in Class 10 (Existing CHC Interests), by definition, only exist at CHC Parent. Likewise, the Interests in Class 11 (Intercompany Interests), by definition, do not exist at CHC Parent. Thus, the only Class of Interests at CHC Parent is Class 10 and the only

Class of Interests at each and every other Debtors is Class 11. Therefore, on a Debtor by Debtor basis, there is only one Class of Interests. Del Genio Decl. at ¶ 57.

Based upon the foregoing, the Debtors submit that the Plan's proposed classification of Claims and Interests is reasonable and appropriate. Accordingly, the Debtors submit that the Plan satisfies the requirements of sections 1122(a) and (b) of the Bankruptcy Code.

### B. SECTION 1123(a): THE PLAN'S CONTENT IS APPROPRIATE

Section 1123(a) of the Bankruptcy Code sets forth seven (7) requirements with which every chapter 11 plan must comply. As demonstrated herein, the Plan fully complies with each enumerated requirement.

### (1) SECTION 1123(a)(1): DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS

Section 1123(a)(1) requires a plan to designate, subject to section 1122 and certain exceptions, classes of claims and equity interests. As discussed above, the Plan designates eleven (11) different Classes of Claims and Interests. Plan, Art. III. Accordingly, the Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

### (2) SECTION 1123(a)(2): CLASSES NOT IMPAIRED BY THE PLAN

Section 1123(a)(2) requires a plan to specify which classes of claims or interests are unimpaired by the plan. Section 3.3 of the Plan specifies that (i) Class 1, Other Priority Claims; (ii) Class 2, Other Secured Claims; (iii) Class 9, Intercompany Claims; and (iv) Class 11, Intercompany Interests are unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code. Plan, § 3.3. Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

(3)　　SECTION 1123(a)(3): TREATMENT OF CLASSES IMPAIRED BY THE PLAN

Section 1123(a)(3) requires a plan to specify how it will treat impaired classes of claims or interests. Article IV of the Plan sets forth the treatment for each Class of Claims and Interests under the Plan, of which the following are impaired within the meaning of section 1124 of the Bankruptcy Code: (i) Class 3, Revolving Credit Agreement Claims; (ii) Class 4, ABL Credit Agreement Claims; (iii) Class 5, Senior Secured Notes Claims; (iv) Class 6, Unsecured Notes Claims; (v) Class 7, General Unsecured Claims; (vi) Class 8, Convenience Claims; and (vii) Class 10, Existing CHC Interests. Plan, Art. IV. Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

(4)　　SECTION 1123(a)(4): EQUAL TREATMENT WITHIN EACH CLASS

Section 1123(a)(4) requires a plan to provide the same treatment for each claim or interest within a particular class, unless a holder of a claim or interest agrees to receive treatment that is less favorable to the treatment afforded to the other class members. Pursuant to the Plan, the treatment of each Claim against, or Interest in, the Debtors, in each respective Class, is the same as the treatment of every other Claim or Interest in such Class, save certain permissible distinctions. Del Genio Decl. at ¶ 63.

Section 1123(a)(4) permits variations in the ultimate form of the recovery received by holders of claims or interests within the same class, where the plan offers each claim or interest holder the *same treatment options*. *See In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3rd Cir. 2013) ("[C]ourts have interpreted the 'same treatment' requirement to mean that all claimants in a class must have 'the same opportunity' for recovery."); *Ad Hoc Comm. of Pers. Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.)*, 412 B.R. 53, 62 (S.D.N.Y. 2008) ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity.").

Pursuant to the Plan, holders of Revolving Credit Agreement Claims each receive their Pro Rata share of the Exit Revolving Credit Facility, at their election in the form of a Revolving Commitment[8] to make Revolving Loans after the Effective Date or in the form of a Non-Revolving Commitment that will operate as a term loan after the Effective Date. Plan Supplement, Ex. D (Exit Revolving Credit Agreement) at Section 2.23; Disclosure Statement § V. N. The fact that some, but not all, holders of Revolving Credit Agreement Claims will hold Revolving Commitments and others will hold term loans does not violate the "same treatment" requirement in section 1123(a)(4) because all creditors in that Class were provided with the same options, the only disparate treatment is by consent, and ultimately, each claimant's percentage recovery—regardless of which option they choose—is the same. Del Genio Decl. at ¶ 64.

In addition, holders of Senior Secured Notes Claims (Class 5) and Unsecured Notes Claims (Class 6) have the option to subscribe to the Rights Offering. The Rights Offering is being conducted pursuant to section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, and in order to comply with those rules the right to participate in the Rights Offering will be limited to only those Class members who are Accredited Investors within the meaning of Regulation D. To compensate those holders who are not eligible to exercise Subscription Rights, the Plan provides that each Senior Secured Notes Claims holder will receive its share of up to one percent (1%) of the New Membership Interests otherwise distributable to holders of Allowed Senior Secured Notes Claims and each Unsecured Notes Claims holder will receive its share of up to zero-point-one percent (0.1%) of the New Membership Interests otherwise distributable to holders of Allowed Unsecured Notes Claims. Plan, § 4.5(a), § 4.6(a). As set forth in more detail

---

[8] Capitalized terms in this paragraph that are used but not defined shall have the meanings ascribed to them in the Exit Revolving Credit Agreement.

in Section XXIII.C below, the objection raised by KLS suggesting that the Debtors' payment of the Put Option Premium to the Backstop Parties, as previously approved by this Court, violates section 1123(a)(4) is without merit or evidence, and should be overruled.

Further, as discussed in detail in Section II above, as part of the global settlement, the Plan provides for the bifurcated treatment of Primary General Unsecured Claims and Secondary General Unsecured Claims in Class 7 (General Unsecured Claims) at each Debtor. Thus, as a technical matter, claimants within Class 7 do not receive the exact same treatment at each Debtor—primary and secondary claimants receive different recoveries. Del Genio Decl. at ¶ 66. However, this results from the limited consolidation of Primary General Unsecured Claims for distribution purposes only, which is part of the settlement between the Debtors and the Consenting Creditor Parties as to "equal" treatment of the creditors holding General Unsecured Claims. Plan, § 5.21. Most importantly, such treatment has been accepted and consented to by virtually all Class 7 holders of General Unsecured Claims.[9] Accordingly, for the reasons set forth in Section II above, the Debtors request that the Court find that the proposed Plan Distributions for the Claims in Class 7 are permissible under section 1123(a)(4) of the Bankruptcy Code.

### (5)     SECTION 1123(a)(5):  ADEQUATE MEANS FOR IMPLEMENTATION

Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means for the plan's implementation."   11 U.S.C. § 1123(a)(5).   The Plan and the various documents and agreements set forth in the Plan Supplement provide adequate and proper means

---

[9] ECN's Ballot rejecting the Plan were not timely received by KCC before the Voting Deadline.  Ballot Certification at ¶ 14.  Accordingly, the Debtors did not count this Ballot.  Disclosure Statement Order at ¶32(h)(i).  However, ECN has filed a motion seeking the Court's approval to have its Ballot counted.  *See Motion of ECN Capital (Aviation) Corp. to Deem Late Filed Ballot as Timely Filed* [Docket No. 1626].  If the Court grants this motion and allows the counting of ECN's Ballot, Class 7 (General Unsecured Claims) at CHC Helicopter Holding S.À R.L. would reject the Plan.

for implementation of the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code. This includes, without limitation: (i) the continued corporate existence of the Debtors; (ii) the entry into the corporate constituent documents that will govern the Reorganized Debtors after the Effective Date, including, without limitation, the Reorganized CHC Operating Agreement, the Amended Certificates of Incorporation, and the Amended By-Laws; (iii) the entry into the Restructuring Transactions and Registration Rights Agreement; (iv) the entry into, and incurrence of new indebtedness under the New Second Lien Convertible Notes Indenture, New Unsecured Notes Indenture, Exit Revolving Credit Agreement, New Intercreditor Agreement, and Amended and Restated ABL Credit Agreement; (v) receipt of proceeds of the Rights Offering; (vi) issuance and distribution of New Membership Interests; (vii) distribution of Cash; (viii) the cancellation of certain existing agreements, duties, notes, instruments, certificates evidencing debt of, and Interests in the Debtors, except as evidenced in Section 5.10 of the Plan; (ix) the release of Liens; (x) the reinstatement and continuance of Intercompany Interests; (xi) the settlement of Claims; (xii) the limited consolidation of the Debtors for distribution on account of Primary General Unsecured Claims; and (xiii) the establishment of a reserve for the payment of Disputed Claims.

**(6)    SECTION 1123(a)(6): PROHIBITION ON ISSUANCE OF NONVOTING SECURITIES**

Section 1123(a)(6) of the Bankruptcy Code prohibits the issuance of nonvoting equity securities and requires amendment of a debtor's charter to so provide. The certificate of incorporation, articles of incorporation, limited liability company agreement or similar governing document, as applicable, of each Debtor has been or will be amended on or prior to the Effective Date to prohibit the issuance of nonvoting equity securities in compliance with section 1123(a)(6). In addition, the only equity securities being issued pursuant to the Plan are New

Membership Interests, which have voting rights. Therefore, the issuance of New Membership Interests also complies with section 1123(a)(6) of the Bankruptcy Code.

### (7) SECTION 1123(a)(7): PROVISIONS REGARDING DIRECTORS AND OFFICERS

Section 1123(a)(7) of the Bankruptcy Code requires a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7).

Consistent with the terms of the Plan Support Agreement, as negotiated with the Consenting Creditor Parties, the Plan provides that the New Board of Reorganized CHC will consist of (a) its Chief Executive Officer; (b) three (3) managers selected by the Requisite Plan Sponsors in their sole discretion, but after consultation with the Chief Executive Officer; and (c) one (1) independent manager selected by the Requisite Plan Sponsors in their sole discretion, but after consultation with the Creditors' Committee and the Individual Creditor Parties, in each instance as disclosed in the Plan Supplement. *See* Plan, *Definition of* "New Board" at 11. For the remaining Reorganized Debtors, the Plan Supplement specifies that their directors and officers will remain unchanged. *See* Plan Supplement, Ex. A (List of Initial Directors and Officers of CHC Helicopter I LLC (Reorganized CHC)), n.1. The Debtors submit that these provisions — which were negotiated with the key creditor stakeholders and future equity owners of the company — are consistent with the interests of creditors, equity security holder, and public policy and, accordingly, satisfy section 1123(a)(7) of the Bankruptcy Code. Del Genio Decl. at ¶ 69.

(8) **SECTION 1123(a)(8): INAPPLICABLE PROVISION**

The Debtors are not "individuals" (as that term is defined in the Bankruptcy Code) and, accordingly, section 1123(a)(8) of the Bankruptcy Code does not apply. *Id*. at ¶ 70.

C. **SECTION 1123(b): THE PLAN'S CONTENT IS PERMITTED**

Bankruptcy Code section 1123(b) sets forth certain permissive provisions that define what may be incorporated into a chapter 11 plan. Each provision of the Plan is consistent with section 1123(b).

(1) **SECTION 1123(b)(1): IMPAIRMENT/UNIMPAIRMENT OF CLAIMS AND INTERESTS**

Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests." 11 U.S.C. § 1123(b)(1). As discussed in Sections III.B(1) and (2) above, Articles III and IV of the Plan classify and describe the treatment for each Impaired and Unimpaired Class.

(2) **SECTION 1123(b)(2): ASSUMPTION/REJECTION OF EXECUTORY CONTRACTS AND LEASES**

Section 1123(b)(2) of the Bankruptcy Code permits a plan to provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases, subject to section 365 of the Bankruptcy Code. Article VIII of the Plan provides for the rejection of the executory contracts and unexpired leases of the Debtors as of the Effective Date, except for any executory contract or unexpired lease that (i) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is specifically designated on the Schedule of Assumed Contracts and Leases filed and served prior to commencement of the Confirmation Hearing, (iii) is specifically designated on the Schedule of Rejected Contracts and Leases filed and served prior to commencement of the Confirmation Hearing, (iv) is specifically designated on the Schedule of Assumed Aircraft Leases filed and served prior to commencement

of the Confirmation Hearing, (v) is specifically designated on the Schedule of Rejected Aircraft Leases filed and served prior to commencement of the Confirmation Hearing, or (vi) is the subject of a separate (A) assumption motion filed by the Debtors or (B) rejection motion filed by the Debtors under section 365 of the Bankruptcy Code before the Confirmation Date.  Plan, Art. VIII.  Accordingly, the Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

### (3) SECTION 1123(b)(3): SETTLEMENT/RETENTION OF CLAIMS AND CAUSES OF ACTION

#### (a) SETTLEMENT OF CLAIMS

Section 1123(b)(3)(A) of the Bankruptcy Code permits a debtor to incorporate the settlement of claims belonging to the debtor or the estate into a plan.  As set forth in Section II above, the Plan incorporates a multi-faceted global settlement of a variety of issues and potential causes of action, and satisfies the requirements of the Bankruptcy Code and Bankruptcy Rules for approval thereof.

#### (b) RETAINED CAUSES OF ACTION

Consistent with section 1123(b)(3)(B) of the Bankruptcy Code, pursuant to Section 10.12 of the Plan, and except as expressly provided in Section 10.11 of the Plan and subject to Sections 10.7, 10.8, and 10.9 of the Plan, the Plan preserves the Debtors' rights, Claims, Causes of Action, rights of setoff or recoupment or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or themselves in accordance with of the Bankruptcy Code and applicable nonbankruptcy law, and any other affirmative Causes of Action against parties with a relationship with the Debtors.  *See* Plan, §§ 10.7, 10.8, 10.9, 10.11, 10.12.  The proceeds of any such Causes of Action, if litigated or settled, will benefit the Debtors and their stakeholders as a whole, including their new equity owners.  Del Genio Decl. at ¶ 76.  This provision was negotiated among the Debtors and the

Consenting Creditor Parties, and is a component of the global settlement underlying the Plan. *Id.* As addressed in more detail in Section XXIII.B below, the Debtors and the Consenting Creditor Parties submit that it would not be appropriate or in the best interests of their Estates to segregate any of these Causes of Action into a litigation trust. *Id.*

### (4) SECTION 1123(b)(4): SALE OF ASSETS

Section 1123(b)(4) of the Bankruptcy Code, which permits a plan to provide for the sale of all or substantially all of a debtor's property, is not applicable in these Chapter 11 Cases. *Id.* at ¶ 77.

### (5) SECTION 1123(b)(5): MODIFICATION OF RIGHTS

As permitted by section 1123(b)(5) of the Bankruptcy Code, Article IV of the Plan modifies the rights of holders of Revolving Credit Agreement Claims (Class 3), ABL Credit Agreement Claims (Class 4), Senior Secured Notes Claims (Class 5), Unsecured Notes Claims (Class 6), General Unsecured Claims (Class 7), Convenience Claims (Class 8), and Existing CHC Interests (Class 10), and leaves Unimpaired the rights of holders of Claims and Interests in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 9 (Intercompany Claims), and Class 11 (Intercompany Interests). Plan, Art. IV.

### (6) SECTION 1123(b)(6): OTHER PERMISSIBLE PROVISIONS

Section 1123(b)(6) permits a plan to include "any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(6). This is relevant to the Plan's provisions for a Disputed Claims Reserve, as well as the release, injunction, and exculpation provisions.

### (a) DISPUTED CLAIMS RESERVE

Section 7.7(a) of the Plan provides for the withholding of New Membership Interests and New Unsecured Notes from the Plan Distribution to holders of Allowed General

Unsecured Claims in an amount that would have been distributable to holders of Disputed General Unsecured Claims if such Claims had been Allowed on the Effective Date, as well as Cash in an amount that would be distributable to any Disputed Convenience Claims had such Disputed Claims been Allowed on the Effective Date to establish a Disputed Claims Reserve. Plan § 7.7(a). Section 7.7(b) of the Plan further provides that the Debtors intend to "seek a determination by the Bankruptcy Court of the estimated amount (either on an individual or aggregate basis) of Disputed General Unsecured Claims and the Disputed Convenience Claims for purposes of determining the amount of New Membership Interests and New Unsecured Notes attributable to such Disputed Claims." Plan, § 7.7(b). Pursuant to this provision, and consistent with Bankruptcy Code section 1123(b)(6), the Debtors request that the Court determine, solely for the purposes of establishing the amounts to be initially withheld in respect of Disputed Claims,[10] that the estimated amount of Disputed Primary General Unsecured Claims is $356,459,639, the estimated amount of Disputed Secondary General Unsecured Claims is $448,661,511, and the estimated amount of Disputed Convenience Claims is $4,906,146. Del Genio Decl. at ¶ 80. Based on these estimates and certain other assumptions described in more detail in the Del Genio Declaration, the Debtors request that the Court determine that the amount of consideration to be withheld in connection with Section 7.7 of the Plan should be (i) 0.37% of New Membership Interests[11] and $7,938,944 in New Unsecured Notes on account of Disputed Primary General Unsecured Claims, (ii) 0.32% of New Membership Interests and $6,891,566 in New Unsecured Notes on account of Disputed Secondary General Unsecured Claims, and

---

[10] The right of all parties to argue the appropriate Allowed amount of Disputed Claims is preserved, regardless of what is initially withheld.

[11] All references to New Membership Interests in this sentence refer to amounts after dilution on account of the New Second Lien Convertible Notes (as if the New Second Lien Convertible Notes converted on the Effective Date), but prior to dilution on account of the Management Incentive Plan.

(iii) $750,000 in Cash on account of Disputed Convenience Claims. *Id*. at ¶¶ 80–83. As set forth in the Del Genio Declaration, these amounts represent a reasonable and good faith estimate of the amount of New Membership Interests, New Unsecured Notes, and Cash that would be distributable to Disputed Primary General Unsecured Claims, Disputed Secondary General Unsecured Claims, and Disputed Convenience Claims, as applicable, had such Disputed Claims been Allowed on the Effective Date, in accordance with the terms of the Plan. *Id*. at ¶ 80. Finally, the Debtors also seek the Court's authority to increase or decrease the amount of New Membership Interests and New Unsecured Notes withheld in respect of Disputed Claims should any of the assumptions underlying this analysis change such that the amount of Disputed General Unsecured Claims or Disputed Convenience Claims increases or decreases. *Id*.

### (b) RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS

Article X of the Plan provides for certain Debtor and third party releases, an exculpation provision, and an injunction provision. Plan, Art. X. As established in Section II above and as discussed in further detail in Section XXIII below, these provisions are the product of extensive good faith, arm's-length negotiations, were a material inducement for parties to enter into the Support Agreements, are an integral component of the global settlement embodied in the Plan, and are supported by the Debtors and their key stakeholders, including the Creditors' Committee, the Plan Sponsors, the Individual Creditors Parties, the Milestone Parties, and the majority of creditors entitled to vote to accept or reject the Plan. Del Genio Decl. at ¶ 84. These provisions were a heavily negotiated aspect of the Plan and failure to give effect to them would impair the Debtors' ability to confirm the Plan. *Id*. at ¶ 84. In addition, these provisions cover the Debtors' officers and directors—individuals who authorized the filing of these Chapter 11 Cases, participated in the restructuring, and provided necessary services and leadership to the Debtors during these cases. Moreover, the third party release provisions were conspicuously

38

disclosed in boldface type in the Plan, the Disclosure Statement, and on the Ballots and, importantly, holders of Claims or Interests entitled to vote on the Plan were given the option to opt-out. *Id.* Accordingly, and as discussed further in Section XXIII below, the objections to these provisions raised by the U.S. Trustee and KLS should be overruled.

### (c) SECURITIES

In addition, and consistent with the applicable provisions of the Bankruptcy Code and applicable law, the Plan provides for (a) the exemption, pursuant to section 1145 of the Bankruptcy Code, of the offer, issuance, and distribution of New Membership Interests and New Unsecured Notes under the plan, which will be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to an underwriter in section 2(a)(11) of the Securities Act of 1933 (the "**Securities Act**"), (ii) compliance with any rules and regulations of the Securities and Exchange Commission, and state securities and "blue sky" laws if any, applicable at the time of any future transfer of such securities or instruments, and (iii) any applicable regulatory approval; and (b) the exemption, pursuant to section 4(a)(2) under the Securities Act or Regulation D promulgated thereunder, of the offer, issuance, and distribution of Subscription Rights, New Second Lien Convertible Notes (and the New Membership Interests issuable upon conversion thereof) pursuant to the Rights Offering and to the Backstop Parties under the Backstop Agreement (including the New Second Lien Convertible Notes comprising the Put Option Premium), which will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or an available exemption from the registration requirements of the Securities Act.[12]

---

[12] The issuance of New Membership Interests upon the conversion of the New Second Lien Convertible Notes will be exempt from registration under the Securities Act pursuant to Section 3(a)(9) thereof.

### D.  SECTION 1123(c):  INAPPLICABLE PROVISION

The Debtors are not "individuals" (as that term is defined in the Bankruptcy Code) and, accordingly, section 1123(c) of the Bankruptcy Code does not apply.  *Id*. at ¶ 85.

### E.  SECTION 1123(d):  CURE OF DEFAULTS

Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default[,] the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable non-bankruptcy law."  11 U.S.C. § 1123(d).

Section 8.2 of the Plan provides for the satisfaction of default claims associated with each executory contract and unexpired lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code.  Plan, § 8.2.  All cure amounts, as set forth in that certain *Notice Regarding (I) Executory Contracts and Unexpired Leases to be Assumed, (II) Proposed Cure Amounts and (III) Related Procedures* mailed to each counterparty to an executory contract or unexpired lease sought to be assumed pursuant to the Plan, were determined in accordance with the underlying agreements and applicable bankruptcy and non-bankruptcy law.  Certificate of Service [Docket No. 1606]; Del Genio Decl. at ¶ 86.

Accordingly, the Plan complies with section 1123(d) of the Bankruptcy Code.

### IV.  SECTION 1129(a)(2):  THE DEBTORS HAVE COMPLIED WITH THE BANKRUPTCY CODE

Section 1129(a)(2) of the Bankruptcy Code requires plan proponents to comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(2).  The legislative history to section 1129(a)(2) indicates that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code.  *See* H.R. Rep. No. 95–595, at 412 ("Paragraph (2) [of section 1129(a)] requires that the proponent of the

plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In re Johns-Manville Corp.*, 68 B.R. at 630.

### A. SECTION 1125: POSTPETITION DISCLOSURE STATEMENT AND SOLICITATION

Section 1125(b) of the Bankruptcy Code provides, in pertinent part, that:

> An acceptance or rejection of a plan may not be solicited after the commencement of [a] case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. . . .

11 U.S.C. § 1125(b).

By entry of the Disclosure Statement Order on December 20, 2016, the Court approved the Disclosure Statement as containing "adequate information" pursuant to section 1125(b). As set forth in the Ballot Certification, the Debtors solicited votes on the Plan consistent with the Court-approved Solicitation Procedures. Ballot Certification at ¶ 7. Further, in compliance with section 1125(b), the Debtors did not solicit acceptances of the Plan from any holder of a Claim or Interest prior to entry of the Disclosure Statement Order.

### B. SECTION 1126: ACCEPTANCE OF THE PLAN

Section 1126 of the Bankruptcy sets forth the procedures for soliciting votes on a chapter 11 plan and determining acceptance thereof. Pursuant to section 1126, only holders of allowed claims or equity interests, as the case may be, in impaired classes of claims or equity interests that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject such plan. Section 1126 provides, in pertinent part, that:

> (a) The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan.

41

\*　　　\*　　　\*

    (f)    Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

    (g)    Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.

11 U.S.C. § 1126(a), (f), (g).

        As set forth in the Ballot Certification and above, the Debtors solicited acceptances of the Plan from the holders of Claims against the Debtors in each Class of Impaired Claims entitled to receive distributions pursuant to the Plan in accordance with section 1126 of the Bankruptcy Code. Ballot Certification at ¶ 7. The Impaired Classes entitled to vote on the Plan were (i) Class 3, Revolving Credit Agreement Claims; (ii) Class 4, ABL Credit Agreement Claims; (iii) Class 5, Senior Secured Notes Claims; (iv) Class 6, Unsecured Notes Claims; (v) Class 7, General Unsecured Claims; and (vi) Class 8, Convenience Claims. *Id.* at ¶ 8.

        The Debtors did not solicit votes for the Plan by any holder of Claims or Interests, as applicable, in (i) Class 1, Other Priority Claims; (ii) Class 2, Other Secured Claims; (iii) Class 9, Intercompany Claims; and (iv) Class 11, Intercompany Interests, as such Classes are Unimpaired and, therefore, deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

        The Debtors also did not solicit votes for the Plan by any holder of Interests in Class 10 (Existing CHC Interests), as such Class does receive or retain any property on account

42

of its Interests and, therefore, is deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of claims entitled to vote to accept or reject the plan:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

As evidenced in the Ballot Certification, with the exception of Class 8 (Convenience Claims) at Heli-One (Netherlands) B.V., the Plan has been accepted by holders of allowed Claims in excess of two-thirds in amount and one-half in number of those who timely voted to accept or reject the Plan at each Debtor.[13]  Ballot Certification, Ex. A2 (Debtor Summary of Voting Classes).

Based upon the foregoing, the Debtors submit that the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

## V.   SECTION 1129(a)(3):  THE PLAN HAS BEEN PROPOSED IN GOOD FAITH AND NOT BY ANY MEANS FORBIDDEN BY LAW

Section 1129(a)(3) requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  In the Fifth Circuit good faith is "evaluated in light of the totality of the circumstances surrounding establishment of the plan,

---

[13] ECN's Ballot rejecting the Plan was not timely received by KCC before the Voting Deadline; however, if such Ballot is counted, then the Plan will not have been accepted by two-thirds in amount of the holders of General Unsecured Claims (Class 7) at CHC Helicopter Holding S.À R.L.  Ballot Certification at ¶ 14.

43

mindful of the purposes underlying the Bankruptcy Code. Generally, where a plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied." *W. Real Estate Equities, LLC v. Vill. At Camp Bowie I, LP (In re Vill. at Camp Bowie I, L.P.)*, 710 F.3d 239, 247 (5th Cir. 2013) (internal quotation marks omitted); *see also Fin. Sec. Assur. Inc. v. T-H New Orleans Ltd. P'Ship (In re T-H New Orleans Ltd. P'Ship)*, 116 F.3d 790, 802 (5th Cir. 1997) ("The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start."); *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985) ("Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied.") (citation omitted).

The Debtors have proposed the Plan in good faith and solely for the legitimate and honest purposes of reorganizing the Debtors' ongoing businesses and enhancing their long-term financial viability while providing recoveries to creditors. Del Genio Decl. at ¶ 94. The Plan is the culmination of months of rigorous, arm's-length negotiations among the Consenting Creditor Parties. *Id*. As noted above, the Plan received overwhelming support from the Classes entitled to vote, which is further testament to its fairness and the good-faith efforts that went into the Plan negotiation process. Ballot Certification, Ex. A2 (Debtor Summary of Voting Classes). Based on this support, the significant infusion of liquidity provided by the Rights Offering, and the fact that the Plan complies with all the relevant provisions of the Bankruptcy Code, the Plan has more than a reasonable likelihood of success, it has a strong likelihood of success. Ballot Certification at ¶ 18; Del Genio Decl. at ¶ 94.

Only one creditor, ECN, has objected to the Plan on this basis, arguing that the Debtors have not satisfied the good faith requirement because the Plan preserves certain Causes of Action for the Reorganized Debtors. ECN Objection at ¶ 16. As discussed in Section II above and Section XXIII.B below, this is a component of the global, integrated settlement underlying the Plan, and is the result of a determination by the Debtors and the Consenting Creditor Parties that (1) the value of any such Causes of Action could best be maximized by having the Reorganized Debtors retain them as the proceeds of any such Causes of Action, if litigated or settled, will benefit the Debtors and their stakeholders as a whole (including their new equity owners) and that (2) the other consideration to be distributed to unsecured creditors is fair and reasonable, and satisfies the provisions of the Bankruptcy Code. Del Genio Decl. at ¶ 95.

## VI. SECTION 1129(a)(4): THE PLAN PROVIDES THAT PROFESSIONAL FEES AND EXPENSES ARE SUBJECT TO COURT APPROVAL

Section 1129(a)(4) requires that "any payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4). Section 1129(a)(4) has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval as to their reasonableness by the court. *See Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*, 329 B.R. 491, 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a plan should not be confirmed unless fees and expenses related to the plan have been approved, or are subject to the approval, of the Bankruptcy Court."), *aff'd*, 241 F. App'x 1 (3d Cir. 2007).

Pursuant to the interim compensation procedures[14] established in these cases, the Court has authorized and approved the retention and payment of certain Professional Persons, subject to final review for reasonableness by the Court pursuant to section 330 of the Bankruptcy Code. Pursuant to Section 2.2 of the Plan, all Professional Persons seeking payment of Professional Fee Claims are required to file, no later than sixty (60) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred. Plan, § 2.2. After notice and a hearing the Allowed amounts of such Professional Fee Claims will be determined by the Bankruptcy Court, and only then will the Reorganized Debtors pay such Claims.

Pursuant to Section 5.23 of the Plan, on the Effective Date, the Restructuring Expenses through the Effective Date will be paid in full; provided, however, that any Restructuring Expenses incurred through the Confirmation Date, to the extent any notice or objection period has not yet run as of the Effective Date, any such notice and objection periods will survive after the Effective Date and, to the extent of any timely and successful objection to a Restructuring Expense, the recipient of such successfully challenged Restructuring Expense will be subject to disgorgement. Plan, § 5.23; Del Genio Decl. at ¶ 97.

Accordingly, the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

## VII.  SECTION 1129(a)(5):  THE DEBTORS HAVE DISCLOSED ALL NECESSARY INFORMATION REGARDING DIRECTORS, OFFICERS, AND INSIDERS

Section 1129(a)(5) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized

---

[14] *See Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals Pursuant to Sections 105(a), 330, and 331 of the Bankruptcy Code, Bankruptcy Rule 2016, and Local Rule 2016-1,* dated June 8, 2016 [Docket No. 291].

debtors; that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and, to the extent that there are any insiders that will be retained or employed by the reorganized debtors, that there be disclosure of the identity and nature of any compensation of any such insiders. 11 U.S.C. § 1129(a)(5).

The Debtors have satisfied the foregoing requirements. Pursuant to Section 5.12 of the Plan, the Debtors have identified and disclosed the affiliations of the directors and officers of the Reorganized Debtors in the Plan Supplement. Plan, § 5.12; Plan Supplement, Ex. A (List of Initial Directors and Officers of CHC Helicopter I LLC (Reorganized CHC)). The Plan Supplement also provides for the assumption of certain material employment agreements, many of which relate to individuals who are considered insiders of the Debtors, and describes the principal terms of the Management Incentive Plan that will be adopted by the New Board and will take effect on, or as soon as reasonably practicable after, the Effective Date. Plan Supplement, Ex. B (Management Incentive Plan Term Sheet).

The proposed directors and the officers of the Reorganized Debtors all are competent, have relevant and valuable business and industry experience, and will provide continuity and fresh perspectives on running the Reorganized Debtors' businesses. Plan Supplement, Ex. A (List of Initial Directors and Officers of CHC Helicopter I LLC (Reorganized CHC)); Del Genio Decl. at ¶ 101. Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

## VIII. SECTION 1129(a)(6): REGULATORY APPROVAL IS NOT APPLICABLE

Section 1129(a)(6) of the Bankruptcy Code provides that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly

conditioned on such approval." 11 U.S.C. § 1129(a)(6). The Debtors submit that this provision of the Bankruptcy Code is inapplicable to these cases. *Id*. at ¶ 102.

## IX. SECTION 1129(a)(7): THE PLAN SATISFIES THE BEST INTERESTS TEST

Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and equity holders. This requirement is commonly referred to as the "best interests" test. The best interests test requires that each holder of a claim or equity interest either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. 11 U.S.C. § 1129(a)(7).

Under the best interests test, "the court must measure what is to be received by rejecting creditors . . . under the plan against what would be received by them in the event of liquidation under chapter 7. In doing so, the court must take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation." *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007), *appeal dismissed*, 371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008). The Court must evaluate the liquidation analysis cognizant of the fact that "[t]he hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7." *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000). "As § 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting impaired claims or interests. If a class of claims or interests unanimously accepts the plan, then the best interests test is automatically satisfied for all members of that class." *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 761 (Bankr. S.D.N.Y. 1992). Accordingly, the best interests test does not apply to the holders of Claims or Interests in the Unimpaired Classes.

48

As set forth in the liquidation analysis attached to the Disclosure Statement as Exhibit G (the "**Liquidation Analysis**"), the best interests test is satisfied as to each non-accepting holder of a Claim against or Interest in each Debtor. Del Genio Decl. at ¶ 104; Disclosure Statement, Ex. G (Liquidation Analysis). Specifically, the Liquidation Analysis demonstrates that all Classes of Claims or Interests will recover value equal to or in excess of what such Claims or Interests would receive in a hypothetical chapter 7 liquidation. Notably, Class 3 (Revolving Credit Agreement Claims) is estimated to receive an approximately one-hundred percent (100%) recovery under the Plan, as opposed to an estimated recovery of approximately sixty-two-point-eight percent (62.8%) in a hypothetical liquidation. Class 4 (ABL Credit Agreement Claims), on the other hand, is estimated to receive an approximately thirty-nine-point-two percent (39.2%) recovery under the Plan, compared to an estimated recovery of approximately forty-one-point-two percent (41.2%) in a liquidation. While the estimated recovery to holders of Class 4 (ABL Credit Agreement Claims) may be greater in a hypothetical liquidation, their Plan treatment is part of the Debtors' Court approved settlement with these lenders, who unanimously accepted the Plan. Ballot Certification, Ex. A2 (Debtor Summary of Voting Classes). With regard to Class 5 (Senior Secured Notes Claims), the estimated recovery under the Plan is between approximately five-point-four percent and seventeen-point-six percent (5.4%-17.6%) compared to approximately three-point-five percent (3.5%) in a hypothetical liquidation. Similarly, the estimated recoveries for Class 6 (Unsecured Notes Claims) in a hypothetical liquidation scenario would drop from between approximately six-point-six percent to sixteen-point-two percent (6.6%-16.2%) down to approximately three-point-five percent (3.5%). Further, the total estimated recovery for unsecured Claims, including the Claims in Class 7 (General Unsecured Claims) and Class 8 (Convenience Claims), would be between

approximately zero percent and point-eight-six percent (0%-0.86%), as compared to the approximately one-point-eight percent to three percent (1.8%-3.0%) estimated recovery for Class 7 and approximately ten-point-four percent (10.4%) estimated recovery for Class 8 under the Plan. Class 10 (Existing CHC Interests), which does not retain or recover any value under the Plan, is likewise not estimated to recover anything in a hypothetical liquidation. Del Genio Decl. at ¶ 104; Disclosure Statement, Ex. G (Liquidation Analysis).

The Debtors' Liquidation Analysis is sound and reasonable and incorporates justified assumptions and estimates regarding the liquidation of the Debtors' Assets and the satisfaction of their Claims, based upon the knowledge and expertise of the Debtors' advisors. The Liquidation Analysis assumes that the Debtors would commence a chapter 7 liquidation proceeding whereby the Court would appoint a chapter 7 trustee (the "**Trustee**") to administer the Debtors' Estates, and the Trustee would cease all of the Debtors' operations and immediately begin liquidating the Debtors' Assets, with all owned Assets being sold over a sixty (60) day period. The Liquidation Analysis utilized the Debtors' financials, weekly cash flow projections, as well as third party analyses and reports to estimate an asset liquidation value available for recovery by certain creditors. The Liquidation Analysis also took into account the expected generation of certain additional Claims attributed to a winding up of the Debtors' business (*e.g.*, severance Claims, lease rejection Claims, etc.), as well as the priorities that might attach to such Claims. Del Genio Decl. at ¶ 105; Disclosure Statement, Ex. G (Liquidation Analysis).

Based on the foregoing, the Plan satisfies the requirements of section 1129(a)(7).

## X. SECTION 1129(a)(8): THE PLAN HAS BEEN ACCEPTED BY MOST IMPAIRED CLASSES ENTITLED TO VOTE AND, AS TO SUCH CLASSES, THE REQUIREMENTS OF SECTION 1129(a)(8) HAVE BEEN SATISFIED

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept the plan or not be impaired by the plan. As set forth above, the holders of

Claims or Interests in (i) Class 1, Other Priority Claims; (ii) Class 2, Other Secured Claims; (iii) Class 9, Intercompany Claims; and (iv) Class 11, Intercompany Interests are unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

Section 1126 of the Bankruptcy Code provides that a plan is accepted by an impaired class of claims if the accepting class members hold at least two-third in amount and more than one-half in number of the claims in their respective class that have voted. 11 U.S.C. § 1126(c). As set forth above and in the Ballot Certification, each of the following Classes at each of the Debtors voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code: (i) Class 3, Revolving Credit Agreement Claims; (ii) Class 4, ABL Credit Agreement Claims; (iii) Class 5, Senior Secured Notes Claims; (iv) Class 6, Unsecured Notes Claims; and (v) Class 7, General Unsecured Claims. Class 8, Convenience Claims, at every Debtor except one (Heli-One (Netherlands) B.V.) accepted the Plan. Ballot Certification, Ex. A2 (Debtor Summary of Voting Classes). Notwithstanding this, as set forth in Section XVII below, the Debtors have satisfied the "cram down" requirements under section 1129(b) of the Bankruptcy Code with respect to this rejecting Class.

Further, pursuant to section 1126(g) of the Bankruptcy Code, impaired classes that neither receive nor retain property under a plan are deemed to have rejected the plan. 11 U.S.C. § 1126(g). Holders of Interests in Class 10 (Existing CHC Interests) are not entitled to receive or retain any property on account of their Interests in the Debtors and, as such, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. As discussed more fully in Section XVII below, the Debtors have also satisfied the "cram down"

requirements under section 1129(b) of the Bankruptcy Code with respect to Class 10, therefore, the Court may confirm the Plan notwithstanding the deemed rejection by this Class.

XI.  **SECTION 1129(a)(9): THE PLAN PROVIDES FOR PAYMENT IN FULL OF ALL ALLOWED PRIORITY CLAIMS**

Section 1129(a)(9) of the Bankruptcy Code requires that persons holding allowed claims entitled to priority under section 507(a) receive specified cash payments under the plan. Unless the holder of a particular claim agrees to a different treatment with respect to such claim, section 1129(a)(9) of the Bankruptcy Code sets forth the treatment the plan must provide. 11 U.S.C. § 1129(a)(9). The Plan's treatment provisions for these Claims comply with these requirements.

A.  **SECTION 1129(a)(9)(A): ADMINISTRATIVE EXPENSE CLAIMS**

With respect to Administrative Expense Claims, in accordance with section 1129(a)(9)(A) of the Bankruptcy Code, Section 2.1 of the Plan provides that on the Effective Date, or as soon thereafter as is reasonably practicable, each holder of an Allowed Administrative Expense Claim will receive, in full and final satisfaction of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim; *provided*, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business, including Administrative Expense Claims arising from or with respect to the sale of goods or services on or after the Petition Date, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business. Plan, § 2.1. Accordingly, the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code.

B.  **SECTION 1129(a)(9)(B): OTHER PRIORITY CLAIMS**

With respect to Other Priority Claims, in accordance with section 1129(a)(9)(B) of the Bankruptcy Code, Section 4.1(a) of the Plan provides that on the later of the Effective

Date and the date that is ten (10) Business Days after the date such Other Priority Claim becomes

an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed

Other Priority Claim will receive, in full and final satisfaction of such Allowed Other Priority

Claim, at the option of the Debtors, with consent of the Requisite Plan Sponsors and the

Creditors' Committee, not be unreasonably withheld, or the Reorganized Debtor, as applicable,

(i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment

consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided*, that

Other Priority Claims that arise in the ordinary course of the Debtors' business, shall be paid by

the Debtors or the Reorganized Debtors, as applicable, in the ordinary course.  Plan, § 4.1(a).

Accordingly, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code.

C.        SECTION 1129(a)(9)(C):  PRIORITY TAX CLAIMS

With respect to Priority Tax Claims, in accordance with section 1129(a)(9)(C) of

the Bankruptcy Code, Section 2.3 of the Plan provides that on the Effective Date or as soon

thereafter as is reasonably practicable, each holder of an Allowed Priority Tax Claim will

receive, at the option of the Debtors, with the consent of the Requisite Plan Sponsors and the

Creditors' Committee, not to be unreasonably withheld, or the Reorganized Debtors, as

applicable, in full and final satisfaction of such Allowed Priority Tax Claim, (i) Cash in an

amount equal to the Allowed amount of such Claim, (ii) equal annual installment payments in

Cash, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim, over

a period ending not later than five (5) years after the Petition Date, or (iii) treatment in a manner

not less favorable than the most favored non-priority unsecured claim provided for by this Plan;

*provided*, that Allowed Priority Tax Claims that arise in the ordinary course of the Debtors'

business, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary

course.  Plan, § 2.3.  Accordingly, the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code.

## XII.    SECTION 1129(a)(10):  AT LEAST ONE CLASS OF IMPAIRED CLAIMS HAS ACCEPTED THE PLAN

Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of a plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  As set forth in Section X above and in the Ballot Certification, at least one impaired Class at each Debtor has voted to accept the Plan, even excluding the acceptance of the Plan by any insiders in such Classes.  Ballot Certification, Ex. A2 (Debtor Summary of Voting Classes).  The Plan therefore satisfies section 1129(a)(10) of the Bankruptcy Code.

## XIII.    SECTION 1129(a)(11):  THE PLAN IS FEASIBLE

Section 1129(a)(11) of the Bankruptcy Code requires the bankruptcy court to determine that a plan is feasible.   Specifically, the bankruptcy court must determine that confirmation is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor (or any successor thereto), unless such liquidation or reorganization is proposed in the plan.   11 U.S.C. § 1129(a)(11).   The feasibility test set forth in section 1129(a)(11) requires the bankruptcy court to determine whether a plan may be implemented and has a reasonable likelihood of success.  *See Energy Res. Co.*, 495 U.S. at 549; *In re T-H New Orleans Ltd. P'Ship*, 116 F.3d at 801; *Kane v. Johns-Manville Corp.*, 843 F.2d at 649.  Section 1129(a)(11) does not require a guarantee of a plan's success; rather, the appropriate inquiry is whether a plan offers a reasonable assurance of commercial viability.  *See In re T-H New Orleans Ltd. P'Ship*, 116 F.3d at 801 (citing *In re Briscoe Enters., Ltd., II*, 994 F.2d at 1165–66).

The key element of feasibility is whether there is a reasonable probability that the provisions of the plan can be performed. The purpose of the feasibility test is to protect against visionary or speculative plans. *See Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 COLLIER ON BANKRUPTCY ¶ 1129.02, at 1129-36.11 (15th ed. 1984)). "To establish the feasibility of a plan, [a] debtor must present proof through reasonable projections that there will be sufficient cash flow to fund the plan" and "[s]uch projections cannot be speculative, conjectural or unrealistic." *In re Idearc Inc.*, 423 B.R. at 167.

The Plan embodies a meticulously-tailored restructuring, including a significant infusion of liquidity, which will provide for the continued viability of the Debtors' businesses. The Debtors have analyzed their ability to fulfill their obligations under the Plan and have taken into consideration their estimated costs of administration. Del Genio Decl. at ¶ 114. The Debtors, with aid from their advisors, prepared financial projections (the "**Financial Projections**") for the fiscal years 2017 through 2019, as set forth in Exhibit H to the Disclosure Statement. *Id*. at ¶ 115; Disclosure Statement, Ex. H (Financial Projections).

The Financial Projections were developed using a methodical, iterative process and are based on the extensive experience of the Debtors' management and historical trends and data. Del Genio Decl. at ¶ 116. Underlying the Financial Projections is a set of sound, closely-examined assumptions. The Financial Projections were prepared by the Debtors, with aid from their advisors, and were reviewed by, and reflect the input of, the advisors to the Creditors' Committee and the Plan Sponsors, respectively. In preparing the Financial Projections, the Debtors hired experts to evaluate the near and longer term outlook on oil and gas production, pricing, and off-shore rig activity levels; reviewed their fleet's current contracted status and

made assessments of whether or not these contracts were likely to be renewed or if volume or price changes were likely; and evaluated the MRO activity level based on projected global helicopter activity and the potential for market share gains. *Id*. Further, while the Debtors remain confident in the long term fundamentals of the offshore oil and gas market, the Financial Projections reflect a prolonged downturn in the oil and gas market as the timing of an industry recovery remains uncertain. *Id*.

The Financial Projections demonstrate that the Reorganized Debtors will be able to meet their obligations under the Plan. Confirming the Plan will allow the Debtors to (i) obtain three-hundred million dollars ($300 million) in Cash on account of the fully subscribed Rights Offering; (ii) reduce their debt obligations by approximately nine-hundred-twenty-five million dollars ($925 million) (prior to conversion of all of the New Second Lien Convertible Notes, and by one-point-four billion dollars ($1.4 billion) subsequent to such conversion); (iii) reduce their annual Cash interest burden by approximately eighty-five percent (85%) (freeing up approximately one-hundred-fifteen million dollars ($115 million) in annual cash flow that can be used for reinvestment in the Debtors' business); and (iv) achieve one-billion-fifteen million dollars ($1.015 billion) in prepetition aircraft-related savings over a ten (10) year period. After honoring their obligations under the Plan, the Reorganized Debtors will have sufficient capital and liquidity to operate their business and satisfy ongoing obligations as they become due. *Id*. at ¶ 117; Disclosure Statement, Ex. H (Financial Projections).

For these reasons, the Plan provides for an achievable plan of reorganization, which exceeds the Debtors' minimum burden to show that the Plan carries a reasonable likelihood of success. Accordingly, the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code and should be approved.

## XIV. SECTION 1129(a)(12):  ALL STATUTORY FEES HAVE OR WILL BE PAID

Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan . . . ." 11 U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses.  11 U.S.C. § 507(a)(2).  In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, Section 12.6 of the Plan provides that on the Effective Date, and thereafter as may be required, such fees, together with interest, if any, shall be paid by the Reorganized Debtors.  Plan, § 12.6.

## XV. SECTION 1129(a)(13):  CONTINUATION OF RETIREE BENEFITS

Section 1129(a)(13) requires that:

> The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

11 U.S.C. § 1129(a)(13).  Subject to the limitations set forth in the Plan, all employee compensation and benefit plans of the Debtors that were listed on the Schedule of Assumed Compensation and Benefit Plans will be deemed to be, and will be treated as if they were, executory contracts to be assumed under the Plan.  Plan, § 8.5.  Notwithstanding any limitations set forth in Section 8.5 of the Plan, all of the Debtors' retiree benefits, as defined in section 1114 of the Bankruptcy Code, were listed on the Schedule of Assumed Compensation and Benefit Plans and assumed under the Plan.  Del Genio Decl. at ¶ 120.  Accordingly, the Plan satisfies the requirements of section 1129(a)(13).

## XVI. SECTIONS 1129(a)(14), 1129(a)(15), AND 1129(a)(16): INAPPLICABLE PROVISIONS

Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations. The Debtors are not subject to any domestic support obligations and, as such, section 1129(a)(14) does not apply. *Id.* at ¶ 121.

Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code). The Debtors are not "individuals" and, accordingly, section 1129(a)(15) is inapplicable. *Id.* at ¶ 122.

Section 1129(a)(16) of the Bankruptcy Code applies to transfers of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust. The Debtors are each a moneyed, business, or commercial corporation and, accordingly, section 1129(a)(16) is inapplicable. *Id.* at ¶ 123.

## XVII. SECTION 1129(b): THE PLAN SATISFIES THE "CRAM DOWN" REQUIREMENTS WITH RESPECT TO CLASS 8 AND CLASS 10

Section 1129(b) of the Bankruptcy Code provides a mechanism whereby a plan proponent can confirm a plan in circumstances where not all impaired classes of claims and equity interests accept the plan. This mechanism is colloquially known as "cram down."

Section 1129(b) provides in pertinent part that:

> [I]f all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1). Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not

"discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

As noted above, the single voting creditor in Class 8 (Convenience Claims) at Heli-One (Netherlands) B.V. voted to reject the Plan.  Ballot Certification, Ex. A2 (Debtor Summary of Voting Classes).  In addition, Class 10 (Existing CHC Interests) at CHC Parent is not receiving any distribution under the Plan and, thus, is deemed to reject the Plan. Accordingly, the Debtors must satisfy section 1129(b) with respect these two Classes.[15]  As set forth below, the Debtors submit that this provision is satisfied and notably, no party has asserted otherwise.

## A.    THE PLAN DOES NOT DISCRIMINATE UNFAIRLY

The unfair discrimination standard of section 1129(b) ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value it will receive under a plan when compared to the value given to all other similarly situated classes.  *See Stucki v. Orwig,* Case No. 3:12–CV–1064–L, 2013 WL 1499377, at *7 (N.D. Tex. Apr. 12, 2013) ("A plan that has not been accepted by all impaired classes may be confirmed or 'crammed down' over an [sic] dissenting class only if [it] does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.") (internal quotation marks omitted); *see also In re Hardeman Cnty. Hosp. Dist.*, 540 B.R. 229, 238 (Bankr. N.D. Tex. 2015) ("A determination of whether a plan unfairly discriminates involves consideration of differential treatment as between similarly situated classes and whether

---

[15] ECN's Ballot rejecting the Plan was not timely received by KCC before the Voting Deadline; however, if such Ballot is counted, Class 7 (General Unsecured Claims) at CHC Helicopter Holding S.À R.L. would reject the Plan. Ballot Certification at ¶ 14.  In such a scenario, the Debtors would also need to satisfy section 1129(b) with respect that Class.

the treatment, though different, is fair under the given facts."); *In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 865 (Bankr. S.D. Tex. 2001) ("The 'does not discriminate unfairly' requirement in § 1129(b) protects each class of creditors against involuntary loss of their equal distribution rights *vis a vis* other creditors of equal rank"). Section 1129(b)(1) does not prohibit all discrimination between classes; it prohibits only discrimination that is unfair. *See In re LeBlanc*, 622 F.2d at 879 ("A bankruptcy court can permit discrimination when the facts of the case justify it."); *see also in re Hardeman Cnty. Hosp. Dist.*, 540 B.R. at 238 ("A determination of whether a plan unfairly discriminates involves consideration of differential treatment as between similarly situated classes and whether the treatment, though different, is fair under the given facts.").

The weight of judicial authority holds that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if similar classes are treated differently without a reasonable basis for the disparate treatment. *See In re LeBlanc*, 622 F.2d at 879; *see also In re Gen. Homes Corp. FGMC*, 134 B.R. 853, 863 (Bankr. S.D. Tex. 1991) ("The power to separately classify creditors is subject to a limitation that some reasonable grounds must exist in order to authorize the proposed classification scheme . . . one such rationale is a demonstrated economic need to treat certain otherwise similar claims differently"); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990); *In re Furlow*, 70 B.R. 973, 978 (Bankr. E.D. Pa. 1987) ("[D]ifferent treatment is permissible if and only if the debtor is able to prove a reasonable basis for the degree of discrimination contemplated by the Plan."). Accordingly, as between two classes of claims or two classes of equity interests, there is no unfair discrimination where the classes are comprised of dissimilar claims or interests, as applicable, or where there facts and circumstances of the case justify disparate treatment.

As discussed in Section III.A(2) above, the Plan properly classifies unsecured Claims into four (4) separate Classes: Class 6 (Unsecured Notes Claims), Class 7 (General Unsecured Claims, Class 8 (Convenience Claims), and Class 9 (Intercompany Claims). While the Plan does provide disparate treatment to each of these Classes, such treatment is not discriminatory or unfair. Under the facts and circumstances of these Chapter 11 Cases it is necessary and appropriate to leave the Intercompany Claims in Class 9 in place to maintain the Debtors' cash management structure and enable the Debtors to continue doing business as a going concern as before. Del Genio Decl. at ¶ 126.

Likewise, with respect to treatment received by Class 6 and Class 7, the recovery provided to the holders of Unsecured Notes Claims in Class 6 reflects the fact that forty (40) of the forty-three (43) Debtors issued or guaranteed the obligations under the Unsecured Notes Indenture and, therefore, the holders of Unsecured Notes Claims are able to assert the full value of their Unsecured Notes Claims against all forty (40) of those entities, while the holders of General Unsecured Claims in Class 7 are limited to asserting their Claims against a smaller subset of the Debtors (often a single Debtor). *Id.*; Disclosure Statement, § 1.8. Further, several of the Debtors at which Unsecured Notes Claims are asserted do not have General Unsecured Claims or Convenience Claims asserted at them and, therefore, the unencumbered value of such Debtors inures solely to the benefit of the holders of Unsecured Notes Claims. *Id.*; Disclosure Statement, § 1.8.

Finally, with respect to the Convenience Claims in Class 8, these Claims have been separately classified and treated for administrative convenience, consistent with section 1122(b) of the Bankruptcy Code, and their percentage recovery is reasonable under the facts and

circumstances of these Chapter 11 Cases.[16] Accordingly, the Plan satisfies the unfair discrimination test with respect to Class 8 at Heli-One (Netherlands) B.V. It is important to note that this is the only Class of Convenience Claims that rejected the Plan, and it was based on the vote of a single claimant in that Class (at that Debtor).

As discussed in Section III. A above, the Interests in Class 10 (Existing CHC Interests) exist only at CHC Parent and are the only Class of Interests at that Debtor. There are no similarly situated Classes. All Existing CHC Interests are classified together and afforded the same treatment under the Plan. As such, there is no unfair discrimination among holders of Existing CHC Interests and no unfair discrimination with respect to Class 10.

## B. THE PLAN IS FAIR AND EQUITABLE

Section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides that a plan is fair and equitable with respect to a class of impaired unsecured claims that did not accept such plan if, pursuant to the plan, no holder of a claim or interest that is junior to the interests of such class will receive or retain any property on account of their junior interest. 11 U.S.C. § 1129(b)(2)(B)(ii). Similarly, section 1129(b)(2)(C)(ii) of the Bankruptcy Code provides that a plan is fair and equitable with respect to a class of impaired interests that did not accept the plan if, pursuant to the plan, no holder of an interest that is junior to the interests of such class will receive or retain any property on account of their junior interest. 11 U.S.C. § 1129(b)(2)(C)(ii). These requirements are often referred to as the "absolute priority rule."

As set forth above, the single voting creditor in Class 8 at Heli-One (Netherlands) B.V. voted to reject the Plan and, therefore, the absolute priority rule must be satisfied as to such

---

[16] For the same reasons set forth above, the Plan would also satisfy the unfair discrimination test with respect to Class 7 (General Unsecured Claims) at CHC Helicopter Holding S.À R.L. if ECN's late Ballot is counted.

Class. While no Class senior to Class 8 is recovering more than in full, *see United Sav. Ass'n v. Timbers of Inwood Forest Assocs. (In re Timbers of Inwood Forest Assocs.)*, 793 F.2d 1380, 1409–10 (5th Cir. 1986), *aff'd en banc*, 808 F.2d 363 (5th Cir. 1987), *aff'd*, 484 U.S. 365 (1988) (noting that section 1129(b) requires that "[n]o class may be paid more than in full"), the Intercompany Interests at Heli-One (Netherlands) B.V. are unimpaired. This, however, is justified for several reasons and does not violate the absolute priority rule. Retention of the Intercompany Interests in Class 11 is a key component of the Debtors' reorganization strategy and is necessary to maintain the corporate enterprise structure so that the Debtors can continue doing business as a going concern as before. Del Genio Decl. at ¶ 131. Impairment or cancellation of these interests would collapse the Debtors' carefully designed organizational structure, which was specifically created based on the Debtors' specific business and operational needs, and to comply with regulatory requirements and maintain tax efficiencies. *Id.* Furthermore, while the Intercompany Interests remain unimpaired, the value of such Interests was taken into account when determining the value of the distributions to be made to creditors.[17] *Id.* at ¶ 128.

Additionally, holders of Interests in Class 10 (Existing CHC Interests) are deemed to have rejected the Plan and, therefore, the absolute priority rule must also be satisfied as to such Class. Here, the Plan also complies with the absolute priority rule, as there are no Interests junior to Class 10 and, thus, no junior Interests will receive recoveries under the Plan on account of such Interests. Additionally, no holders of Claims or Interests senior to those in Class 10 will receive recoveries in excess of their respective entitlements under the Bankruptcy Code.

---

[17] For the same reasons set forth above, the Plan would also satisfy the fair and equitable standard with respect to Class 7 (General Unsecured Claims) at CHC Helicopter Holding S.À R.L. if ECN's late Ballot is counted.

Accordingly, the Plan is "fair and equitable" and, therefore, satisfies the requirements of section 1129(b) of the Bankruptcy Code.

## XVIII. SECTION 1129(c):  THE PLAN IS THE ONLY PLAN

The Plan is the only plan filed in these Chapter 11 Cases and, accordingly, section 1129(c) of the Bankruptcy Code does not apply.  *Id.* at ¶ 132.

## XIX.  SECTION 1129(d):  THE PRINCIPAL PURPOSE OF THE PLAN IS NOT THE AVOIDANCE OF TAXES

The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act of 1933, and no governmental unit has objected to confirmation of the Plan on any such grounds.  The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.  *Id.* at ¶ 133.

## XX.  SECTION 1129(e):  INAPPLICABLE PROVISION

The provisions of section 1129(e) of the Bankruptcy Code apply only to "small business cases."  These Chapter 11 Cases are not "small business cases" as defined in the Bankruptcy Code.  *Id.* at ¶ 134.  Accordingly, section 1129(e) of the Bankruptcy Code is inapplicable in these cases.

## XXI.  SECTION 1127:  MODIFICATION OF THE PLAN

Pursuant to section 1127 of the Bankruptcy Code, a plan proponent may modify a plan at any time before confirmation so long as the plan, as modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the proponent of the modification complies with section 1125 of the Bankruptcy Code.  In addition, with respect to modifications made after acceptance but prior to confirmation of the plan, Bankruptcy Rule 3019 provides, in relevant part:

> [A]fter a plan has been accepted and before its confirmation, the proponent may file a modification of the

> plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

FED. R. BANKR. P. 3019(a). Here, the Debtors modified the Plan on February 8, 2017 to, among other things, (i) identify the agents under the Exit Revolving Credit Facility and the New Second Lien Convertible Notes Indenture; (ii) include the Accepting Revolving Credit Facility Lenders in the releases provided by the Debtors, as well as the Plan's exculpation provision; (iii) include certain technical amendments to account for the mechanics of reserving New Membership Interests on account of Dispute Claims and the specifics of the Restructuring Steps, including the addition of two new Cayman entities; (iv) clarify the timing of the payment of the Restructuring Expenses; and (v) perform various clean up changes, such as entering missing docket numbers and clarifying which documents were filed with the Plan Supplement. As described in Sections III and IV.A above, the Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code, and the Debtors have complied with section 1125 of the Bankruptcy Code. Accordingly, the requirements of section 1127 have been satisfied. Moreover, Bankruptcy Rule 3019 is satisfied because the modifications do not impact, let alone materially impact, any creditor's or equity holder's treatment. *See In re Am. Solar King Corp.*, 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988) ("[Section 1127] permits modifications that might technically have a negative impact on claimants where the modifications are not substantial. [Bankruptcy Rule 3019] should be interpreted in such a fashion as to give effect to, not to undermine, [section 1127]. Thus, if a modification does not 'materially' impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the amended plan as well.").

**XXII. <span>Cause Exists to Waive Stay of Confirmation Order</span>**

Bankruptcy Rule 3020(e) provides that: "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 3020(e). The Debtors request that the Bankruptcy Court direct that the Confirmation Order be effective immediately upon its entry, notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e).

Under the circumstances and to conserve estate resources and fees, it is appropriate for the Bankruptcy Court to exercise its discretion to order that Bankruptcy Rule 3020(e) is not applicable and permit the Debtors to consummate the Plan and commence its implementation without delay after the entry of the Confirmation Order. Such relief is in the best interests of the Debtors' Estates and creditors, and will not prejudice any parties in interest given the overwhelming consensus on the Plan. Del Genio Decl. at ¶ 139.

**XXIII. <span>The Objections to the Plan Should be Overruled</span>**

Three parties in interest objected to the Plan: the U.S. Trustee, ECN, and KLS. For the reasons set forth below, each Objection should be overruled and the Plan should be confirmed.

**A. <span>The UST Objection</span>**

In the UST Objection, the U.S. Trustee argues that (i) the Management Incentive Plan disclosed and reserved for under the Plan is really a "key employee retention plan" or "KERP" that should (along with the prepetition Short Term Incentive Plan) be approved by separate motion pursuant to section 503(c) of the Bankruptcy Code; (ii) the release and exculpation provisions provided in the Plan should be clarified to confirm that they do not effect releases in contravention of *Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009); and (iii) the Confirmation Order should

include language excepting certain government actions from the Plan's releases. These objections misconstrue the relevant provisions of the Plan. Based on the explanation set forth below, and the Debtors' agreement with the U.S. Trustee to insert the provision set forth in Subsection (3) below in the Confirmation Order, the Court should overrule the UST Objection.

### (1) INCLUSION OF THE MANAGEMENT INCENTIVE PLAN IN THE CHAPTER 11 PLAN WAS INTENDED ONLY TO PROVIDE NECESSARY DISCLOSURES; IT IS NOT A PRE-EMERGENCE RETENTION PLAN REQUIRING APPROVAL UNDER SECTION 503

Pursuant to the Plan, the Debtors included the Management Incentive Plan in the Plan Supplement for the limited purposes of (i) disclosing the carve out of ten (10) percent of the New Membership Interests[18] and the setting aside of such interests for a future distribution to management pursuant to a Management Incentive Plan to be adopted by the New Board and administered after the Effective Date, and (ii) complying with the Debtors' obligation to supplement the information contained in the Debtors' Statements of Financial Affairs and Schedules of Assets and Liabilities related to the compensation paid to insiders retained by the Reorganized Debtors, as required pursuant to section 1129(a)(5) of the Bankruptcy Code.

The Debtors do not seek the Court's approval of the nature, terms, or administration of the Management Incentive Plan. Similarly, the Debtors are not seeking the Court's approval of the Short Term Incentive Plan Term Sheet included in the Plan Supplement. Rather the Debtors are simply disclosing that the New Board intends to ratify, and pay certain compensation after the Effective Date pursuant to, the Short Term Incentive Plan adopted by the Debtors' pre-restructuring board of directors prior to the Petition Date.

---

[18] Calculated after taking into account dilution on account of the New Second Lien Convertible Notes (as if the New Second Lien Convertible Notes converted on the Effective Date) and the Phantom Units issuable under the Management Incentive Plan (as if all Phantom Units were issued on the Effective Date).

Disclosure of this information was relevant to stakeholders, particularly those who are to receive New Membership Interests pursuant to the Plan, since the dilutive effect of the ten (10) percent reserved for management impacts the potential value of such New Membership Interests. This consideration to management serves to align the interests of management with the interests of the new owners of the reorganized enterprise in maximizing value, and therefore is reasonable, but the purpose of disclosing this information was so that creditors could make an informed judgment about the Plan.

Furthermore, section 503 of the Bankruptcy Code is not applicable because the Management Incentive Plan is a post-effective date plan and the Short Term Incentive Plan, which was approved prepetition, is not paid until after emergence. Moreover, the Management Incentive Plan term sheet was not finalized until the end of January, and many of the terms and specific award amounts remain to be determined by the New Board. Thus, it is hard to conceive how the Management Incentive Plan could be construed to have incentivized management to stay with the Debtors during these Chapter 11 Cases. The purpose of the Management Incentive Plan is to incentivize management, and align their interests with those of the new owners, on a post-emergence basis.

The cases cited by the U.S. Trustee are thus easily distinguishable from the facts and circumstances of the Debtors' Management Incentive Plan. First, the incentive plan in *In re Dana Corp.* was proposed in the midst of the debtors' chapter 11 cases, was not pursuant to a chapter 11 plan of reorganization, and only required the covered executives to stay with the company until the effective date of the plan—thus justifying the court's characterization of the plan as retentive rather than incentive. 351 B.R. 96, 102 (Bankr S.D.N.Y. 2006). Second, the provision at issue in *In re AMR Corp.* was the proposed severance payment—not the proposed

employee incentive programs—contained in the merger agreement that the debtors sought authority to enter into; a distinction that, contrary to the U.S. Trustee's assertion, does have a difference as the court approved the incentive programs while disallowing the severance payment. 490 B.R. 158, 161–62, 170 (Bankr. S.D.N.Y. 2013).

Notably, the U.S. Trustee already raised this issue in the *United States Trustee's Objection to Debtors' Motion for an Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019 Authorizing the Debtors to Enter into and Approving Plan Support Agreement, Backstop Agreement and Milestone Term Sheet (Docket Entry No. 953)* [Docket No. 1163] (the "**UST PSA Objection**") and the Court specifically ruled that "[t]he management incentive plan contemplated under the PSA does not require Court approval under Section 503 of the Bankruptcy Code. It is not an incentive plan that is being established and paid during the Debtors' bankruptcy cases." Hearing Tr. Dec. 20, 2016 at 28:18-21. Moreover, courts in this and other jurisdictions have approved plans that included management incentive programs. *See In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 26, 2016); *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. Jan. 27, 2017) [Docket No. 1629]; *In re Goodrich Petroleum Corp.*, No. 16-31975 (MI) (Bankr. S.D. Tex. Sept. 28, 2016); *In re SandRidge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. Sept. 20, 2016).

Based on the foregoing, sections 503(c)(1) and (3) are inapplicable to the Debtors' requested relief, as they would only apply to obligations that are incurred during the Chapter 11 Cases and that would thus incur an administrative expense to the Debtors' Estate. *See* 11 U.S.C. §§ 503(c)(1) and (3).

Finally, while not necessarily relevant to the issue, the U.S. Trustee's Objection implicitly disparages the Debtors' management team—a team that was hired in the midst of the oil and gas downturn and just one year before the filing of these Chapter 11 Cases—as having made bad decisions and lack of foresight, causing the Debtors' financial distress. *See* UST Objection at ¶¶ 38–39. While the Debtors understand the U.S. Trustee's mission to guard against abuses of the bankruptcy system, this is an unfair mischaracterization of the Debtors' management team which has played an active and vital role in these Chapter 11 Cases as well as in the Debtors' efforts to turn around their businesses—cutting costs, stabilizing relationships with customers, and securing new business opportunities. *See* Del Genio Decl. at ¶¶ 9–12.

Based on the foregoing, the U.S. Trustee's Objection to the Management Incentive Plan and the Short Term Incentive Plan should be overruled.

### (2) THE RELEASE AND EXCULPATION PROVISIONS ARE PERMISSIBLE

In response to the U.S. Trustee's request, the Debtors hereby clarify and confirm that the releases are consistent with applicable Fifth Circuit law. Courts in this and other jurisdictions in the Fifth Circuit have approved release and exculpation provisions similar to those provided in Section X of the Plan. *See Idearc Inc.*, 423 B.R. at 157; *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 26, 2016) [Docket No. 737]; *In re Goodrich Petroleum Corp.*, No. 16-31975 (MI) (Bankr. S.D. Tex. Sept. 28, 2016) [Docket No. 531]; *In re SandRidge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. Sept. 20, 2016) [Docket No. 901].

Courts in this circuit permit and approve releases that are consensual. *See In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 776 (Bankr. N.D. Tex. 2007) ("Consensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate section 524(e).") (*citing Republic Supply*

*Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987))  Releases are consensual when parties in interest receive sufficient notice of the releases, are given an opportunity to opt out of the releases, and when the release provisions are conspicuous and emphasized with boldface type in the plan, disclosure statement, and ballots.  *See In re SandRidge Energy*, No. 16-32488 (Bankr. S.D. Tex. Sept. 20, 2016) at ¶40 ("[T]he Third Party Release is consensual as the parties in interest were provided notice of the chapter 11 proceedings, the Plan, and the deadline to object to confirmation of the Plan . . . [and] were given the opportunity to opt in or opt out of the Third Party Release, and the release provisions of the Plan were conspicuous, emphasized with boldface type in the Plan, the Disclosure Statement, and the ballots."); *In re Goodrich Petroleum Corp.*, No. 16-31974 (Bankr. S.D. Tex. Sept. 28, 2016) at ¶27 ("The ballots . . . unambiguously stated that the Plan contains the Third-Party Release and provided such holders of claims with the opportunity to opt-out of the Third Party Release.").

Courts in this circuit also examine whether the releases are integral to the implementation of a plan, the value provided to the debtors and their estates, and whether or not such provisions are appropriately tailored to the facts and circumstances of the case.  *See In re Energy & Expl. Partners*, No. 15-44931 (Bankr. N.D. Tex. Apr. 26, 2016) at 17; *In re SandRidge Energy*, No. 16-32488 (Bankr. S.D. Tex. Sept. 20, 2016) at ¶41 ("The Third Party Release is specific in language, integral to the Plan, a condition of the settlement, and given for substantial consideration."); *In re Goodrich Petroleum Corp.*, No. 16-31974 (Bankr. S.D. Tex. Sept. 28, 2016).

As discussed in Section III.C(6) above, the release and exculpation provisions provided for under the Plan are reasonable, integral to the global settlement, and, with respect to the releases, consensual.  The Debtors provided all impaired Classes receiving a recovery under

the Plan with the opportunity to vote to accept or reject the Plan. The third-party release provisions were conspicuously disclosed in boldface type in the Plan, the Disclosure Statement and on the Ballots. All holders of Claims and Interests, regardless of voting status, were informed to review the Plan closely and were conspicuously advised that Article X of the Plan contained certain release, exculpation, and injunction provisions that would affect their rights vis-à-vis the Released Parties. Against this backdrop, parties entitled to vote on the Plan were invited to cast ballots accepting the Plan, including its integrated release provisions, or to reject the Plan, and either provide—or opt-out of providing—releases to the Released Parties.

Based on the foregoing, the U.S. Trustee's Objection to the release and exculpation contained in the Plan should be overruled.

### (3) THE DEBTORS HAVE INCLUDED A GOVERNMENT CARVE-OUT IN THE CONFIRMATION ORDER

The Debtors have included the following language in the Confirmation Order:

> *For the avoidance of doubt, unless otherwise agreed or consented to by a Governmental Unit, no provision in the Plan or in the Confirmation Order: (a) releases any Released Party or Exculpated Parties other than the Debtors or Reorganized Debtors from any claim or cause of action held by a Governmental Unit; or (b) enjoins, limits, impairs or delays any Governmental Unit from commencing or continuing any claim, suit, action, proceeding, cause of action, or investigation against any Released Party or Exculpated Parties other than the Debtors or Reorganized Debtors; provided; however, that nothing in the Plan or in the Confirmation Order, including clauses (a) and (b) above, shall discharge, release, enjoin, or otherwise bar (i) any liability of the Debtors or the Reorganized Debtors to a Governmental Unit arising on or after the Confirmation Date with respect to events occurring on or after the Confirmation Date, (ii) any liability to a Governmental Unit that is not a Claim, (iii) any valid right of setoff or recoupment of a Governmental Unit and (iv) any police or regulatory action by a Governmental Unit.*

This language substantially conforms to the language requested by the U.S. Trustee and the U.S. Trustee has confirmed that it adequately resolves this portion of the UST Objection.

### B. THE ECN OBJECTION

ECN, the holder of a large General Unsecured Claim due to the Debtors' rejection of leases and related subleases with ECN's aircraft, has filed the ECN Objection asserting that the Plan (1) does not maximize Estate value for the benefit of creditors and (2) violates the good faith requirement of section 1129(a)(3). The premise of ECN's misguided assertions is the contention that the Plan is defective in the absence of a litigation trust. These assertions are false and blatantly misconstrue the requirements of the Bankruptcy Code in order to advance their position in a parallel proceeding. Accordingly, the Court should overrule the ECN Objection in its entirety.

### (1) THE PLAN IS VALUE-MAXIMIZING

ECN's assertion that "the Debtors have failed to maximize the value of estate property for the benefit of creditors" is not true. ECN Objection at ¶16. As part of the global settlement, the Debtors negotiated the consensual waiver of the Senior Secured Notes Deficiency Claim (which could have been hundreds of millions of dollars), in addition to extracting other debt-reducing concessions from creditors. The secured and unsecured creditors also reached an agreement over the allocation and valuation of encumbered and unencumbered assets, to arrive at proposed Plan Distributions that the Consenting Creditor Parties, including the Creditors' Committee, determined are fair, reasonable, and in the best interests of creditors. Without these agreements, particularly the waiver of the Senior Secured Notes Deficiency Claim, the recovery available to holders of General Unsecured Claims would be substantially smaller than what is provided for under the Plan.

Nevertheless, ECN asserts, without supporting evidence, that there is more value available for holders of General Unsecured Claims than is provided for under the Plan, that value belongs to the holders of General Unsecured Claims, and that a litigation trust is required in order to maximize the value of the Debtors estates. ECN fails to recognize that the Plan is a global, integrated settlement agreement, the terms of which cannot be cherry-picked. One component of this agreement was to permit the Reorganized Debtors to maintain certain Causes of Action (many of which may be worth more in the hands of the Reorganized Debtors who have flexibility to negotiate commercial resolutions), for the benefit of the Reorganized Debtors and their stakeholders, including ECN and other creditors who will hold New Membership Interests in the Reorganized Debtors.

ECN has not proposed a comprehensive plan of its own, and takes for granted that the Consenting Creditor Parties would be willing to renegotiate the terms and structure of the global settlement. Like the unsuccessful creditors in *In re NII Holdings, Inc.*, ECN has "provided no evidence to support the theory that a new settlement [agreement] could be negotiated, agreed upon, and confirmed [in a timely manner]." 536 B.R. 61, 125 (Bankr. S.D.N.Y. 2015). Moreover, "in evaluating [a settlement agreement], the Court need not consider a hypothetical settlement that is not before it" nor must "a judge . . . be convinced that the settlement is the best possible compromise." *Id*. Rather, the Court need only find that "the settlement is fair and equitable and in the best interest of the estate," *In re Age Refining, Inc.*, 801 F.3d at 540, and as set forth in Section II.E above, the Debtors have met this burden. Moreover, the Debtors are under no obligation to prove that the Plan is the best plan possible, which essentially would require the Debtors to prove a negative. The Debtors need only demonstrate that the Plan satisfies the applicable provisions of section 1129 of the Bankruptcy Code by a

preponderance of the evidence, which they have. *See In re Briscoe Enters., Ltd., II*, 994 F.2d at 1165.

Furthermore, even if it were possible to amend this term of the settlement and Plan, adding a litigation trust now would be a material change to the Plan, and would likely require the Debtors to resolicit the Plan. The delay and costs attendant thereto would outweigh any theoretical benefit of this venture.

### (2) THE PLAN HAS BEEN PROPOSED IN GOOD FAITH

ECN's contention that the Debtors' proposal of the Plan violated the fundamental tenant of good faith is inaccurate and proffered in a thinly veiled attempt to establish jurisdiction for its adversary proceeding with Airbus.

First, the Bankruptcy Code does not require a Plan to include a litigation trust—or any particularized mean of implementation. Second, "[a] plan need not be one that the creditors would themselves design to satisfy the requirement of good faith." *In re Barnes*, 309 B.R. 888, 893 (Bankr. N.D. Tex. 2004). Rather, "to be proposed in good faith, a plan must 'fairly achieve a result consistent with the Bankruptcy Code.'" *Id*. (quoting *Ronit, Inc. v. Stemson Corp*. (*In re Block Shim Dev. Co.—Irving*), 939 F.2d 289, 292 (5th Cir.1991). As the Debtors' established in Section V above, the Plan has been proposed in good faith and solely for the legitimate and honest purposes of reorganizing the Debtors' ongoing businesses and enhancing their long-term financial viability while providing recoveries to creditors consistent with the Bankruptcy Code. *See In re Sun Country Dev.*, 764 F.2d at 408 ("Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied.").

Further, to the extent that ECN truly had an issue with the disclosures and assumptions presented in the Disclosure Statement, it had ample opportunity to file an objection

to the Disclosure Statement Approval Motion. It did not do so. Indeed, ECN has been no stranger to these proceedings and has been actively pursuing an adversary proceeding against Airbus in this Court. In fact, in the *Plaintiff's Opposition to Defendant's Motion to Dismiss* filed by ECN in its adversary proceeding on January 27, 2017, ECN touted that the Debtors' retention of the Airbus Cause of Action "could enhance [the Debtors'] going-concern value for the benefit of their equity holders—*i.e.*, the Debtors' constituents that will receive a substantial portion of the reorganized Debtors' equity under the Plan" and that "[a]s such, the Debtors' stakeholders could reap the rewards of ECN Capital's litigation in the form of an increase in the value of their post-emergence equity . . ." *ECN Capital (Aviation) Corp. v. Airbus Helicopters (SAS)* (*In re CHC Grp. Ltd.*), Adv. No. 16-03151-bjh (Bankr. N.D. Tex. Jan. 27, 2017) [Docket No. 63] at 10. These statements are a far cry from the accusations of bad faith proffered in the ECN Objection, as well as the assertion that "ECN Capital and [the] other general unsecured creditors [are] the rightful beneficiaries of such Causes of Action." ECN Objection at ¶ 18; *see also Plaintiff's Opposition to Defendant's Motion for Withdrawal of the Reference of Adversary Proceeding*, *ECN Capital (Aviation) Corp. v. Airbus Helicopters (SAS) (In re CHC Grp. Ltd.)*, Case No. 3:17-cv-00075-C (N.D. Tex. Feb. 2, 2017) [Docket No. 18] at 9 (acknowledging that the Airbus Causes of Actions could provide a "major windfall" to the Debtors' stakeholder "*if the Reorganized Debtors (or a litigation trust)*" brought certain Claims against Airbus) (emphasis added).

Based on the foregoing, the ECN Objection should be overruled in its entirety.

### (3) INFORMATION REGARDING DEBTORS' AIRBUS MODEL EC225 AND AS332 L2 HELICOPTERS

Pursuant to the Court's request, the Debtors ascertained the following facts regarding their aircraft fleet. Prior to the Petition Date, the Debtors suspended their flying

operations of EC225 and AS332 helicopters. Fowkes Decl. at ¶ 11. As of the Petition Date, the Debtors had forty (40) Airbus Model EC225 helicopters ("**EC225**") and sixteen (16) Airbus Model AS332 L2 helicopters ("**AS332**"), of which six (6) EC225s and three (3) AS332s were owned by the Debtors; the remaining helicopters were leased from various third party lessors. *Id*. at ¶ 10. Upon emergence from these Chapter 11 Cases, the Debtors' aircraft fleet will contain two (2) owned EC225 helicopters and three (3) owned AS332 helicopters. *Id*. at ¶ 13.

### C. THE KLS OBJECTION

KLS, a holder of Senior Secured Notes, has filed the KLS Objection asserting that the Plan (1) violates the equal treatment provisions set forth in section 1123(a)(4) of the Bankruptcy Code, and (2) contains impermissible release and exculpation provisions. This Objection misconstrues the applicable provisions of the Bankruptcy Code and is little more than a blatant attempt to "get a second bite at the apple" without presenting any new evidence on an issue that the Court already considered in the context of the Support Agreements Approval Motion. KLS failed to timely object and participate in the Support Agreements Approval Motion litigation, when it had ample opportunity to do so. This latecomer approach should not be accepted by this Court.

### (1) THE PLAN DOES NOT VIOLATE SECTION 1123(a)(4) OF THE BANKRUPTCY CODE

The KLS Objection is premised on the mistaken contention that the Put Option Premium is consideration to be paid on account of the Plan Sponsors' Senior Secured Notes Claims and, therefore, violates section 1123(a)(4) of the Bankruptcy Code. This issue was raised and litigated in the context of the Support Agreements Approval Motion, and KLS has presented no basis on which to reargue it now. *See Objection to Motion for an Order Authorizing the Debtors to Enter into and Approving Plan Support Agreement, Backstop Agreement and*

*Milestone Term Sheet* [Docket No. 1164] (the "**AGCO PSA Objection**") at ¶38 ("The Debtor's [sic] discriminatory refusal to offer all Secured Noteholders the ability to backstop the Rights Offering and receive a share of the above-market fees they propose to pay to the Plan Sponsors will cause the CHC Plan to violate section 1123(a)(4) of the Bankruptcy Code . . ."). As the Court may recall, KLS waited until fifty (50) days after the original objection deadline, thirty-five (35) days after the extended objection deadline, and the day before the third day of hearings was set to begin, to file its objection to the Support Agreements Approval Motion, and the Court appropriately denied its flawed attempt to participate. *See Objection and Joinder to Objection to Motion for an Order Authorizing the Debtors to Enter into and Approving Plan Support Agreement, Backstop Agreement, and Milestone Term Sheet* [Docket No. 1351] (the "**KLS PSA Objection**"); Hearing Tr. Dec. 16, 2016 at 8:12–16. Now, KLS is trying to re-litigate those identical issues.

As the Debtors previously stated in the *Debtors' Omnibus Reply to Objections to Debtors' Motion for an Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019 Authorizing the Debtors to Enter Into and Approving Plan Support Agreement, Backstop Agreement and Milestone Term Sheet* [Docket No. 1184] (the "**PSA Reply**") and on the record at the hearing on the Support Agreements Approval Motion, the Put Option Premium is a commitment fee paid to the Backstop Parties as consideration for their willingness to backstop the Rights Offering and to bear the attendant risks; it is not a payment on account of the Backstop Parties' prepetition Claims. *See* PSA Reply at 28, 30; Hearing Tr. Nov. 17, 2016 at 41:5–8, 133:25–134:19, 349:5–9; Hearing Tr. Nov. 22, 2016 at 35:22–36:16, 37:19–22; Hearing Tr. Dec. 16, 2016 at 34:3–35:11. After numerous depositions, extensive document productions, and three (3) full days of testimony, no party challenging the Put Option

Premium produced any evidence controverting this. *See* Hearing Tr. Dec. 16, 2016 at 291:23-25, 292:12-14, 294:8-10 ("[Y]ou've given me no evidence that any portion of the fees that are in dispute here are on account of a pre-petition claim. . . . [Y]ou gave me nothing in this evidentiary record that suggests that any portion of the fee is payable on account of a pre-petition debt. . . . [T]he only evidence in this record is that there was never any discussion of payment of any of these fees on account of pre-petition debt." Indeed, while preserving parties' ability to raise section 1123(a)(4) objections at confirmation, the Court stated in its ruling on the Support Agreements' Approval Motion that "[o]n this record, the credible evidence establishes that the fees are being paid to the Plan Sponsors for their commitment to backstop the Rights Offering under the CHC Plan and not for an impermissible purpose." Hearing Tr. Dec. 20, 2016 at 30:8–12. KLS has not alleged any new facts or theories to support its position.

The requirement in section 1123(a)(4) to provide the same treatment for each claim in a class "does not require identical treatment for all class members in all respects under a plan, and that the requirements of section 1123(a)(4) apply only to a plan's treatment *on account of particular claims* or interests in a specific class—not the treatment that members of the class may separately receive under a plan on account of the class members' other rights or contributions." *In re Adelphia Commc'ns Corp.*, 368 B.R. at 249–50. In other words, section 1123(a)(4) only prohibits disparate treatment of similarly situated creditors in the same class on account of their *prepetition claims*, but does not categorically prohibit disparate treatment of creditors on account of their postpetition contributions. The Put Option Premium is paid on account of the Backstop Parties' postpetition commitment to backstop the Rights Offering—no party has put forth evidence to the contrary. As established in Section III.B(4) above, all holders of Class 5 Senior Secured Notes Claims receive the same treatment on account of their Claims

and, thus, the Plan satisfies the requirements set forth in section 1123(a)(4) of the Bankruptcy Code.

Finally, whether the Plan Sponsors owe fiduciary duties to similarly situated creditors, as well as the issue of whether they violated those purported duties, is not an issue as to the confirmability of the Plan and should be overruled.

### (2) THE RELEASE AND EXCULPATION PROVISIONS ARE PERMISSIBLE

As discussed in response to the UST Objection and in Section III.C(6) above, the release and exculpation provisions provided for under the Plan are reasonable, integral to the global settlement and, with respect to the releases, consensual. Despite having full disclosure and the option to opt out of the releases, KLS chose not to vote on the Plan and thus, did not avail itself of the opportunity to opt-out of the third party release; this is disingenuous.

Further, the exculpation provided in Section 10.8 of the Plan is appropriate under applicable law because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations between the Debtors and the Consenting Creditor Parties, is an integral component of the global settlement (benefit of which to the Estate has already been established), and is appropriately limited in scope—covering only certain enumerated activities performed in furtherance of the Debtors' restructuring and excepting criminal acts, intentional fraud, willful misconduct, and gross negligence. *See Idearc Inc.*, 423 B.R. at 157; *In re Energy & Exploration Partners, Inc.,* No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 26, 2016); *In re Goodrich Petroleum Corp.*, No. 15-31975 (MI) (Bankr. S.D. Tex. Sept. 28, 2016); *In re SandRidge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. Sept. 20, 2016).

Moreover, KLS' attack on the integrated and bargained-for exculpation provisions contained in the Plan is self-serving and duplicitous. KLS did not vote to reject the Plan and exercised its Subscription Rights to purchase New Second Lien Convertible Notes, suggesting

that KLS agrees with the Plan and wants it confirmed, but would like the Court to re-trade the deal on its behalf and provide it with a share of the Put Option Premium. The Court refused to do this for the parties objecting to the Support Agreements Approval Motion, and it should take the same position with KLS.

Based on the foregoing, the KLS Objection should be overruled in its entirety.

## XXIV. CONCLUSION

The Plan complies with and satisfies all the requirements of section 1129 of the Bankruptcy Code. The Plan and the settlements incorporated therein also comply with Bankruptcy Rule 9019 and Bankruptcy Code section 105(a). The Objections should, therefore, be overruled, each of the compromises and settlements embodied in the Plan should be approved, and the Plan should be confirmed.

Dated: Dallas, Texas
February 8, 2017

*/s/ Stephen A. Youngman*
WEIL, GOTSHAL & MANGES LLP

Stephen A. Youngman (22226600)
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone:    (214) 746-7700
Facsimile:    (214) 746-7777
Email:        stephen.youngman@weil.com

-and-

Gary T. Holtzer (*pro hac vice*)
Kelly DiBlasi (*pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007
Email:        gary.holtzer@weil.com
Email:        kelly.diblasi@weil.com

*Attorneys for Debtors and Debtors in Possession*

## EXHIBIT A

### List of Debtors

| Debtor | Last Four Digits of Federal Tax I.D. No. | Debtor | Last Four Digits of Federal Tax I.D. No. |
|---|---|---|---|
| CHC Group Ltd. | 7405 | CHC Hoofddorp B.V. | 2413 |
| 6922767 Holding SARL | 8004 | CHC Leasing (Ireland) Limited (n/k/a CHC Leasing (Ireland) Designated Activity Company) | 8230 |
| Capital Aviation Services B.V. | 2415 | CHC Netherlands B.V. | 2409 |
| CHC Cayman ABL Borrower Ltd. | 5051 | CHC Norway Acquisition Co AS | 6777 |
| CHC Cayman ABL Holdings Ltd. | 4835 | Heli-One (Netherlands) B.V. | 2414 |
| CHC Cayman Investments I Ltd. | 8558 | Heli-One (Norway) AS | 2437 |
| CHC Den Helder B.V. | 2455 | Heli-One (U.S.) Inc. | 9617 |
| CHC Global Operations (2008) ULC | 7214 | Heli-One (UK) Limited | 2451 |
| CHC Global Operations Canada (2008) ULC | 6979 | Heli-One Canada ULC | 8735 |
| CHC Global Operations International ULC | 8751 | Heli-One Holdings (UK) Limited | 6780 |
| CHC Helicopter (1) S.à r.l. | 8914 | Heli-One Leasing (Norway) AS | 2441 |
| CHC Helicopter (2) S.à r.l. | 9088 | Heli-One Leasing ULC | N/A |
| CHC Helicopter (3) S.à r.l. | 9297 | Heli-One USA Inc. | 3691 |
| CHC Helicopter (4) S.à r.l. | 9655 | Heliworld Leasing Limited | 2464 |
| CHC Helicopter (5) S.à r.l. | 9897 | Integra Leasing AS | 2439 |
| CHC Helicopter Australia Pty Ltd | 2402 | Lloyd Bass Strait Helicopters Pty. Ltd. | 2398 |
| CHC Helicopter Holding S.à r.l. | 0907 | Lloyd Helicopter Services Limited | 6781 |
| CHC Helicopter S.A. | 6821 | Lloyd Helicopter Services Pty. Ltd. | 2394 |
| CHC Helicopters (Barbados) Limited | 7985 | Lloyd Helicopters International Pty. Ltd. | 2400 |
| CHC Helicopters (Barbados) SRL | N/A | Lloyd Helicopters Pty. Ltd. | 2393 |
| CHC Holding (UK) Limited | 2198 | Management Aviation Limited | 2135 |
| CHC Holding NL B.V. | 6801 | | |

A-1